# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No.: 07-cv-00170-RPM-CBS

RUSSELL A. PULS, JR.,

       Plaintiff,

v.

LANDMARK COMMUNITY NEWSPAPERS, INC., a Virginia corporation, and
LANDMARK COMMUNITY NEWSPAPERS OF COLORADO, INC., a Colorado corporation,

       Defendants.

## AFFIDAVIT OF GUY R. FRIDDELL, III

COMMONWEALTH OF VIRGINIA,

CITY OF NORFOLK, to-wit:

       This day personally appeared before me, a Notary Public in the aforesaid jurisdiction, Guy R. Friddell, III, who after first being duly sworn, stated and deposed as follows:

       1.     My name is Guy R. Friddell, III and I am the Executive Vice President of Landmark Communications, Inc. ("LCI"). LCI is a privately-held media company with interests in newspapers, classified publications, television broadcasting, cable programming, and on-line publishing. Its headquarters are located at 150 Brambleton Avenue, Norfolk, Virginia, 23510-2075.

       2.     LCI owns 100% of the stock of Landmark Community Newspapers, Inc. ("LCNI"), a Virginia corporation. See LCNI Stock Certificate, attached as Exhibit A. LCNI was a wholly-owned subsidiary of LCI in January of 2006.

# Exhibit A-3

3.      LCI also held a 50% interest in former Trader  Publishing Company ("Trader") throughout Trader's existence.  Trader was founded in 1991 as a Virginia partnership between TPI, Inc. and LTM Company, L.P. with each party holding 50% of the interest in Trader  See Trader Partnership Agreement, attached as Exhibit B.

4.      LTM Company, L.P. was a Virginia limited partnership between LTM Investments, Inc., a Nevada Corporation and limited partner, and LTM Holdings, Inc, a Virginia Corporation and General Partner.  See LTM Company, L.P. Partnership Agreement, attached as Exhibit C.

5.      LTM Investments, Inc. was a wholly-owned subsidiary of Landmark Target Media Properties, Inc., a Virginia corporation.  See LTM Investments, Inc. Stock Certificate, attached as Exhibit D.

6.      LTM Holdings, Inc. was a wholly-owned subsidiary of Landmark Target Media, Inc., a Virginia corporation.  See LTM Holdings, Inc. Stock Certificate, attached as Exhibit E.

7.      Landmark Target Media Properties, Inc. was also a wholly-owned subsidiary of Landmark Target Media, Inc.  See Landmark Target Media Properties, Inc. Stock Certificate, attached as Exhibit F.

8.      Landmark Target Media, Inc. was a wholly-owned subsidiary of LCI.  See Landmark Target Media, Inc. Stock Certificate, attached as Exhibit G.

9.      A chart showing  the ownership chain for Trader in January 2006 is attached as Exhibit H.

10.     A chart showing the relationship between LCNI and Trader in January of 2006 is attached as Exhibit I.

2

11.     Trader's assets were split in September of 2006 between Landmark and Cox Communications.  At that time, Landmark acquired many Trader publications, including the Colorado Parent.

Guy R. Friddell, III

_____

City of Norfolk
Commonwealth of Virginia

Subscribed and sworn before me this _18th_ day of May of 2007.

Susan S. Goetz
_____
Notary Public

My Commission Expires: _10-31-07_

3



Exhibit A to
Friddell Affidavit

SDR:np/#23418IN7.NEW
March 31, 1991

# JOINT VENTURE AGREEMENT
## OF
## TRADER PUBLISHING COMPANY

**Exhibit B to
Friddell Affidavit**

## TABLE OF CONTENTS

                                                                    **Page**

1.  FORMATION AND TERM . . . . . . . . . . . . . . . . . . .    1
    A.   Formation . . . . . . . . . . . . . . . . . . . . .    1
    B.   Term . . . . . . . . . . . . . . . . . . . . . . . .   1

2.  DEFINITIONS . . . . . . . . . . . . . . . . . . . . . .    1

3.  NAME AND PLACE OF BUSINESS . . . . . . . . . . . . . . .   13
    A.   Name . . . . . . . . . . . . . . . . . . . . . . . .  13
    B.   Place of Business . . . . . . . . . . . . . . . . .   13

4.  BUSINESS OF VENTURE . . . . . . . . . . . . . . . . . .   13

5.  VENTURERS, INTERESTS AND CAPITAL CONTRIBUTIONS . . . . .   13
    A.   Venturers and Interests . . . . . . . . . . . . . .   13
    B.   Initial Capital Contributions . . . . . . . . . . .   14
    C.   Additional Capital . . . . . . . . . . . . . . . . .  17
    D.   Default Remedies . . . . . . . . . . . . . . . . . .  18
    E.   Guaranty of Venture Indebtedness . . . . . . . . .   20
    F.   Right of Contribution . . . . . . . . . . . . . . .   20
    G.   Additional General Provisions on Capital and
         Obligations of Venturers . . . . . . . . . . . . .   21

6.  ALLOCATIONS . . . . . . . . . . . . . . . . . . . . . .   23
    A.   Net Income, Net Loss and Credits . . . . . . . . .   23
    B.   Partner Nonrecourse Deductions . . . . . . . . . .   23
    C.   Gain from Sale . . . . . . . . . . . . . . . . . . .  23
    D.   Loss from Sale . . . . . . . . . . . . . . . . . . .  23
    E.   Partner Nonrecourse Deduction Chargeback. . . . . .  23
    F.   Allocations to Reflect Book Value/Tax Disparity . .  23
    G.   Mid-Year Transfers. . . . . . . . . . . . . . . . .   24

7.  DISTRIBUTIONS . . . . . . . . . . . . . . . . . . . . .   24
    A.   Net Cash from Operations . . . . . . . . . . . . .   24
    B.   Net Proceeds from Financing . . . . . . . . . . . .   25
    C.   Net Proceeds from Sale . . . . . . . . . . . . . .   25
    D.   Mid-Year Transfers . . . . . . . . . . . . . . . . .  25
    E.   Outstanding Loan to Venture . . . . . . . . . . . .   25

8.  MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . .  25
    A.   Board of Directors . . . . . . . . . . . . . . . . .  25
    B.   Appointment and Removal of Directors . . . . . . .   26
    C.   Exercise of Authority Granted to the Board . . . .   26
    D.   Chairman of the Board . . . . . . . . . . . . . . .   29
    E.   Meetings of the Board . . . . . . . . . . . . . . .   29
    F.   Committees of the Board . . . . . . . . . . . . . .   30
    G.   Officers of the Venture . . . . . . . . . . . . . .   30
    H.   Annual Business Plan . . . . . . . . . . . . . . . .  31

i

      I.    Limitation on Other Venturers' Powers . . . . . . . 32
      J.    Execution of Documents . . . . . . . . . . . . . 32

9.   COMPENSATION AND REIMBURSEMENT OF VENTURERS . . . . . 33
      A.   Compensation of Venturers . . . . . . . . . . . 33
      B.   Reimbursement Restrictions . . . . . . . . . . . 33

10.  AUTHORITY OF THE VENTURERS AND AFFILIATES TO DEAL WITH
    THE VENTURE . . . . . . . . . . . . . . . . . . . . 33

11.  OTHER ACTIVITIES OF VENTURERS . . . . . . . . . . . . 34
      A.   Prohibited Activities . . . . . . . . . . . . . 34
      B.   Right of First Opportunity . . . . . . . . . . . 34
      C.   Excluded Businesses . . . . . . . . . . . . . . 36
      D.   Breach of Restrictions . . . . . . . . . . . . 36
      E.   Enforceability of Restrictions . . . . . . . . . 37
      F.   Other Activities . . . . . . . . . . . . . . . 37

12.  ACCOUNTS, BOOKS, RECORDS, ACCOUNTING REPORTS AND TAX
    MATTERS . . . . . . . . . . . . . . . . . . . . . . 38
      A.   Bank Accounts . . . . . . . . . . . . . . . . . 38
      B.   Maintenance of Books . . . . . . . . . . . . . 38
      C.   Method of Accounting . . . . . . . . . . . . . 38
      D.   Financial Reports . . . . . . . . . . . . . . . 38
      E.   Tax Returns and Information . . . . . . . . . . 39
      F.   Tax Matters Partner . . . . . . . . . . . . . . 39
      G.   Independent Accountants . . . . . . . . . . . . 40

13.  EXCULPATION AND INDEMNIFICATION OF VENTURERS . . . . . 40
      A.   Exculpation . . . . . . . . . . . . . . . . . . 40
      B.   Indemnification . . . . . . . . . . . . . . . . 40

14.  ASSIGNABILITY OF VENTURE INTERESTS AND WITHDRAWAL . . . 41
      A.   Pledge or Encumbrance of Interest . . . . . . . 41
      B.   Disposition of Interest and Withdrawal . . . . . 41
      C.   Procedure for Joint Sale of Business . . . . . . 42
      D.   Withdrawal Without Consent . . . . . . . . . . 44
      E.   Withdrawal With Consent . . . . . . . . . . . . 45
      F.   Remedy for Breach . . . . . . . . . . . . . . . 45
      G.   Substitution of Assignee as a Venturer . . . . . 46

15.  CONTINUATION OF THE VENTURE BUSINESS IN CERTAIN EVENTS . 47
      A.   Dissolution of a Venturer . . . . . . . . . . . 47
      B.   Bankruptcy . . . . . . . . . . . . . . . . . . 47

16.  TERMINATION . . . . . . . . . . . . . . . . . . . . 49
      A.   Events Causing Dissolution . . . . . . . . . . 49
      B.   Winding Up Venture Affairs . . . . . . . . . . 50

17.  ADMISSION OF ADDITIONAL VENTURERS . . . . . . . . . . 50

18.  AMENDMENTS . . . . . . . . . . . . . . . . . . . . . 51

ii

19.  NOTICES  . . . . . . . . . . . . . . . . . . . . . 51
     A.   Form of Notice  . . . . . . . . . . . . . . 51
     B.   Effective Date of Notice  . . . . . . . . . . 51

20.  POWER OF ATTORNEY  . . . . . . . . . . . . . . . . 51
     A.   Appointment of Venturers as Attorney-in-Fact  . . . 51
     B.   Irrevocable Appointment . . . . . . . . . . . 52

21.  GOVERNING LAW  . . . . . . . . . . . . . . . . . . 52

22.  CAPTIONS . . . . . . . . . . . . . . . . . . . . . 52

23.  CONSTRUCTION . . . . . . . . . . . . . . . . . . . 53

24.  SEVERABILITY . . . . . . . . . . . . . . . . . . . 53

25.  EXECUTION AND COUNTERPARTS . . . . . . . . . . . . 53
     A.   General Execution Matters . . . . . . . . . . 53
     B.   Additional Parties  . . . . . . . . . . . . . 53

26.  SUCCESSORS . . . . . . . . . . . . . . . . . . . . 55

27.  ENTIRE AGREEMENT . . . . . . . . . . . . . . . . . 55

Exhibit A - Names and Interests of Venturers

Exhibit B - NONE

Exhibit C - Preliminary Exhibit

Exhibit D - Form of Business Opportunity Notice

Exhibit E - Addresses for Notice Purposes

JOINT VENTURE AGREEMENT
OF
TRADER PUBLISHING COMPANY

THIS JOINT VENTURE AGREEMENT is made as of this 31st day of March, 1991, by and among the parties identified on Exhibit A attached, who hereby associate to form a joint venture upon the following terms and conditions:

1.  FORMATION AND TERM.

 A.  Formation.

  (1)  The parties hereby associate to form a joint venture pursuant to the Uniform Partnership Act of Virginia.

  (2)  The Venturers shall execute and file any certificate and comply with any similar requirements of any jurisdiction in which the Venture will be deemed to be doing business pursuant to applicable state law.

  (3)  The Venturers shall qualify to do business in each jurisdiction in which the Venturers will be deemed to be doing business pursuant to applicable state law.

 B.  Term.

  The term of the Venture shall begin on the date of the execution of this Agreement by the Venturers and shall continue until December 31, 2041, unless earlier terminated in accordance with this Agreement.

2.  DEFINITIONS.

  The following terms used in this Agreement shall (unless otherwise expressly provided herein or unless the context otherwise requires) have the following respective meanings:

 Act.

  The Uniform Partnership Act of Virginia, as it may be amended or superseded from time to time.

 ADI.

  An Area of Dominant Influence, as defined by the Federal Communications Commission, or successor agency.

 Affiliate or Affiliated Person.

  When used with reference to a specified Person:

(1) any Person directly or indirectly Controlling, Controlled by, or under common Control with, the specified Person;

(2) any Person owning or Controlling ten percent (10%) or more of the outstanding voting securities of the specified Person;

(3) any Person that is an officer, director or partner of the specified Person or of which the specified Person is an officer, director or partner; or

(4) any spouse, child, parent, brother or sister of the specified Person.

_Agreement_.

This Joint Venture Agreement, as originally executed and as amended from time to time, as the context requires.

_Auditor_.

KPMG Peat Marwick, or another nationally recognized accounting firm agreed upon by the Venturers.

_Bankruptcy_.

(1)  The filing of an application by a Venturer for, or its consent to, the appointment of a trustee, receiver or custodian of its assets;

(2)  The entry of an order for relief with respect to a Venturer in proceedings under the United States Bankruptcy Code, as amended or superseded from time to time;

(3)  The making by a Venturer of a general assignment for the benefit of creditors;

(4)  The entry of an order, judgment or decree by any court of competent jurisdiction appointing a trustee, receiver or custodian of the assets of a Venturer;

(5)  The failure by a Venturer generally to pay its debts as the debts become due within the meaning of Section 303(h)(1) of the United States Bankruptcy Code or the admission in writing of its inability to pay its debts as they become due; or

(6)  Suffering or permitting a Venturer's Interest to become subject to the enforcement of any rights of a creditor of a Venturer, whether arising out of an attempted charge upon such Venturer's Interest by judicial process or otherwise, if such

2

Venturer shall fail to obtain the dismissal of such enforcement proceedings, whether by legal process, bonding, or otherwise, within ninety (90) days after actual notice of such creditor's action.

**Bankrupt Venturer.**

A Venturer that is the subject of Bankruptcy.

**Board.**

The Board of Directors described in Section 8A.

**Board Appointed Officers.**

The CEO and any officers that report directly to the CEO.

**Business Opportunity Notice.**

The notice described in Section 11B(1) in the form attached as **Exhibit D**.

**Business Plan.**

The operating and capital budgets and the marketing and strategic plans described in Section 8H(1).

**Capital Account.**

As of any date, with respect to either Venturer, the capital account maintained for such Venturer as determined under Section 5G.

**Capital Contribution.**

The total amount of money and the agreed upon fair market value of any property contributed to the Venture by a Venturer or its predecessor in interest on the date of contribution.

**CEO.**

The President and Chief Executive Officer.

**Change of Control.**

As to any Person, a change, shift or transfer of Control with respect to such Person or with respect to any entity Controlling such Person. No Change of Control shall be deemed to have occurred with respect to TPI (or any permitted transferee thereof) or Cox, as long as the Estate of James M. Cox, Jr.,

3

Barbara Cox Anthony, Garner Anthony, Anne Cox Chambers, or their executors, administrators and descendants by blood or adoption (or the spouses of such descendants) or trusts for the benefit of such persons shall collectively Control such Person; and no Change of Control shall be deemed to have occurred with respect to LTM Company (or any permitted transferee thereof) or Landmark, as long as Frank Batten or his descendants by blood or adoption (or the spouses of such descendants), or trusts for the benefit of such persons, shall collectively Control such Person.

<u>Closing Date</u>.

The meaning ascribed to that term in the Contribution Agreement.

<u>CMSA</u>.

A Consolidated Metropolitan Statistical Area, as defined by the United States Bureau of the Census.

<u>Code</u>.

The Internal Revenue Code of 1986, as amended from time to time.

<u>Combined Ownership Interest</u>.

The Interest, Venture Subsidiary Ownership Interest and Stock Ownership Interest.

<u>Contribution Agreement</u>.

The Contribution Agreement to be entered into among TPI, Cox Texas, TPI Holdings and Cox; LTM Holdings, LTM Company, Properties and Landmark; TPC Holding; and the Venture, pursuant to which the Venturers will agree to contribute certain assets to the capital of the Venture and the Venture will agree to assume certain liabilities of the Venturers.

<u>Control</u>.

The possession by any person or related group of persons, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or partnership interests, by contract or otherwise.

<u>Controlled</u>.

To be under the Control of the specified Person.

4

<u>Controls or Controlling</u>.

The possession of Control.

<u>Conversion Notice</u>.

The notice described in Section 5D(2)(b)(ii) of a Lending Venturer's intent to convert to a Capital Contribution a loan made by such Lending Venturer to a Defaulting Venturer.

<u>Cox</u>.

Cox Enterprises, Inc., a Delaware corporation.

<u>Cox Texas</u>.

Cox Texas Publications, Inc., a Delaware corporation.

<u>Debt Service</u>.

The total of all payments, including principal and interest, due with respect to any loans to the Venture or to which the property or assets of the Venture are subject.

<u>Deciding Investment Banker</u>.

The nationally recognized investment banker appointed by the investment bankers selected by (1) the Venturer having the option to purchase the Combined Ownership Interest of the Bankrupt Venturer and its Related Persons and (2) the Successor in Interest to such Bankrupt Venturer, as described in Section 15B(2).

<u>Default Notice</u>.

The notice described in Section 5D(2)(b)(i) of a Venturer's intent to make a Capital Contribution upon default by a Venturer.

<u>Defaulting Venturer</u>.

A Venturer that fails to pay all amounts then due from that Venturer under this Agreement.

### Depreciation or Amortization Deductions.

The depreciation deductions under Section 167(a) of the Code and the amortization deductions under Section 1253(d) of the Code.

### Director.

Any individual designated by a Venturer to serve on the Board.

### Disposition.

The sale, assignment, transfer or other disposition, in any manner, whether voluntarily or involuntarily, by operation of law or otherwise.

### Election Notice.

The notice described in Section 11B(2)(a) of the Offeree's desire for the Venture to pursue an opportunity in an MSA or CMSA in which the Venture does not at that time conduct the Venture Business.

### Employee Benefit Plan.

The meaning given to that term in Section 3(3) of the Employee Retirement Income Security Act.

### Final Exhibit.

The exhibit described as the Final Exhibit in Section 5B(4).

### Gain or Loss from Sale.

Any gain or loss for federal income tax purposes resulting from the sale or other disposition of any or all of the Venture's assets not in the ordinary course of business, except that for purposes of Capital Account adjustments, such gain or loss shall be computed by reference to the value on the books of the Venture as of the date of sale or other disposition rather than by reference to the adjusted tax basis of such property as of that date.

### Interest.

The ownership interest of a Venturer in the Venture at any particular time, including the right of the Venturer to any and all benefits to which the Venturer is entitled and the obligations to which the Venturer is subject under this Agreement. The initial Interests of the Venturers, expressed as

a percentage, are set forth on <u>Exhibit A</u> and shall be adjusted from time to time in accordance with Section 5D.

<u>Landmark</u>.

Landmark Communications, Inc., a Virginia corporation.

<u>Lending Venturer</u>.

A Non-Defaulting Venturer that lends money to a Defaulting Venturer under Section 5D(2)(a).

<u>Loan Notice</u>.

The notice described in Section 5C(3)(b) of a Venturer's intent to lend to the Venture under Section 5C(3)(a), which shall specify the amount of the proposed loan and the purposes therefor.

<u>LTM Company</u>.

LTM Company, a Virginia general partnership.

<u>LTM Directors</u>.

The Directors designated by LTM Company.

<u>LTM Holdings</u>.

LTM Holdings, Inc., a Virginia corporation.

<u>MSA</u>.

A Metropolitan Statistical Area, as defined by the United States Bureau of the Census.

<u>Net Cash from Operations</u>.

For any taxable year, the excess of Venture Revenues over the sum of (1) Operating Expenses of the Venture paid in cash during the year, (2) Debt Service, and (3) any reasonable reserves, as determined by the Board, for Operating Expenses in succeeding years, for the repair, replacement or preservation during the current or subsequent years of any Venture asset, for Debt Service, or for contingencies and unanticipated obligations.

<u>Net Income or Net Loss</u>.

The income or loss, as the case may be, of the Venture for a period as determined in accordance with Section 703(a) of the Code, including each item of income, gain, loss or deduction

7

required to be separately stated, but excluding Gain or Loss from Sale.

### Net Proceeds from Financing.

Net cash realized by the Venture from borrowing by the Venture or refinancing of indebtedness of the Venture, reduced by (1) all expenses related to the transaction, (2) the amount applied, as determined by the Board, toward the payment of any indebtedness of the Venture or other expenditures on behalf of the Venture, and (3) reasonable reserves, as determined by the Board, to satisfy other obligations of the Venture or anticipated capital expenditures.

### Net Proceeds from Sale.

Net cash realized by the Venture from the sale, exchange, condemnation, or other disposition of capital assets of the Venture or from policies of insurance for damage to, or destruction of, or defects of title to, capital assets of the Venture (to the extent, in the case of insurance proceeds, insurance proceeds exceed the actual or estimated costs of repairing or replacing such assets damaged or destroyed or curing defects of title), reduced by (1) all expenses related to the transaction, (2) the amount applied, as determined by the Board, toward the payment of any indebtedness of the Venture, and (3) reasonable reserves, as determined by the Board, to satisfy other obligations of the Venture or anticipated capital expenditures.

### Non-Defaulting Venturer.

A Venturer that has paid all amounts then due from that Venturer under this Agreement.

### Offeree.

The Venturer who is not the Offeror or a Related Person of an Offeror.

### Offeror.

A Venturer, Parent or Related Person that desires to engage, independently or with others, in a Protected Business in any MSA or CMSA in which the Venture does not at that time conduct the Protected Business, as described in Section 11B.

### Operating Expenses.

All costs and expenses of ownership of the Venture's assets and operation of the Venture Business, including but not limited to, payroll costs, costs of materials, taxes, insurance premiums, utility costs, costs of repairs and maintenance, costs

8

for general, administrative and overhead, audit expenses, and any other expenses incurred in the ordinary course of operating the Venture Business.

**Parent**.

Each of Cox and Landmark.

**Partnership Interest**.

The 99 percent ownership interest in TPC Holding contributed to the Venture on behalf of LTM Company.

**Person**.

Any individual, corporation, partnership, firm, joint venture, association, trust or unincorporated organization, a government, or any agency, authority or political subdivision thereof, or any other entity.

**Preliminary Exhibit**.

**Exhibit C** attached to this Agreement as described in Section 5B(3).

**Prime Rate**.

The annual prime rate (or base rate) or the midpoint of the range of rates reported in the "Money Rates" column or section of The Wall Street Journal as being the base rate on corporate loans at larger U.S. money center commercial banks on the first date on which The Wall Street Journal is published in each month.

In the event The Wall Street Journal ceases publication of the Prime Rate, then the "Prime Rate" shall mean the "prime rate" or "base rate" announced by Chase Manhattan Bank, N.A. or the successor to substantially all of its assets and business (whether or not such rate has actually been charged by that bank). In the event that bank discontinues the practice of announcing that rate, Prime Rate shall mean the highest rate charged by that bank on short-term, unsecured loans to its most credit-worthy large corporate borrowers.

**Properties**.

Landmark Target Media Properties, Inc., a Virginia corporation.

**Proportionate Share**.

The share equal to the Venturer's Interest.

**Protected Business**.

An activity or business that involves the production, distribution and/or sale of photo guide and general merchandise classified advertising publications distributed primarily through retail outlets, of the following subjects:

> Vehicles, including automobiles, trucks, motorcycles and/or recreational vehicles;
> Boats, including sail boats, yachts and/or motor boats;
> Heavy equipment;
> Airplanes;
> Helicopters;
> Any subcategory of the foregoing subjects;
> Accessories related to the foregoing subjects; and
> General merchandise classified.

**Receiving Venturer**.

A Venturer that receives a Selling Notice.

**Regulations**.

Regulations issued under the Code by the Department of the Treasury, as amended from time to time.

**Related Person**.

Any Person that directly or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, a Venturer or a Parent.

**Sellers**.

The Selling Venturer and all other owners of the Selling Venturer's (or its Related Persons') Combined Ownership Interest or any portion thereof.

**Selling Notice**.

The notice described in Section 14C(1) relating to the Disposition of the Combined Ownership Interest of a Selling Venturer and its Related Persons. The Selling Notice shall specify the Venturer's and its Related Persons' offer to make a Disposition of their Combined Ownership Interest, the cash price, and all other terms and conditions of the proposed transaction and shall be signed by all Sellers.

10

<u>Selling Venturer</u>.

A Venturer that gives a Selling Notice.

<u>Shares</u>.

The issued and outstanding common shares of capital stock of TPI Holdings.

<u>Stockholders' Agreement</u>.

The Stockholders' Agreement attached as Exhibit B to the Stock Option Agreement.

<u>Stock Option Agreement</u>.

The Option to Purchase Stock of TPI Holdings dated as of March 31, 1991 among Cox Texas, LTM Company and TPI Holdings.

<u>Stock Ownership Interest</u>.

The rights of a Person under the Stock Option Agreement or the Shares owned by such Person, as applicable.

<u>Successor in Interest</u>.

The Person who succeeds to an Interest upon the Bankruptcy of a Venturer.

<u>Tax Indemnity Agreement</u>.

The Tax Indemnity Agreement dated as of March 31, 1991 among LTM Company, LTM Holdings and TPI.

<u>TPC Holding</u>.

Trader Publishing Holding Company, a Virginia general partnership.

<u>TPC Holding Joint Venture Agreement</u>.

The Amended and Restated Joint Venture Agreement of TPC Holding, dated as of March 31, 1991.

<u>TPI</u>.

TPI, Inc., a Delaware corporation.

<u>TPI Directors</u>.

The Directors designated by TPI.

11

**TPI Holdings.**

TPI Holdings, Inc., a Delaware corporation.

**Unamortized Intangibles.**

The franchises, consulting agreements, non-compete agreements, employment agreements, circulation outlet lists, subscription lists, advertiser lists and other intangible assets to be contributed to the capital of the Venture and/or TPC Holding, as will be described in the Contribution Agreement, with respect to which the Venture and/or TPC Holding, as of the date of the Contribution Agreement, intends to claim Depreciation or Amortization Deductions.

**Venture.**

The joint venture formed under this Agreement.

**Venture Business.**

The business of the Venture described in Section 4.

**Venture Revenues.**

All cash revenue from the operation of the Venture Business, interest income received during the year, distributions from Venture Subsidiaries, and reserves set aside in prior years and no longer deemed necessary for the Venture Business, as determined by the Board.

**Venture Subsidiary.**

Any joint venture or partnership in which the Venture is a venturer or partner.

**Venture Subsidiary Ownership Interest.**

The ownership interests of a Person in all Venture Subsidiaries.

**Venturer.**

The persons or entities listed in Exhibit A and any additions or successors thereto.

12

3.   NAME AND PLACE OF BUSINESS.

A.   Name.

The business of the Venture shall be conducted under the name of Trader Publishing Company or such other name or names as the Board may hereafter from time to time determine.   No Venturer shall have the right to use, and each Venturer agrees not to use, any trade or service names, marks, emblems or logos owned by or licensed to the Venture other than on behalf of the Venture or any Venture Subsidiary.

B.   Place of Business.

The principal place of business of the Venture shall be 100 West Plume Street, Norfolk, Virginia 23510, or such other place as the Board may determine.

4.   BUSINESS OF VENTURE.

The business of the Venture shall consist of (1) the production, distribution and/or sale of photo guide and general merchandise classified advertising publications; (2) the conduct of other publishing activities that substantially benefit from the Venture's distribution system and nationwide sales organization; (3) carrying on any and all activities related or incidental thereto, including electronic publishing, and (4) becoming a venturer or partner in a joint venture or partnership that conducts the business described in subparagraph (1) and/or (2).   The Venture shall not engage in any other business or activity without the mutual consent of the Venturers, which consent may be withheld in the sole discretion of either Venturer.

5.   VENTURERS, INTERESTS AND CAPITAL CONTRIBUTIONS.

A.   Venturers and Interests.

(1)   The Venturers are as set forth on Exhibit A. The Venturers shall receive the Interests set forth opposite their names on Exhibit A in return for their initial Capital Contributions.

(2)   Each Venturer has entered into this Agreement in reliance upon the unique knowledge, experience and expertise of the other Venturer in the development and operation of the Venture Business.   Accordingly, no Venturer shall be required to accept performance under this Agreement from any Person other than a Venturer or a Person to whom a Venturer is permitted to make a Disposition of its Interest, except as otherwise specifically provided in this Agreement.

13



B.    <u>Initial Capital Contributions</u>.

(1)   The Venturers will, simultaneously with the execution of this Agreement, contribute, or cause to be contributed, to the Venture the assets which each Venturer will be obligated to contribute to the Venture pursuant to Section 1.01 of the Contribution Agreement, and LTM Company will contribute cash in the amount provided under Section 5B(2)(a), for which the Venturers will receive Capital Account credit in the amount of the value of those assets, as determined by the Venturers, subject to the adjustments described in Section 5B(5), 5B(6), 5B(7) and 5B(8), to the end that the Capital Contributions under this Section 5B and the Capital Accounts reflecting those Capital Contributions shall be equal.   The Venture will assume the liabilities of the Venturers that the Venture will be obligated to assume pursuant to Section 2.01 of the Contribution Agreement.

(2)   (a)   LTM Company will contribute or cause to be contributed, to the Venture $30.7 million in cash, simultaneously with the contribution of the assets described in Section 5B(1), subject to the following adjustments:

(i)   The Capital Contribution required to be made by or on behalf of LTM Company shall be increased by the present value of the future tax benefits to be received by the Venture from the Depreciation or Amortization Deductions to be taken by the Venture with respect to the Unamortized Intangibles contributed to the capital of the Venture by TPI.

(ii)   The Capital Contribution required to be made by or on behalf of LTM Company shall be decreased by the present value of the future tax benefits to be received by the Venture and/or TPC Holding from the Depreciation or Amortization Deductions to be taken by the Venture and/or TPC Holding with respect to the Unamortized Intangibles contributed to the capital of the Venture and/or TPC Holding by or on behalf of LTM Company and/or LTM Holdings.

(b)   For purposes of Section 5B(2)(a)(i) and Section 5B(2)(a)(ii), the present value shall be computed using a ten percent (10%) per annum discount rate, compounded quarterly, and assuming that one quarter of such annual tax benefits will be realized on each of March 31, June 30, September 30 and December 31 of the applicable taxable year (except that the tax benefits for the taxable year beginning April 1, 1991 and ending December 31, 1991 will be realized one-third each on June 30, September 30 and December 31).

14

(c)   For purposes of Section 5B(2)(a)(i) and Section 5B(2)(a)(ii), the tax benefit shall be computed using a combined forty percent (40%) federal and state income tax rate.

(3)   The Preliminary Exhibit sets forth (a) the estimated non-current assets contributed by or on behalf of each Venturer to the Venture (including the Partnership Interest), (b) the agreed upon fair market value of those estimated assets as of the date of contribution, and (c) the adjustments to the required Capital Contribution of LTM Company pursuant to Section 5B(2)(a).

(4)   (a)   As soon as possible after the Closing Date, and in any event, within six (6) months thereafter, representatives of each Venturer shall jointly prepare a revised Preliminary Exhibit setting forth (i) the entries for the non-current assets (including the Partnership Interest) contributed by or on behalf of each Venturer to the Venture, determined as of March 31, 1991 and (ii) the adjustments to the required Capital Contribution of LTM Company pursuant to Section 5B(2)(a).   If the representatives of the Venturers agree upon the determinations described in Section 5B(4)(a)(i) and 5B(4)(a)(ii), then they shall determine the fair market value of the non-current assets contributed by or on behalf of each Venturer to the Venture as of the date of contribution, on the same basis as that used in determining the fair market value of the estimated assets contributed for purposes of the Preliminary Exhibit; and they shall set forth on the Final Exhibit: (x) the entries for the non-current assets contributed by or on behalf of each Venturer to the Venture, (y) the agreed upon fair market value of those assets, and (z) the cash Capital Contribution of LTM Company to the Venture, as adjusted pursuant to Section 5B(6).

(b)   If the representatives of the Venturers are unable to agree upon the determination described in Section 5B(4)(a)(i) and/or 5B(4)(a)(ii) within six (6) months after the Closing Date, the determination or determinations as to which the Venturers are unable to agree shall be referred to the Auditor, and the Auditor shall be instructed to promptly make the determination described in Section 5B(4)(a)(i) and/or 5B(4)(a)(ii), as applicable.   If necessary, the Auditor is authorized to conduct an audit.   The Auditor's determination of the matters described in Section 5B(4)(a)(i) and/or 5B(4)(a)(ii) shall be binding upon the Venturers.   In the event that the Auditor is required to make any such determination, the Venture shall pay the fees of the Auditor.   After such determination, the Venturers shall determine the fair market value of the non-current assets contributed by or on behalf of each Venturer to the Venture as of the date of contribution on the same basis as that used in determining the fair market value of the estimated assets contributed for purposes of the Preliminary Exhibit; and they shall set forth on the Final Exhibit: (x) the entries for the non-current assets contributed by or on behalf of each

15

Venturer to the Venture, (y) the agreed upon fair market value of those assets, and (z) the cash Capital Contribution of LTM Company to the Venture, as adjusted pursuant to Section 5B(6).

(5)  (a)  If the Final Exhibit sets forth a deviation from the Preliminary Exhibit in the non-current assets (including the Partnership Interest) contributed to the Venture by or on behalf of LTM Company and/or the agreed upon fair market value thereof, then the Capital Accounts of the Venturers will be adjusted accordingly to the end that the Capital Accounts of the Venturers will be equal.

(b)  If the Final Exhibit sets forth a deviation from the Preliminary Exhibit in the non-current assets contributed to the Venture by TPI and/or the agreed upon fair market value thereof, the allocation of the value of the TPI assets will be adjusted accordingly to the end that the Capital Accounts of the Venturers will remain equal.

(6)  If (a) the entries for the Unamortized Intangibles contributed by or on behalf of the Venturers to the Venture and/or (b) the entries for the Unamortized Intangibles contributed by LTM Holdings to TPC Holding, as set forth on the Final Exhibit and/or the final exhibit to the TPC Holding Joint Venture Agreement, differ from those shown on the Preliminary Exhibit and/or the preliminary exhibit to the TPC Holding Joint Venture Agreement, the cash Capital Contribution of LTM Company made pursuant to Section 5B(2) shall be adjusted accordingly. LTM Company shall immediately make a cash Capital Contribution to the Venture in the amount of the difference, or the Venture shall make a cash distribution to LTM Company in the amount of the excess, as applicable.  Any distribution or Capital Contribution made as provided in this Section 5B(6) shall be reflected in the Capital Account of LTM Company pursuant to Section 5G, and, to the extent necessary, the value of the TPI assets will be adjusted accordingly, to the end that the Capital Accounts of the Venturers will be equal.

(7)  (a)  The Venturers will make any Capital Contribution required of them by Section 3.02(a)(i) of the Contribution Agreement and will each be entitled to any distribution made by the Venture with respect to the net current assets contributed by it pursuant to that Section, as applicable.

(b)  If any distributions or Capital Contributions are made in respect of net current assets pursuant to Section 3.02(a)(i) of the Contribution Agreement, such distributions or Capital Contributions shall, if and to the extent appropriate, be reflected in the Capital Accounts of the Venturers pursuant to Section 5G, and after such adjustments, if any, the Capital Accounts of the Venturers shall remain equal.

16

(8)   (a)   LTM Company will receive Capital Account credit for its contribution of the Partnership Interest equal to the capital account credit received in respect of the assets contributed to TPC Holding pursuant to Section 1.01 of the Contribution Agreement upon contribution of those assets, as finally adjusted under Section 5B(3)(d) and/or 5B(4) of the TPC Holding Joint Venture Agreement.

(b)   If there is an adjustment pursuant to Section 5B(3)(d) and/or 5B(4) of the TPC Holding Joint Venture Agreement, then the Capital Accounts of the Venturers shall be adjusted accordingly, to the end that the Capital Accounts of the Venturers will remain equal.

C.   Additional Capital.

(1)   Subject to the limitations set forth in Section 5C(2), if, in the reasonable opinion of either Venturer, additional capital is needed by the Venture for Debt Service or other Venture obligations incurred in accordance with this Agreement, to protect and preserve the value of the Venture's property or assets, or to enable the Venture to meet its capital contribution and/or contribution obligations to any Venture Subsidiary or any partner or venturer of a Venture Subsidiary, the Venturers shall, within twenty (20) days after notice from either Venturer indicating the need for such additional capital and the purposes for which such additional capital is required, each contribute their Proportionate Share of the additional capital specified in the notice.

(2)   Except as set forth in Section 11B(4), the amount of additional capital that each Venturer and its Related Persons, together, shall be obligated to contribute to the Venture and any Venture Subsidiary, in the aggregate, is $2,000,000.  Any increase in such amount shall require the mutual consent of the Venturers, which consent may be withheld in the sole discretion of either Venturer.

(3)   (a)   If, in the reasonable opinion of either Venturer, additional capital in excess of that which the Venturers are obligated pursuant to Section 5C(2) or Section 11B(4) to contribute to the Venture is needed by the Venture for Debt Service or other Venture obligations incurred in accordance with this Agreement, to protect and preserve the value of the Venture's property or assets, or to enable the Venture to meet its capital contribution and/or contribution obligations to any Venture Subsidiary or any partner or venturer of a Venture Subsidiary, a Venturer may, but shall not be required to, lend money to the Venture, which loan shall bear interest at a fluctuating rate equal to two (2) percentage points above the Prime Rate.  Any such loan shall be repaid in full before any distributions are made under Section 7.

17

(b)  If either Venturer proposes to lend to the Venture under Section 5C(3)(a), that Venturer shall give a Loan Notice to the other Venturer.  The other Venturer shall have the right to lend to the Venture its Proportionate Share of the loan amount, by giving notice to the other Venturer within fifteen (15) days after the Loan Notice is given, and such loan to the Venture shall be made within that time period.

D.    Default Remedies.

(1)  (a)  If a Venturer fails to pay any amount that it is required to pay under this Agreement (including Capital Contributions under Sections 5B, 5C and 11B(4) and contribution payments under Section 5F), it shall be a Defaulting Venturer.  The Non-Defaulting Venturer may pursue any and all available legal or equitable remedies against the Defaulting Venturer, including, without limitation, actions to compel payment of the amount due.  The Venturers each waive the requirement that any action for collection be in the form of an accounting proceeding or that they await the dissolution of the Venture.  The Defaulting Venturer shall pay interest to the Venture on the amount in default at an annual interest rate of two percent (2%) plus the Prime Rate (but in no event at an interest rate higher than the maximum rate legally permitted) and reasonable fees (including attorneys'), costs and expenses of enforcement incurred by the Venture and/or the Non-Defaulting Venturer.

(b)  In lieu of pursuing any right or remedy under this Agreement or at law or in equity, the Non-Defaulting Venturer shall have the right to demand and receive from the Venture an immediate return of the additional Capital Contribution that was made by the Non-Defaulting Venturer but not made by the Defaulting Venturer.

(2)  In addition to the remedies described in Section 5D(1)(a), the Non-Defaulting Venturer shall have the following cumulative rights and remedies:

(a)  The Non-Defaulting Venturer may lend to the Defaulting Venturer, on a demand basis, all or any part of the amount in default.  The loan shall be disbursed by the Lending Venturer to the Venture on behalf of the Defaulting Venturer.  The Defaulting Venturer shall be deemed to have made a Capital Contribution to the Venture in the amount of the loan, subject to reduction as described in Section 5D(2)(b)(iii).  The loan shall bear interest at an annual interest rate of two percent (2%) plus the Prime Rate (but in no event at an interest rate higher than the maximum rate legally permitted).  The Lending Venturer shall have a continuing lien and security interest on the Combined Ownership Interest of the Defaulting

18

Venturer and its Related Persons to secure the repayment of the loan and interest due thereon, which lien may be foreclosed and enforced at any time and from time to time in accordance with applicable law, after ten (10) days' prior notice to the Defaulting Venturer.  The Defaulting Venturer will pay all reasonable attorney's fees in connection with preparation and review of the instruments necessary to perfect such lien.  All distributions otherwise payable to the Defaulting Venturer while any loan from the Lending Venturer remains unpaid shall be paid to the Lending Venturer and applied first to the payment of interest and then to the principal of the loan.

(b)  (i)  The Non-Defaulting Venturer may make a Capital Contribution to the Venture in the amount that the Defaulting Venturer is in default, at any time before it makes a loan under Section 5D(2)(a) in the full amount in default.  If the Non-Defaulting Venturer desires to exercise the election to make a Capital Contribution as provided in this Section 5D(2)(b), it shall give a Default Notice to the Defaulting Venturer.  If the Defaulting Venturer does not cure the default within ten (10) days after the Default Notice is given, by payment of the amount in default (and interest thereon), the Non-Defaulting Venturer may make a Capital Contribution to the Venture within twenty (20) days after the date of the Default Notice.

(ii)  The Lending Venturer may convert the principal amount of a loan made under Section 5D(2)(a) into a Capital Contribution, at any time before such loan is repaid.  If the Lending Venturer desires to exercise the election to convert a loan to a Capital Contribution as provided in this Section 5D(2)(b)(ii), that Venturer shall give a Conversion Notice to the Defaulting Venturer.  If the Defaulting Venturer does not cure the default within ten (10) days after the Conversion Notice is given, by repayment of the loan which the Lending Venturer desires to convert into a Capital Contribution, together with unpaid interest thereon, then upon the expiration of such ten (10) day period, the principal amount of the loan shall automatically be converted to a Capital Contribution as herein described.  The principal of the loan shall be extinguished upon such conversion, and the Defaulting Venturer shall not have any right to repay the principal amount of a loan made by the Lending Venturer after the conversion of such loan into a Capital Contribution.  However, the Defaulting Venturer shall remain liable to the Lending Venturer for accrued and unpaid interest on such loan.

(iii)  Upon the Capital Contribution under Section 5D(2)(b)(i) or conversion under Section 5D(2)(b)(ii), the Interest of each Venturer shall be recalculated and shall be equal to a fraction, the numerator of which shall be the Capital Account of each Venturer, and the denominator of which shall be the aggregate Capital Accounts of the Venturers.

19

Before the calculation described in the preceding sentence, the Capital Account of the Defaulting Venturer shall be reduced by the amount of the Capital Contribution deemed made by the Defaulting Venturer pursuant to Section 5D(2)(a), and the Capital Account of the Non-Defaulting Venturer shall be increased by the amount of the Capital Contribution made by the Non-Defaulting Venturer under Section 5D(2)(b)(i) or the principal amount of the loan which is being converted by the Non-Defaulting Venturer under Section 5D(2)(b)(ii).

(3) (a)   If either Venturer becomes a Defaulting Venturer, the Non-Defaulting Venturer shall have the right (unless the Non-Defaulting Venturer exercises its right to demand and receive a return of the additional Capital Contribution that was made by the Non-Defaulting Venturer but not made by the Defaulting Venturer, pursuant to Sectin 5D(1)(b)) to immediately designate an additional Director.  Upon such designation, the Non-Defaulting Venturer shall give notice to the Defaulting Venturer setting forth the Director's name, his business and residence addresses and his business telephone number.

(b)  If the Defaulting Venturer cures its default at any time before the Non-Defaulting Venturer makes a Capital Contribution under Section 5D(2)(b)(i) or before a loan made by a Lending Venturer is converted into a Capital Contribution pursuant to Section 5D(2)(b)(ii), the additional Director appointed by the Non-Defaulting Venturer shall immediately be removed from the Board without further action.

(c)  If the Defaulting Venturer does not cure its default before the Non-Defaulting Venturer makes a Capital Contribution under Section 5D(2)(b)(i) or before a loan made by a Lending Venturer pursuant to Section 5D(2)(a) is converted into a Capital Contribution pursuant to Section 5D(2)(b)(ii), the Board shall thereafter consist of the number of Directors designated as of that time (including the Director designated pursuant to Section 5D(3)(a)).

E.   <u>Guaranty of Venture Indebtedness</u>.

The Venturers shall not be obligated to guarantee Venture indebtedness unless they mutually agree to do so.

F.   <u>Right of Contribution</u>.

If either Venturer pays more than its Proportionate Share of any Venture debt or the aggregate portion thereof actually paid (based upon the respective Interests of the Venturers at the time the debt was incurred), including for this purpose payments made by such Venturer, the partners of any Venturer which is a partnership, the shareholder or shareholders of any corporate Venturer or the shareholder or shareholders of

20

any partner of a Venturer which is a partnership, under the guaranty of a Venture debt, then the Venturer who has paid more than its Proportionate Share of any Venture debt or the aggregate portion thereof actually paid, shall be entitled to contribution from the other Venturer for its Proportionate Share of such Venture debt or the aggregate portion thereof actually paid. Such contribution payment shall be due within twenty (20) days after written notice from the Venturer that has paid more than its Proportionate Share of any Venture debt or the aggregate portion thereof actually paid.

G.   <u>Additional General Provisions on Capital and Obligations of Venturers</u>.

(1)   (a)   A Capital Account shall be established and maintained for each Venturer. A Venturer shall have a single Capital Account, regardless of the time or manner in which any portions of the Venturer's Interest were acquired. If an Interest is transferred in accordance with this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

(b)   As of any date, a Venturer's Capital Account shall consist of (i) the sum of (A) its Capital Contributions, (B) allocations to it of Net Income and Gain from Sale (or items thereof) (other than gain under Section 6F) including income and gain exempt from tax, and (C) the amount of any Venture liabilities assumed by that Venturer or which are secured by any Venture assets distributed to that Venturer, minus (ii) the sum of (A) the amount of money distributed to it by the Venture or distributed by the Venture on behalf of it to a Lending Venturer, (B) the fair market value of property distributed to it by the Venture, (C) the amount of any liabilities of that Venturer assumed by the Venture or secured by any property contributed by that Venturer to the Venture, (D) allocations to it of expenditures of the Venture described in Section 705(a)(2)(B) of the Code or treated as such expenditures under the Regulations, and (E) allocations to it of Net Loss and Loss from Sale (or items thereof). The Capital Account of a Lending Venturer shall not be reduced by any distributions made by the Venture to it on behalf of a Defaulting Venturer.

(c)   (i)   In the discretion of the Board, the book value of the Venture's assets may be revalued and, if so, the Capital Account of each Venturer shall be adjusted to reflect a revaluation of the Venture's assets upon the occurrence of the following events:

(A)   The contribution of money or other property (other than a de minimis amount) to the Venture by a new or existing Venturer as consideration for an Interest;

21

(B)   The distribution of money or other property (other than a de minimis amount) by the Venture to a retiring or continuing Venturer as consideration for an Interest; or

(C)   The liquidation of the Venture within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g).

(ii)   The adjustment shall be based on the fair market value of Venture property (taking Section 7701(g) of the Code into account) on the date of adjustment, and shall reflect the manner in which the unrealized income, gain, loss or deduction inherent in the property (that has not previously been reflected in Capital Accounts) would have been allocated among the Venturers if there had been a taxable disposition of the property for fair market value on that date.

(d)   If any Venture asset has a book value that differs from the adjusted tax basis of that asset, then the Capital Accounts shall be adjusted in accordance with Regulation Section 1.704-1(b)(2)(iv)(g) for allocations of depreciation, depletion, amortization and gain or loss computed for book purposes rather than tax purposes, with respect to such asset.

(e)   If there is any basis adjustment pursuant to an election under Section 754 of the Code, then Capital Accounts shall be adjusted to the extent required by the Regulations.

(f)   The principles in this Agreement governing the adjustments of Capital Accounts are intended to satisfy the capital account maintenance requirements of Regulation Section 1.704-1(b)(2)(iv) and shall be construed consistently therewith.

(2)   Neither Venturer gives up any of its rights to be repaid its Capital Contribution in favor of the other Venturer.

(3)   Neither Venturer shall be paid interest on its Capital Account.

(4)   Neither Venturer shall have the right to demand and receive property other than cash in return of its Capital Contribution.

(5)   Neither Venturer shall have the right to demand and receive the return of its Capital Contribution until the termination of the Venture.

6.    **ALLOCATIONS**.

    A.    **Net Income, Net Loss and Credits**.

        Subject to Sections 6B, 6E and 6F, Net Income, Net Loss and tax credits shall be allocated between the Venturers in proportion to their respective Interests.

    B.    **Partner Nonrecourse Deductions**.

        Any partner nonrecourse deductions (as defined in Regulation Section 1.704-1T(b)(4)(iv)(h)(3)) for any fiscal year shall be allocated to the Venturer who bears the economic risk of loss with respect to the partner nonrecourse debt (as defined in Regulation Section 1.704-1T(b)(4)(iv)(k)(4)) to which such partner nonrecourse deductions are attributable in accordance with Regulation Section 1.704-1T(b)(4)(iv)(h).

    C.    **Gain from Sale**.

        Subject to Sections 6E and 6F, Gain from Sale shall be allocated between the Venturers in proportion to their respective Interests.

    D.    **Loss from Sale**.

        Subject to Section 6F, Loss from Sale shall be allocated between the Venturers in proportion to their respective Interests.

    E.    **Partner Nonrecourse Deduction Chargeback**.

        If there is a disposition in a Venture fiscal year of any asset securing nonrecourse debt that gave rise to partner nonrecourse deductions allocated under Section 6B, there shall be specially allocated, to the Venturers to whom the partner nonrecourse deductions attributable to that asset were previously allocated, items of Venture income and gain for such year (and if necessary, subsequent years) in an amount equal to the partner nonrecourse deductions previously allocated.

    F.    **Allocations to Reflect Book Value/Tax Disparity**.

        In accordance with Section 704(c) of the Code and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Venture shall, solely for tax purposes, be allocated between the Venturers so as to take into account any variation between the adjusted basis of such property to the Venture for federal income tax purposes and its agreed upon fair market value at the time of contribution, such that any unrealized gain or loss associated

23

with such property is allocated to the Venturer that contributed the property; and any additional gain or loss associated with such property is allocated between the Venturers in accordance with their respective Interests. In addition, if Venture property is revalued and Capital Accounts are adjusted, then subsequent allocations of income, gain, loss and deduction for tax purposes with respect to the revalued property shall take into account the variation between the property's adjusted tax basis and book value in the same manner as under Section 704(c) of the Code and Regulations.

G.   **Mid-Year Transfers.**

In the case of an Interest that has been transferred during the year, unless otherwise agreed by the parties to the transfer:

(1)   All Net Income and Loss allocable to the Interest shall be allocated between the transferor and the transferee in the ratio of the number of days in the year before and after the effective date of the transfer without regard to the dates during the year on which income was earned, losses incurred or Net Cash from Operations was distributed.

(2)   Tax credits, if any, shall be allocated between the Venturers at the time the property with respect to which the credit is claimed is placed in service.

(3)   All Gain or Loss from Sale shall be allocated to the holder of the Interest as of the date on which the Venture recognizes that Gain or Loss from Sale.

7.   **DISTRIBUTIONS.**

A.   **Net Cash from Operations.**

Net Cash from Operations for any year shall be distributed to the Venturers (at such time as the Board shall determine) in proportion to their respective Interests; provided, however, that the Venture shall, to the extent funds are available for distribution, distribute to each Venturer quarterly, within thirty (30) days after the close of each calendar quarter, an amount equal to the Venturer's share (based upon such Venturer's Interest) of the Venture's estimated taxable income for the year to date through the quarter with respect to which the distribution is made, multiplied by the highest federal corporate income tax rate in effect for the immediately preceding tax year, plus six percent (6%), less distributions for the year to the date of the distribution.

24

B.   Net Proceeds from Financing.

Net Proceeds from Financing shall be distributed to the Venturers (at such time as the Board shall determine) in proportion to their respective Interests.

C.   Net Proceeds from Sale.

Except as provided in Section 16, Net Proceeds from Sale shall be distributed to the Venturers (at such time as the Board shall determine) in proportion to their respective Interests.

D.   Mid-Year Transfers.

In the case of an Interest that has been transferred during the year, unless otherwise agreed by the parties to the transfer:

(1)  Net Cash from Operations shall be distributed to the holder of the Interest on the date of distribution.

(2)  Net Proceeds from Financing allocable to the Interest shall be distributed to the holder of the Interest on the date of distribution.

(3)  Net Proceeds from Sale allocable to the Interest shall be distributed to the holder of the Interest on the date of distribution.

E.   Outstanding Loan to Venture.

Notwithstanding anything to the contrary contained in this Section 7, no distributions shall be made to either Venturer until all loans, together with interest accrued thereon, owed by the Venture to either Venturer have been repaid in full.

8.   MANAGEMENT.

A.   Board of Directors.

(1)  The Venture's business shall be managed by a Board which shall consist of six Directors (subject to adjustment as described in Section 5D(3)(a) and Section 14F), with each Venturer having the right to designate three Directors (subject to Sections 5D(3)(a) and 14F).  In addition, the CEO of the Venture shall be an ex-officio non-voting member of the Board.

(2)  The Board shall, subject to the approval rights reserved to the Venturers in Sections 4, 5C, 5E, 11B, 17 and 18, and subject to Section 8I, have exclusive authority and

25

full discretion with respect to the management of the Venture's business.

(3)   The Board shall act by resolution duly adopted at a meeting of the Board or by consent in writing of all Directors.  At all meetings of Directors, Directors may vote in person or by proxy.  Directors may participate in a meeting by any means of communication by which all Directors participating in such meeting may simultaneously hear each other during the meeting.

(4)   No action may be taken by the Board without the affirmative vote of at least four Directors.

B.   <u>Appointment and Removal of Directors</u>.

(1)   Each Venturer shall promptly designate its Directors so that the Board shall (except as otherwise provided in Sections 5D(3)(a) and 14F) at all times consist of six Directors.

(2)   Either Venturer may at any time, by notice to the other Venturer, remove any or all of its Directors, with or without cause, and substitute new Directors to serve in their stead.  No Director shall, except as provided in Section 5D(3)(b), be removed from office, with or without cause, without the consent of the Venturer that designated him.

(3)   If any Director is unwilling or unable to serve or is removed from office by the Venturer that designated him (except for a removal pursuant to Section 5D(3)(b)), the Venturer that designated him shall designate the successor to that Director.

(4)   The notice of a Venturer appointing a Director shall in each case set forth that Director's business and residence addresses and business telephone number.

(5)   Each Venturer shall promptly give notice to the other Venturer of any change in the business or residence address or business telephone number of any of its Directors.

C.   <u>Exercise of Authority Granted to the Board</u>.

(1)   Subject to the limitations of Section 8C(2), the Board may delegate such general or specific authority to the officers of the Venture as it from time to time considers desirable, and the officers of the Venture may, subject to any restraints or limitations imposed by the Board, exercise the authority granted to them.

26

(2)   Notwithstanding anything contained herein to the contrary, the authority to determine the following matters with respect to both the Venture and any Venture Subsidiary shall be retained by the Board (subject to Section 8F(2)(c)) and any action with respect thereto may be taken by the officers of the Venture (within such general or specific limits as may be determined by the Board) only after the Board has approved the action in question in accordance with this Section:

(a)   Appointing and removing any Board Appointed Officer (subject to Section 8G(4);

(b)   Appointing and removing the Secretary of the Board (who does not have to be a Board member);

(c)   Determining the compensation (base salary and bonus) to be paid to any Board Appointed Officer;

(d)   Adopting any new Employee Benefit Plan or amending any existing Employee Benefit Plan;

(e)   [Intentionally omitted];

(f)   Determining the amount and timing of distributions to the venturers, subject to the provisions of Section 7A; and/or determining the amount and timing of distributions to the venturers or partners of any Venture Subsidiary;

(g)   Entering into any transaction between the Venture and any Venturer or any Affiliate of a Venturer and/or between any Venture Subsidiary and/or venturer or partner thereof or any Affiliate of a venturer or partner of a Venture Subsidiary; provided, however, that any transaction between the Venture and any Venturer or any Affiliate of a Venturer shall be subject to Section 10;

(h)   Acquiring or starting up any business activity within the Venture Business, except as contemplated by Section 11B;

(i)   Borrowing money, other than trade debt in the ordinary course of the Venture Business or as provided for in the Business Plan then in effect;

(j)   Pledging, placing in trust, assigning or otherwise encumbering any existing property, real or personal, now owned or hereafter acquired by the Venture and/or any Venture Subsidiary, excluding accounts receivable from trade creditors, as collateral or security for any borrowing or other obligation of the Venture, except for pledges or deposits under workmen's compensation, unemployment insurance and social security laws or

27

to secure the performance of bids, tenders, contracts (other than for the repayment of money), or leases, or to secure statutory obligations or surety or appeal bonds or to secure indemnity, performance or similar bonds used in the ordinary course of business;

    (k) Selling or otherwise disposing of, or contracting to sell or otherwise dispose of, any of the Venture's assets and/or the assets of any Venture Subsidiary in any one transaction or in any series of transactions out of the ordinary course of the Venture Business, other than as contemplated by the Business Plan then in effect;

    (1) Causing the Venture and/or any Venture Subsidiary to be merged, pooled or combined with any other business or enterprise;

    (m) Entering into any employment agreement that is not terminable upon thirty (30) days' notice without a penalty or termination payment that is material in relation to the compensation called for under the agreement;

    (n) Adopting overall financial policies for the Venture and/or any Venture Subsidiary including, without limitation, adopting the annual Business Plan or any amendments thereto, including, without limitation, any change in the amount of any reserves to be maintained by the Venture and/or any Venture Subsidiary;

    (o) Assuming, guaranteeing (other than credit card obligations for employees), endorsing or otherwise becoming liable for the obligations of any Person except by endorsement for purposes of discount or collection of notes or other instruments received by the Venture and/or any Venture Subsidiary from customers in the ordinary course of business;

    (p) Making loans or advances to any party, excluding loans to employees (but not officers) of the Venture in an aggregate amount not to exceed $1,000 with respect to any one employee and excluding advances for travel and relocation expenses;

    (q) Dissolving the Venture except as otherwise provided in Section 14D and Section 15B(1)(a) and/or dissolving any Venture Subsidiary except as otherwise expressly provided in the joint venture agreement or partnership agreement of any Venture Subsidiary;

    (r) Making any capital expenditures other than as provided in the Business Plan then in effect;

(s)  Changing the fiscal year of the Venture and/or any Venture Subsidiary or any accounting policy or procedure of the Venture and/or any Venture Subsidiary, except as required by law;

(t)  Executing on behalf of the Venture a joint venture agreement or partnership agreement of a Venture Subsidiary;

(u)  Executing on behalf of the Venture any amendments to any joint venture agreement or partnership agreement of a Venture Subsidiary; and

(v)  Giving or withholding any approvals or making any decisions reserved to the Venture under any joint venture agreement or partnership agreement of a Venture Subsidiary.

D.   Chairman of the Board.

(1)  The Chairman of the Board, who shall be one of the Directors, shall be selected by each Venturer on a rotating basis for a one (1) year term.  The initial Chairman of the Board shall be designated by TPI.

(2)  The Chairman of the Board shall preside at Board meetings and shall, in consultation with the CEO, set the agenda for each Board meeting.

E.   Meetings of the Board.

(1)  The annual meeting of the Directors shall be held each year on the first Thursday in December.

(2)  Special meetings of the Board may be held at any time, upon call of the CEO or any Director.

(3)  Unless waived in writing by all of the Directors (before or after a meeting) at least five (5) business days' prior notice of any meeting shall be given to each Director.  Such notice shall, in the case of a special meeting, state the purpose for which such meeting has been called.  No business can be conducted or action taken at such meeting that is not provided for in such notice.  Except as otherwise determined by the Board, all meetings of the Board shall be alternated between Atlanta and Norfolk.  Meetings of the Board shall be conducted in accordance with Roberts Rules of Order.

(4)  A quorum for any meeting of the Board shall be at least four (4) of the Directors then in office.

29

(5)  The Board shall cause to be kept a book of minutes of all of its meetings in which there shall be recorded the time and place of such meeting, whether regular or special, and if special, by whom such meeting was called, the notice thereof given, the names of those present, and the proceedings thereof.  Copies of any consents in writing shall also be filed in such minute book.

F.   Committees of the Board.

(1)  The Board may establish one or more committees (including, without limitation, an audit committee and a compensation committee), each of which shall consist of at least one TPI Director and one LTM Director. The Board shall also establish an Executive Committee, as described in Section 8F(2). Each committee shall exercise those powers of the Board delegated to it by the Board; provided, however, that the Board may not delegate the power to take any action described in Section 8C(2) to any committee other than the Executive Committee.  No action required or permitted to be taken by any committee other than the Executive Committee shall be taken without the affirmative vote of the majority of the members of such committee; and the Executive Committee shall act in accordance with Section 8F(2)(d).

(2)  (a)  The Board shall, promptly upon execution of this Agreement, establish an Executive Committee, which shall consist of one TPI Director and one LTM Director.  The CEO of the Venture shall be an ex-officio non-voting member of the Executive Committee.  The Executive Committee shall meet regularly with the CEO to monitor the Venture Business and shall generally act on behalf of the Venture between meetings of the Board.

(b)  The Chairman of the Executive Committee, who shall be one of the members of the Executive Committee, shall be selected by each Venturer on a rotating basis.  The initial term of the Chairman of the Executive Committee shall be two (2) years and thereafter one (1) year.  The initial Chairman of the Executive Committee shall be designated by TPI.

(c)  The Board may delegate to the Executive Committee any actions that the Board is required or permitted to take.  The Board may alter or withdraw at any time the Board's delegation of authority to the Executive Committee.

(d)  The Executive Committee may act only by unanimous vote.

G.   Officers of the Venture.

(1)  (a)  The Venture shall have such officers as may be designated by the Board pursuant to Section 8C(2)(a) and

30



8C(2)(b) from time to time, who shall act as agents of the Venture, who shall have such powers as are usually exercised by comparably designated officers of a Virginia corporation, and who shall have the power to bind the Venture through the exercise of such powers, to the extent consistent with the terms hereof.  The Venturers hereby appoint the officers described in subparagraph (2) who shall, unless and until removed from office (and subject to Section 8G(4)), act as agents of the Venture.

(b)   The CEO may from time to time appoint officers that do not report directly to the CEO, who shall have such powers as are usually exercised by comparably designated officers of a Virginia corporation.  The CEO shall determine the compensation for the officers other than the Board Appointed Officers.

(2)   Conrad M. Hall shall be the initial CEO, and Mitchell Brooks shall be the initial Executive Vice President and General Manager.

(3)   The CEO shall report to the Board through the Chairman of the Board.  The Board shall communicate as a Board with the CEO through the Chairman of the Board or the Executive Committee.

(4)   The CEO may be removed at any time that the Board consists of an equal number of TPI Directors and LTM Directors by either Venturer in accordance with this subparagraph (4), and his successor shall be appointed by the Board.  If either Venturer desires to remove the CEO and the Board then consists of an equal number of TPI Directors and LTM Directors, such Venturer shall first give notice to the members of the Executive Committee.  The Chairman of the Executive Committee shall promptly arrange for a meeting of the Executive Committee for the purpose of discussing the proposed removal and attempting to resolve the problems that led to the proposal that the CEO be removed.  If the Executive Committee is not able to resolve such issues to the satisfaction of the Venturer that proposed that the CEO be removed, within twenty (20) days after notice of the proposed removal is given to the members of the Executive Committee, then the CEO shall be removed effective as of the expiration of that period.  If the Board consists of an unequal number of Directors, then the CEO may not be removed without the approval of a majority of the Board.

H.   Annual Business Plan.

(1)   The CEO shall, on or before November 1 of each year, propose an annual operating budget and capital budget for the Venture and any Venture Subsidiary for the next fiscal year and submit such budgets to the Board for its approval.  The operating budget shall include a profit and loss statement, a

31

cash flow statement and a balance sheet for the next fiscal year, as of year end, based on the operating and capital budgets.  The capital budget shall specify and quantify capital expenditures, including capital leases.  The submission of the budgets to the Board shall be accompanied by a statement describing the marketing and strategic plans for the Venture and any Venture Subsidiary for the next fiscal year.

(2)   The Board shall consider the adoption of the Business Plan at a meeting called for that purpose and may modify or adjust such Business Plan or any aspect thereof in such manner as it deems appropriate.  The Venture Business shall be carried on, and all decisions with respect to any Venture Subsidiary shall be made, in accordance with the Business Plan as adopted by the Board.

I.   Limitation on Other Venturers' Powers.

(1)   Except for designating and removing Directors pursuant to Sections 5D(3)(a), 5D(3)(b), 8A(1), 8B and 14F; removing the CEO in accordance with Section 8G(4); determining whether the Venture will be required to pursue an opportunity described in a Business Opportunity Notice pursuant to Section 11B; adopting a plan of liquidation and directing the CEO in winding up the affairs of the Venture after the dissolution of the Venture pursuant to Section 15B(1)(a), as provided in Section 16B; and executing certificates and amendments thereof as described in Section 20; neither Venturer acting alone shall, without the consent of the other Venturer, have any right or authority, either expressed or implied, to act for or bind the Venture.

(2)   Notwithstanding anything contained herein to the contrary, either Venturer shall have the right to cause the Venture to pursue a claim for indemnification against the other Venturer, or a Parent or Related Person of the other Venturer, pursuant to the Contribution Agreement.

(3)   Notwithstanding anything contained herein to the contrary, if a Venturer or a Related Person of a Venturer initiates a claim for indemnification against the Venture pursuant to the Contribution Agreement, the Venturer that does not initiate such claim or is not a Related Person of the Person that initiates such claim, shall have the right to direct the CEO in the defense of such claim and shall have the right to otherwise control the Venture's defense of such action.

J.   Execution of Documents.

(1)   Any deed, deed of trust, bill of sale, lease agreement, security agreement, financing statement, contract of sale, partnership agreement or joint venture agreement of a

32

Venture Subsidiary, or other contract or instrument purporting to bind the Venture or to convey or encumber any of the assets of the Venture in the ordinary course of business, may be signed by any Board Appointed Officer, or such other officer as the Board may designate, after obtaining the approval required by this Agreement, and no other signature shall be required.

(2)  Any Person dealing with the Venture shall be entitled to rely on a certificate of any Board Appointed Officer not named in the certificate, as conclusive evidence of the incumbency of any officer of the Venture and his authority to take action on behalf of the Venture and shall be entitled to rely on a copy of any resolution or other action taken by the Board and certified by any Board Appointed Officer of the Venture not named in the resolution, as conclusive evidence of such action and of the authority of the officer referred to in such resolution to bind the Venture to the extent set forth therein.

9.   <u>COMPENSATION AND REIMBURSEMENT OF VENTURERS</u>.

A.   <u>Compensation of Venturers</u>.

Except as provided in Section 10 or as the Board may otherwise determine, neither Venturer shall receive any compensation for its services to the Venture.

B.   <u>Reimbursement Restrictions</u>.

(1)  Neither Venturer shall, without Board approval, be entitled to be reimbursed for any expenses incurred by that Venturer including, without limitation, direct out-of-pocket expenses, overhead or administrative expenses or any allocated expenses of employees or staff.

(2)  No compensation of, or expenses incurred by, the Directors incident to their duties and responsibilities as such under this Agreement shall be paid by, or charged to, the Venture.

10.  <u>AUTHORITY OF THE VENTURERS AND AFFILIATES TO DEAL WITH THE VENTURE</u>.

The Board may, in its discretion, (1) engage any Person in which either Venturer, or any Affiliate of a Venturer, may have an interest, for the performance of any and all services or purchase of goods or other property which may at any time be necessary, proper, convenient, or advisable in carrying on the Venture Business or disposing of some or all of its assets, or (2) transact the Venture Business with, or sell any or all of the Venture's assets to, any Person in which either Venturer, or any Affiliate of a Venturer, may have an interest, if the compensation or price therefor shall not materially and adversely

33

differ from that prevailing in arm's length transactions by others rendering or receiving similar services or purchasing similar goods or other property in comparable transactions as an on-going activity in the same geographical area where such business is transacted.

11.   OTHER ACTIVITIES OF VENTURERS.

   A.   Prohibited Activities.

      Except as provided in Section 11C, the Venturers and Parents shall not, and shall cause all of their Related Persons to refrain from, during the term of the Venture and for a period of three (3) years following the termination of the Venture, engaging, independently or with others, directly or indirectly, as a partner, officer, director, trustee, employee, paid or voluntary consultant, agent or associate, shareholder or member in, or participant in, the ownership, management, operation or control of, a Protected Business in any MSA or CMSA in which the Venture or any Venture Subsidiary then conducts, or has, within three (3) years prior thereto, conducted, the Protected Business.

   B.   Right of First Opportunity.

      (1)   (a)   Except as otherwise provided in Section 11C, if any Venturer or Parent, or a Related Person of a Venturer or Parent, desires to engage, independently or with others, in a Protected Business in any MSA or CMSA in which the Venture or a Venture Subsidiary does not at that time conduct, and has not within three (3) years prior thereto conducted, the Protected Business, they will, or they will cause their Related Persons to, first offer the opportunity to the Venture, by giving the Venture a Business Opportunity Notice in the form of that attached hereto as Exhibit D and containing to the extent reasonably available, the information called for in Exhibit D, and they will, or they will cause their Related Persons to, comply with this Section 11B.

      (b)   The Business Opportunity Notice shall be sent to the attention of the CEO, with a copy to each member of the Executive Committee.

      (c)   The Offeror shall provide the Offeree with such additional information as the Offeror has obtained and which is reasonably requested by the Offeree in order for the Offeree to determine whether it desires for the Venture to pursue such opportunity, if such request is made within fifteen (15) days after the Business Opportunity Notice is given.

      (2)   (a)   If the Venture receives a Business Opportunity Notice, the Offeree shall have the right to require

34

the Venture to pursue the opportunity described therein by giving the Offeror an Election Notice within thirty (30) days after the Business Opportunity Notice is given, or within fifteen (15) days after the Offeror furnishes any information requested by an Offeree as provided in Section 11B(1)(e), whichever is later.

(b)  A copy of the Election Notice shall be sent to the Venture, to the attention of the CEO, and a copy shall be sent to each member of the Executive Committee.

(c)  If the Offeree does not give the Offeror an Election Notice within thirty (30) days after the Business Opportunity Notice is given, or within fifteen (15) days after the Offeror furnishes any information requested by an Offeree as provided in Section 11B(1)(e), whichever is later, the Offeree shall be deemed to have waived its right to require the Venture to pursue such opportunity, and the Offeror may pursue the opportunity for its own account.  Notwithstanding the preceding sentence, if (i) the opportunity is the acquisition of an existing business rather than the start-up of a business, (ii) there is any material change in any term or condition of such acquisition as described in the Business Opportunity Notice, the Offeror shall, before the Offeror may pursue the opportunity for its own account, be required to again present the opportunity to the Venture by giving the Venture a Business Opportunity Notice in accordance with Section 11B(1), which revised Business Opportunity Notice shall describe the revised terms and conditions of such opportunity.

(3)  If (i) the Offeree does not elect to require the Venture to pursue the opportunity described in the Business Opportunity Notice, and (ii) the Offeror does not consummate its participation in the opportunity described in the Business Opportunity Notice within one hundred eighty (180) days after the Business Opportunity Notice is given, the Offeror shall be required to again present the opportunity to the Venture by giving the Venture a Business Opportunity Notice in accordance with Section 11B(1) prior to any further pursuit or any consummation of such opportunity.

(4)  If the Offeree gives an Election Notice, the Venturers agree that they shall cause the Board to take all action necessary for the Venture to pursue such opportunity, and the Offeror shall cooperate with the Venture in its pursuit of such opportunity.  In addition, notwithstanding the limitation of Section 5C(2) on the amount of additional capital that the Venturers shall be obligated to contribute to the Venture, if an Election Notice is delivered, each Venturer agrees to contribute its Proportionate Share of the capital required to finance the acquisition consistent with the source of funds for the purchase price described in the Business Opportunity Notice.

35

C.   <u>Excluded Businesses</u>.

(1)   The restrictions of Section 11A and the right of first opportunity described in Section 11B shall not prohibit either Venturer or a Parent or Related Person of a Venturer from engaging in a Protected Business in any MSA or CMSA in which such Venturer or its Parent or Related Person operates a general interest newspaper with paid circulation on at least a weekly basis, serving the ADI in which the Protected Business is or will be conducted, at the time such Venturer or its Parent or Related Person engages in the Protected Business.

(2)   The restrictions of Section 11A and the right of first opportunity described in Section 11B shall not apply with respect to the acquisition of any activity or business that (a) derives less than twenty-five percent (25%) of all of its revenues from the Protected Business for the most recent fiscal year such information is available, and (b) derives gross revenue from the Protected Business for the most recent fiscal year such information is available in an amount that is less than ten percent (10%) of the Venture's gross revenues from the Protected Business for that twelve (12) month period.

(3)   The restrictions of Section 11A and the right of first opportunity described in Section 11B shall not apply with respect to the holding by any Venturer or a Parent or Related Person of a Venturer of five percent (5%) or less of the issued and outstanding stock of any publicly traded company that engages in a Protected Business.

(4)   The restrictions of Section 11A and the right of first opportunity described in Section 11B shall not apply with respect to the engaging by a Venturer or Related Person of a Venturer in a Protected Business with the other Venturer or a Related Person of the other Venturer, either with or without the Venture.

D.   <u>Breach of Restrictions</u>.

The Venturers and Parents each acknowledge that the territorial, time and other limitations of Section 11A and Section 11B are reasonable and properly required for the adequate protection of the acquisition of the assets of the Venturers by the Venture and the preservation of the value of the other assets of the Venture and agree that such limitations are reasonable with respect to their business activities and the business activities of their Related Persons and do not and will not impose undue hardship on them or their Related Persons.   The Venturers and Parents each acknowledge that the legal remedy for breach by them or by their Related Persons of the restrictions of Section 11A and/or Section 11B will be inadequate.   Therefore, the Venturers and Parents each agree that in the event of any

36

threatened or actual breach of the restrictions of Section 11A and/or Section 11B, in addition to any remedy which the Venturers or any of them may have, each of the Venturers shall be entitled to specific enforcement of the provisions of Section 11A and/or Section 11B through injunctive or other equitable relief attained from a court with appropriate equity jurisdiction, without the showing of irreparable, special or imminent damages or the posting of any bond.  This Section 11D shall not be deemed to limit the circumstances under which the Venturers shall be entitled to specific performance of this Agreement or any provision hereof.

   E. <u>Enforceability of Restrictions</u>.

    Should any provision of this Section 11 be held by a court of competent jurisdiction to be enforceable only if modified, such holding shall not affect the validity of the remainder of the provisions of this Section 11, the balance of which shall continue to be binding upon the Venturers, the Parents and their Related Persons with any such modification to become a part hereof and treated as though contained in this original Section 11.  The Venturers and the Parents further agree that any such court is expressly authorized to modify any such unenforceable provision of this Section 11 in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modification that the court deems warranted to carry out the agreement of the parties as embodied in this sentence.  The Venturers and Parents expressly agree that this Section 11 as so modified by the court shall be binding upon and enforceable against each of them.  In any event, should one or more of the provisions of this Section 11 be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Section 11 or of this Agreement, and if such provision or provisions are not modified as provided above, this Section 11 shall be construed as if such invalid, illegal or unenforceable provisions had never been contained herein.

   F. <u>Other Activities</u>.

    Except as expressly limited by Sections 11A and 11B, either of the Venturers, and/or their Parents and Related Persons, may engage in and possess an interest in any business venture of any nature and description, independently or with others; and neither the Venture nor the Venturers shall, except as otherwise provided in Sections 11A and 11B, have any right by virtue of this Agreement in and to any independent ventures or to the income or profits derived therefrom.  Except as provided in Sections 11A and 11B, neither a Venturer nor any Affiliate of a Venturer shall be obligated to present any particular investment

opportunity to the Venture even if such opportunity is of a character which, if presented to the Venture, could be taken by the Venture, and each of them shall have the right to take for its own account (individually or as a trustee) or to recommend to others any such particular investment opportunity.

12. ACCOUNTS, BOOKS, RECORDS, ACCOUNTING REPORTS AND TAX MATTERS.

A. Bank Accounts.

All funds of the Venture shall be deposited in accounts of the Venture at such financial institutions as the Board may designate. Withdrawals from any such account shall be made only in the regular course of the Venture Business. All withdrawals shall be made upon the signature of such individual or individuals as the Board shall designate.

B. Maintenance of Books.

The Venture shall keep or cause to be kept complete and accurate books of account, in which shall be entered fully and accurately each and every transaction of the Venture. The Venture's books shall be maintained at the principal place of business of the Venture or at such other place as the Board may from time to time designate; and each Venturer shall have access to the books at all reasonable times and the right to inspect and copy either directly or through a person designated by it.

C. Method of Accounting.

All books and records of the Venture shall be kept in accordance with generally accepted accounting principles, with such exceptions as the Board may determine from time to time, with an annual accounting period ending in December, except for the final accounting period, which shall end on the date of termination of the Venture. Any reference in this Agreement (other than in Section 11C(2)) to a "fiscal year" shall be to such annual accounting period.

D. Financial Reports.

(1) The Venture shall prepare or cause to be prepared and shall provide to each Venturer, within seven (7) business days after the end of each month, a statement of profit and loss, a cash flow statement for such month showing variations from the budgeted amount for such month and the year to date, and a balance sheet, all on a consolidated basis and separately for each reporting unit.

(2) The Venture shall also cause to be prepared and shall send to each Venturer within ninety (90) days after the

38

end of each fiscal year, audited financial statements and a statement of profit and loss approved by the Venture's independent certified public accountants.

(3)   In addition, the Venture shall cause to be prepared and shall send to each Venturer within ninety (90) days after the end of each fiscal year, a report stating each Venturer's distributive share of each class of income, gain, loss or deduction, including tax preference items, for the year.

E.   <u>Tax Returns and Information</u>.

The Venture shall cause to be prepared and timely filed annually the federal, state and local tax returns of the Venture.   Drafts of the tax returns shall be submitted to each Venturer for review at least thirty (30) days before the earlier of (1) the proposed filing date or (2) the due date for filing, including extensions that have been granted.   The Venture shall cause to be delivered to each Venturer the tax information required to enable the Venturers to prepare and file their tax returns in a timely manner.

F.   <u>Tax Matters Partner</u>.

(1)   TPI is designated as the Tax Matters Partner for purposes of the Code.

(2)   (a)   The Tax Matters Partner shall keep LTM Company informed of all administrative and judicial proceedings and shall promptly provide LTM Company with copies of all notices and other communications to and from the Internal Revenue Service or other federal, state or local administrative agency pertaining to any tax or similar return filed by the Venture.

(b)   The Tax Matters Partner shall promptly give notice to LTM Company of the time and place of meetings with representatives of the Internal Revenue Service or other federal, state or local administrative agency pertaining to any tax or similar return filed by the Venture, and LTM Company shall be given the opportunity to have a representative attend any such meeting.

(c)   If any matter concerning the Venture is in litigation, the Tax Matters Partner shall keep LTM Company informed of the progress of the litigation and shall afford LTM Company, through its representative, the opportunity to attend all meetings and hearings pertaining to such litigation.

(d)   The Tax Matters Partner shall provide LTM Company with copies of all pleadings, notices or other material documents or communications relating to such litigation.

39