Puls v. Landmark Community Newspapers                                           Susan Blake

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 07-CV-00170-RPM-CBS

---

TELEPHONE DEPOSITION OF: SUSAN R. BLAKE
May 1, 2007

---

RUSSELL A. PULS, JR.,
Plaintiff,
v.
LANDMARK COMMUNITY NEWSPAPERS, INC., a Virginia corporation,
and LANDMARK COMMUNITY NEWSPAPERS OF COLORADO, INC., a
Colorado corporation,
Defendants.

---

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 1515
Arapahoe Street, Tower I, Suite 530, Denver, Colorado 80202
at 9:00 a.m. before Rory L. Joyner, Certified Realtime
Reporter, Registered Professional Reporter and Notary Public
within Colorado.

---

**Page 2**

APPEARANCES

For the Plaintiff:    BRUCE G. SMITH, ESQ.
                      Darling, Bergstrom, & Milligan, PC
                      1515 Arapahoe Street
                      Tower 1
                      Suite 530
                      Denver, Colorado 80202

For the Defendants:   WILLIAM M. FURR, ESQ.
(By telephone)        Willcox & Savage, P.C.
                      1800 Bank of America Center
                      Norfolk, Virginia 23510
Also Present:         Russell A. Puls, Jr.

---

**Page 3**

INDEX
EXAMINATION OF SUSAN R. BLAKE:                PAGE
May 1, 2007

By Mr. Smith:                                    4

By Mr. Furr:                                    ---

INITIAL
DEPOSITION EXHIBITS:                       REFERENCE

(None marked.)

REQUESTED PORTIONS OF TESTIMONY:              PAGE
Request for document production
or information                                 ---

Certified question                             ---

Instruction not to answer                      ---

Other requests or marked testimony             ---

EXHIBITS PREVIOUSLY MARKED        EXHIBIT    PAGE
(None.)

---

**Page 4**

1    WHEREUPON, the within proceedings were taken
2  pursuant to the Federal Rules of Civil Procedure:
3            SUSAN R. BLAKE,
4  present by telephone, having been first duly sworn to state
5  the whole truth, was examined and testified as follows:
6            EXAMINATION
7  BY MR. SMITH:
8    Q.   Would you state your full name, please.
9    A.   Susan Ray Blake.
10   Q.   And Ms. Blake, where are you located at the
11 time of this conference?
12   A.   Norfolk, Virginia.
13   Q.   Is anyone there present with you?
14   A.   No.
15   Q.   All right. Where specifically are you
16 located?
17   A.   In Norfolk, 150 Granby Street.
18   Q.   You are currently employed?
19   A.   Correct.
20   Q.   And what is your job?
21   A.   Director of employee relations, slash,
22 attorney.
23   Q.   All right. For what company?
24   A.   Dominion Enterprises.
25   Q.   And what is Dominion Enterprises? What is

---

Coffman Reporting

303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

(Pages 1 to 4)

EXHIBIT 3

**5**

1 the nature of its business?
2  A.  We publish a number of classified
3 advertising magazines and host a number of
4 information-oriented Web sites.
5  Q.  How long have you been employed by Dominion
6 Enterprises?
7  A.  Dominion Enterprises, which was formerly
8 known as Trader Publishing Company, I've been with that
9 entity since October 23, 2000.
10  Q.  All right. You were previously employed by
11 Trader Publishing Company?
12  A.  Correct, but I never was separated.
13  Q.  Okay. Did Trader simply change its name?
14  A.  It did.
15  Q.  What is the ownership of Dominion
16 Enterprises --
17  A.  We are owned --
18  Q.  -- if you know.
19  A.  Excuse me?
20  Q.  If you know.
21  A.  My understanding is that we are owned by
22 Landmark Communications.
23  Q.  And what was the ownership of Trader
24 Publishing Company?
25  A.  We were owned by Landmark and Cox.

**6**

1  Q.  When did Cox and/or Landmark Communications
2 acquire Trader Publishing Company?
3  A.  Could you repeat the question?
4  Q.  Yes. When did Landmark Communications
5 and/or Cox Communications acquire Trader Publishing
6 Company?
7  A.  I do not know.
8  Q.  Okay. Were you employed by Trader prior to
9 the acquisition by Landmark or Cox?
10  A.  I'm not sure that there was an acquisition.
11 When I joined the company in October of 2000, it was
12 Trader Publishing Company, and the owners were Landmark
13 and Cox.
14  Q.  Okay. Do you know anything about the
15 history of Trader Publishing Company?
16  A.  Just generally that it was created in 1991,
17 as I understand it, with Cox and Landmark.
18  Q.  Okay. So it -- Trader Publishing originated
19 with those two companies?
20  A.  That's my understanding.
21  Q.  Did -- what was the business of Trader
22 Publishing Company?
23  A.  Similar to Dominion Enterprises. We owned
24 and operated a number of classified advertising
25 publications and a number of Web sites.

**7**

1  Q.  And were the publications or the assets
2 different in January of 2006 than they are for Dominion
3 today?
4  A.  Can you repeat the question, please?
5  Q.  Yes. Were the assets and publications of
6 Trader in 2006, January of 2006, different than those of
7 Dominion today?
8  A.  The publications were different. I don't
9 specifically know about assets.
10  Q.  Okay. What -- what were the different
11 publications under Trader at that time?
12  A.  That Dominion no longer publishes today?
13  Q.  Yes.
14  A.  We, at that time, had Auto Trader and Auto
15 Mart, which we no longer have today.
16  Q.  And what happened with those?
17  A.  Cox Communications retained those.
18  Q.  Are those publications? Are Auto Trader and
19 Auto Mart publications?
20  A.  Are they printed publications?
21  Q.  Yes.
22  A.  Yes.
23  Q.  Okay. They are not online publications, or
24 they may be, as well?
25  A.  They may be, as well. I don't know now.

**8**

1  Q.  All right.
2  A.  Since they've been . . .
3  Q.  Prior to Trader Publishing Company, what was
4 your employment?
5  A.  I came directly from law school.
6  Q.  And you're an attorney licensed in the state
7 of Virginia?
8  A.  State of Oregon.
9.  Q.  State of Oregon. All right. Are you
10 licensed in the state of Virginia?
11  A.  No.
12  Q.  Of what state was Trader a company, that it
13 was incorporated in, if you know?
14  A.  My understanding is that it was a Virginia
15 general partnership.
16  Q.  That Trader Publishing Company was a
17 Virginia general partnership?
18  A.  Correct.
19  Q.  Okay. Again, between Cox and Landmark
20 Communications?
21  A.  I honestly don't know the specific names of
22 the entities, but I -- that Landmark and Cox created, but
23 it was a Virginia general partnership with Landmark and
24 Cox.
25  Q.  Okay. In your position, who did you report

**Page 9**

1  to?
2  A.  At what time?
3  Q.  In January of 2006.
4  A.  Robert Parker.
5  Q.  And what is Mr. Parker's title or was Mr.
6  Parker's title at the time?
7  A.  Director of employee relations, slash,
8  attorney.
9  Q.  So he was the director for all of the
10 country?
11 A.  Actually, I need to correct that. I'm
12 sorry. As of January 2006, I reported to Sunny Sonner.
13 Q.  All right. And what was -- that's Ms.
14 Sonner?
15 A.  Correct.
16 Q.  What was her title?
17 A.  Executive vice president of human resources.
18 Q.  Who did Ms. Sonner report to?
19 A.  Conrad Hall.
20 Q.  And what was Mr. Hall's position?
21 A.  CEO.
22 Q.  Of Trader Publishing?
23 A.  Correct.
24 Q.  All right. Did Mr. Parker report to Ms.
25 Sonner, as well?

**Page 10**

1  A.  Yes.
2  Q.  Currently, what is different, if anything,
3  about the reporting structure that you just testified to?
4  A.  I continue to report to Sunny Sonner, and
5  Sunny Sonner continues to report to Conrad Hall.
6  Q.  And do they have the same positions they
7  did -- or do they have the same positions with Dominion
8  that they did with Trader?
9  A.  Yes.
10 Q.  All right. How about Mr. Parker?
11 A.  He is no longer with the company.
12 Q.  All right. Going back to January of 2006,
13 would you describe your job duties and responsibilities.
14 A.  In January 2006, I was the director of HR
15 field services and West Coast employee relations.
16 Q.  And what did that job consist of?
17 A.  I was in charge of overseeing preemployment
18 drug testing, the company's responses to unemployment
19 claims companywide, and employee relations issues on the
20 West Coast.
21 Q.  And Ms. Sonner was responsible for oversight
22 of the whole country relative to Trader Publishing
23 employment matters; is that correct?
24 A.  Ms. Sonner is in charge of oversight of the
25 company's HR department.

**Page 11**

1  Q.  All right. And all employment-related
2  issues that arise?
3  A.  Within the human resources department, yeah.
4  Q.  All right. As part of your compensation
5  with Trader Publishing Company, did you own stock in that
6  company, or were you offered stock in that company?
7  A.  No.
8  Q.  As part of your employment with Trader, were
9  you offered or did you own stock in Landmark
10 Communications?
11 A.  No.
12 Q.  As part of your employment with Dominion
13 Enterprises, is that a -- let me interrupt. Is that a
14 Virginia corporation, or do you know?
15 A.  I believe it is a Virginia general
16 partnership.
17 Q.  Okay. Do you own any interest in Dominion
18 Enterprises?
19 A.  I do not.
20 Q.  Okay. Going back to January of 2006, for
21 purposes of human resources, did Ms. Sonner -- well, let
22 me withdraw that question. When did you first become
23 involved in an issue as to Mr. Puls?
24 A.  Can you clarify what you mean by "issue"?
25 Q.  When did -- when were you asked or informed

**Page 12**

1  to take any action relative to Russell Puls?
2  A.  I received an e-mail around December 27,
3  2005, with Mr. Puls' resume attached, from Gary Hibert,
4  indicating that this was a former Landmark employee and
5  asking me how to get additional information from
6  Landmark.
7  Q.  And who is Mr. Hibert?
8  A.  He is the division head of our United
9  Parenting Publications.
10 Q.  Could you spell his last name?
11 A.  H-i-b-e-r-t.
12 Q.  Okay. How would that e-mail come to you?
13 In other words, why was it directed to you?
14 A.  Because Gary thought I may be able to give
15 him a contact at Landmark.
16 Q.  All right. Is Mr. Hibert somebody you would
17 interact with on a regular basis?
18 A.  I don't know what you mean by "regular."
19 Q.  Well, let's say on a -- on a monthly basis,
20 would you have interaction with him?
21 A.  No. I don't have interaction with Gary on a
22 periodic basis. It's on an as-needed basis.
23 Q.  And the nature of that is consultation
24 relative to human resources matters?
25 A.  Employee relations matters.

Puls v. Landmark Community Newspapers

Susan Blake

### 13

1  Q. All right. What, if any, action did you
2  take based upon that e-mail?
3  A. I forwarded the e-mail to Melody Hester.
4  Q. Who is Ms. Hester?
5  A. Administrative assistant.
6  Q. To whom?
7  A. Sunny Sonner.
8  Q. All right. Do you have copies of those
9  e-mails?
10  A. I do.
11  Q. All right. And those have been printed?
12  A. I do not have them in front of me.
13  Q. Okay. But they're still either retained in
14  the system, or you have hard copies of them?
15  A. They are retained on our system.
16  Q. All right. What was Ms. Hester's response?
17  Well, what was the nature of your inquiry to Ms. Hester?
18  A. Whether -- who to direct Gary's question to.
19  Q. All right. Did you simply forward Mr.
20  Hibert's question?
21  A. I forwarded the e-mail to Melody.
22  Q. All right. And did Mr. Hibert indicate from
23  where the inquiry had come to him?
24  A. I don't recall.
25  Q. What was Mr. Hibert's job title?

### 14

1  A. I know he was the division head of United
2  Parenting Publications. I don't know if his official
3  title is president or not. Or vice president, I presume.
4  Q. Okay. Division head, meaning head of that
5  division of Trader?
6  A. Yes.
7  Q. I take it United Parenting was a
8  wholly-owned division of Trader Publishing Company?
9  A. It is a division of Trader Publishing
10  Company.
11  Q. All right. What did Ms. Hester do with your
12  inquiry, if you know?
13  A. She provided me with a name and contact
14  telephone number at Landmark, which I passed along to
15  Gary Hibert.
16  Q. And what was the name?
17  A. I don't recall.
18  Q. Was it someone in human resources?
19  A. I believe it was.
20  Q. Was it a Kim Hogan?
21  A. I don't recall.
22  Q. Okay. You simply forwarded that back on to
23  Mr. Hibert?
24  A. I passed that information along to Gary,
25  yes.

### 15

1  Q. What did Mr. Hibert do with that
2  information, if anything, do you know?
3  A. I do not know.
4  Q. Did you ever receive any subsequent contact
5  from Mr. Hibert about that inquiry?
6  A. I don't believe so.
7  Q. Have you talked with him about what, if
8  anything, he did with the information?
9  A. I don't believe I spoke with Gary, no.
10  Q. And after that -- what was the time frame of
11  that e-mail? You said right before Christmas of 2005?
12  A. Which e-mail are you referring to?
13  Q. The e-mail from Mr. Hibert to you.
14  A. I believe it was around December 27.
15  Q. Okay.
16  A. 2005.
17  Q. Did you then have other conversations or
18  contacts regarding Mr. Puls?
19  A. I did.
20  Q. And what was the next, if any, contact you
21  had?
22  A. I was involved in a conversation around
23  January 19, 2006, from Landmark regarding Mr. Puls.
24  Q. Was that a call to you from Landmark?
25  A. I believe the initial call was to Sunny

### 16

1  Sonner.
2  Q. All right. And did Ms. Sonner involve you
3  in that call?
4  A. She involved me in a call, yes.
5  Q. Okay. I guess what I'm asking is, were both
6  of you on the call?
7  A. There was a call with, I believe, Kim Hogan,
8  Sunny Sonner, and myself.
9  Q. Okay. Was anyone else on that call?
10  A. Not that I'm aware of.
11  Q. All right. Would you state as best you can
12  recall what was stated by each of the parties.
13  A. As best I can recall, Kim Hogan stated that
14  she had heard Russell Puls had applied for employment
15  with us and advised us that he was not eligible for
16  rehire with Landmark, and that he had been separated from
17  employment with Landmark.
18  Q. What did you or Ms. Sonner state during the
19  call?
20  A. I don't remember.
21  Q. Do you have any notes of that conversation?
22  A. I do not.
23  Q. Did you work up any memorandum or notes
24  after the conversation?
25  A. I did.

```
                                                    17
1    Q.   And was that something you prepared for Mr.
2　Puls -- I mean, for Mr. Furr?
3    A.   It -- I don't understand your question.
4    Q.   Okay. What was the context in which you
5　prepared notes after that conversation?
6    A.   I prepared information pertaining to the
7　situation to David Saslavsky.
8    Q.   And did you transmit a memo or e-mail to Mr.
9　Saslavsky?
10   A.   I transmitted a memo to Mr. Saslavsky. I
11　don't remember if it was via fax or e-mail.
12   Q.   What was the substance of that memo?
13   A.   It was advising Mr. Saslavsky to revoke the
14　offer of Mr. Puls.
15   Q.   And what was -- based upon the information
16　you had received from Ms. Hogan?
17   A.   Based upon Ms. Hogan's confirmation that he
18　had been separated, and Mr. Puls indicated that he had
19　not been separated or forced to resign from any
20　employment.
21   Q.   Was that memo something that was directed by
22　Ms. Sonner for you to do?
23   A.   No. It's a memo I created.
24   Q.   Okay. What I'm asking was, did she direct
25　that you inform Mr. Saslavsky not to hire Mr. Puls?
```

```
                                                    18
1    A.   I don't recall if she made a comment like
2　that or not.
3    Q.   Ultimately, who made the decision not to
4　hire Mr. Puls?
5    A.   I made the recommendation to revoke the
6　offer.
7    Q.   The recommendation to Ms. Sonner?
8    A.   To Mr. Saslavsky.
9    Q.   All right. And did Ms. Sonner agree with
10　that recommendation?
11   A.   I believe she did.
12   Q.   All right. Prior to that memo, had you had
13　a conversation with Mr. Saslavsky?
14   A.   I did.
15   Q.   By telephone?
16   A.   Yes.
17   Q.   All right. What was the substance of that
18　conversation?
19   A.   I asked Mr. Saslavsky about -- confirmed
20　that he had extended an offer to Mr. Puls and asked him
21　about the interview that he had with Mr. Puls.
22   Q.   Was that a call that he initiated or you
23　initiated?
24   A.   I initiated.
25   Q.   Okay. At Ms. Sonner's suggestion?
```

```
                                                    19
1    A.   I don't believe so. I think I initiated
2　that on my own.
3    Q.   And how did it come to your attention that
4　Mr. Saslavsky was involved in that decision of hiring --
5　whether to hire Mr. Puls?
6    A.   I believe I deduced that because Gary had --
7　Gary Hibert had mentioned -- or directed Mr. Puls from
8　Colorado Parent, and David is over that office.
9    Q.   Had you had dealings with Mr. Saslavsky
10　previously?
11   A.   Yes.
12   Q.   Did you have any discussions with Mr.
13　Saslavsky about Mr. Puls prior to that time?
14   A.   Prior to my conversation --
15   Q.   Yes, your telephone conversation with him.
16   A.   No.
17   Q.   Any e-mail correspondence with Mr. Saslavsky
18　about Mr. Puls prior to that time?
19   A.   Not that I recall.
20   Q.   All right. Specifically, you stated in your
21　memo that you recommended against his hire based upon the
22　information you had from Landmark Communications or
23　Landmark Community Newspapers?
24   A.   I don't understand the question.
25   Q.   Okay. In his call to you, did Mr. Saslavsky
```

```
                                                    20
1　request a memo?
2    A.   He did not.
3    Q.   Why was it in the form of a memo rather
4　than, for example, a telephone call back to him?
5    A.   It's just how I chose to do it.
6    Q.   Okay. That was something transmitted by
7　e-mail?
8    A.   I don't know.
9    Q.   Okay. You would still have a copy of that
10　memo?
11   A.   I do, yes.
12   Q.   All right. And when you had -- excuse me --
13　when you had the discussion with Ms. Hogan, were you
14　informed there had been a separation agreement between
15　Mr. Puls and LCNI?
16   A.   I did become aware of that at some point. I
17　don't know if it was during that initial call or not.
18   Q.   Okay. You don't recall whether there was
19　any discussion in that first -- in that call regarding
20　any separation agreement?
21   A.   It was either that call or a subsequent
22　call. I was aware that there was a separation agreement.
23   Q.   Prior to that call, had Ms. Sonner initiated
24　any contact with Ms. Hogan or LCNI, to your knowledge?
25   A.   Prior to which call?
```

**21**

1  Q. The call that you and Ms. Sonner had with
2  Ms. Hogan.
3  A. I don't know.
4  Q. Okay. Why did Ms. Sonner request that you
5  be in on that call?
6  A. I believe because I'm over West Coast
7  employee relations, and Colorado fell within my region.
8  Q. After your memo to Mr. Saslavsky, what, if
9  any, further contacts did you have regarding Mr. Puls?
10 A. Subsequent to the memo?
11 Q. Yes.
12 A. I believe I received two letters from you.
13 Q. Anything further from Mr. Saslavsky?
14 A. I believe he communicated to me that he had
15 revoked the offer.
16 Q. Did Ms. Hogan indicate why Mr. Puls had been
17 terminated from LCNI?
18 A. I don't recall.
19 Q. Did you suggest to Mr. Saslavsky that he
20 discuss with Mr. Puls the apparent discrepancy between
21 information he gave to Trader Publishing and that
22 apparent cause of termination from LCNI?
23 A. Can you repeat the question?
24 Q. Yes. The information you received from LCNI
25 was inconsistent with, apparently, what Mr. Puls had put

**22**

1  on an application with Trader; is that correct?
2  A. Is that a question?
3  Q. Yes.
4  A. Yes, I believed it was inconsistent.
5  Q. All right. Did you discuss with Mr.
6  Saslavsky confronting Mr. Puls about that discrepancy or
7  inconsistency?
8  A. No.
9  Q. Did the two of you discuss what may have
10 been any reason for that discrepancy?
11 A. No.
12 Q. When you had the discussion with Ms. Hogan,
13 did she disclose anything regarding the terms of any
14 settlement with Mr. Puls between LCNI and Mr. Puls?
15 A. I spoke with Ms. Hogan regarding a severance
16 agreement that Mr. Puls had executed.
17 Q. And was that in that same conversation with
18 Ms. Sonner or a subsequent conversation?
19 A. I believe it was a subsequent conversation.
20 Q. Relative to what we've been talking about,
21 what was the time frame of that conversation?
22 A. Either the same day or the following day.
23 Q. And who initiated that call?
24 A. I did.
25 Q. Why did you initiate the call?

**23**

1  A. I believe I wanted to confirm that he was,
2  in fact, separated, that he did not resign, because he
3  had indicated to David Saslavsky that he had resigned and
4  worked out a notice period during the initial interview
5  with David.
6  Q. And did you recontact Ms. Hogan after again
7  talking with Mr. Saslavsky, or is this just a follow-up
8  conversation you had with her?
9  A. I had a follow-up conversation with her. I
10 believe it was subsequent to my conversation with Mr.
11 Saslavsky.
12 Q. All right. And at the time, did Ms. Hogan
13 share the terms of the separation agreement between LCNI
14 and Mr. Puls?
15 A. I don't recall her sharing the specific
16 terms, no, just that there was an agreement, both parties
17 had executed it, and he was not -- he did not resign.
18 Q. Did she send you any paperwork regarding Mr.
19 Puls?
20 A. I don't believe she did.
21 Q. Have you ever seen the separation agreement
22 between Mr. Puls and LCNI?
23 A. I've been looking at it in the pack of
24 materials that you forwarded to my attention.
25 Q. Is that the first time you've been provided

**24**

1  that agreement?
2  A. I believe it is.
3  Q. Okay. Had you received any other paperwork
4  of any kind regarding Mr. Puls prior to the packet that I
5  sent to you related to paperwork at LCNI?
6  A. Can you repeat the question?
7  Q. Yes. Had you received any kind of paperwork
8  regarding Mr. Puls from LCNI prior to the packet of
9  information that I sent to you?
10 A. I don't recall ever receiving any other
11 information, written information, from LCNI, no.
12 Q. Okay. After the contacts from my two
13 letters to you, what, if any, further contact did you
14 have regarding Mr. Puls?
15    MR. FURR: I'm going to instruct the witness
16 not to disclose any attorney-client communications that
17 she had with me or any other party while I was
18 participating in that conversation. Other than that, you
19 can answer the question.
20 A. I had one telephone conversation with David
21 Saslavsky advising him that our counsel, Billy Furr,
22 would be contacting him regarding a deposition in this
23 matter. All other conversations were with my attorney.
24 Q. (BY MR. SMITH) With Mr. Furr?
25 A. Correct.

25

1  Q.  All right. Any conversations regarding Mr.
2  Puls with Ms. Sonner after that point in time?
3  A.  I believe I -- well, I know I let her know
4  that I was going to be deposed in this matter.
5  Q.  Have you ever attended any kind of executive
6  leadership or managerial training with Landmark
7  Communications?
8  A.  No.
9  Q.  You're familiar with the benefit package
10 that Trader Publishing offered to its employees in
11 January of 2006?
12 A.  Generally, yes.
13 Q.  Do you know whether that was the same
14 package that was offered to employees of Landmark
15 Communications?
16 A.  I do not know.
17 Q.  Does Landmark Communications itself, as a
18 holding company, have a human resources department?
19 A.  I don't know that Landmark Communications is
20 a holding company.
21 Q.  Okay. Whether they are or not, do they have
22 a human resources department?
23 A.  I -- there are human resources -- there is a
24 human resources department, as I understand it, at
25 Landmark, yes.

26

1  Q.  And either prior to Dominion or after
2  Dominion took over the operations of Trader Publishing,
3  would you have regular communications with anyone in that
4  department?
5  A.  I don't believe that Dominion took over
6  Trader Publishing Company. I believe Trader Publishing
7  just changed its name to Dominion Enterprises.
8  Q.  All right. Same question.
9  A.  I do not have regular contact with anyone at
10 Landmark. It's on an as-needed basis in response to
11 calls I receive from them, or if I ever needed anything,
12 I would contact them over there.
13 Q.  You learned at some point in time that
14 Landmark Communications would be transferring or selling
15 certain assets that it owned in Trader Publishing?
16 A.  Is that a question?
17 Q.  Yes.
18 A.  Yes.
19 Q.  In what time frame would you have learned of
20 that information?
21 A.  Around September 2005.
22 Q.  Do you know or do you have an understanding
23 yourself of the reason for the sale or divestiture of any
24 assets of Trader Publishing?
25 A.  By Landmark?

27

1  Q.  Yes.
2  A.  I was informed generally that Landmark -- I
3  believe it was reported in the newspaper, Landmark stated
4  that they had a high concentration of assets in
5  classified advertising.
6  Q.  And they wanted to divest themselves of
7  those assets?
8  A.  And that played a role in the decision to
9  sell their portion of Trader Publishing Company.
10 Q.  All right. Did you have a discussion with
11 anyone at Auto Trader at any point in time regarding Mr.
12 Puls?
13 A.  I'm unclear what you mean by "Auto Trader."
14 Q.  Okay. Auto Trader was a division or a part
15 of Trader Publishing Company prior to its assumption by
16 Dominion Enterprises?
17 A.  Repeat that. I think -- repeat that,
18 please.
19 Q.  All right. Was Auto Trader a division of
20 Trader Publishing Company?
21 A.  Yes.
22 Q.  All right. And were they under your
23 contacts, as well as the other divisions of Trader, prior
24 to the creation of Dominion Enterprises?
25 A.  The West Coast of the Auto Trader division,

28

1  yes.
2  Q.  All right. Did you ever have any contact
3  from anyone at Auto Trader regarding Mr. Puls?
4  A.  No.
5  Q.  Would you have a -- any interaction with a
6  Gary Craig with Auto Trader?
7  A.  Any interaction in general?
8  Q.  Yes.
9  A.  I have worked with Gary Craig, yes.
10 Q.  All right. That portion of the business was
11 divested to Cox Communications?
12 A.  The Auto Trader division, as it pertains to
13 automobiles, yes.
14 Q.  All right. Do you have any continued
15 contact with that division that was previously with
16 Trader Publishing Company?
17 A.  The only interaction I still have with any
18 part of the auto trade division is the portion that
19 Dominion Enterprises has which relates to specialty
20 vehicles, recreational vehicles. So it is not the Auto
21 Trader publications. It is our specialty publications.
22 Q.  Was anyone other than Ms. Sonner, yourself,
23 and Mr. Saslavsky involved from Trader Publishing
24 standpoint -- and Mr. Hibert -- involved from Trader
25 Publishing Company in the decision whether to rescind the

Puls v. Landmark Community Newspapers

Susan Blake

**29**

1  offer of employment to Mr. Puls?
2   A.  No.
3   Q.  In other words, Mr. Saslavsky, presumably,
4  did not consult with anyone other than yourself regarding
5  rescinding the offer of employment?
6   A.  If he did, I was not aware of it.
7      MR. SMITH:  Okay.  Let's take a minute.  I
8  don't think I have much more.
9      (Break from 9:41 a.m. to 9:47 a.m.)
10   Q.  (BY MR. SMITH) Just a couple more
11  questions, Ms. Blake.  Prior to this contact as to Mr.
12  Puls, had you received any similar inquiries or any
13  similar input from any Landmark Communications company
14  about a possible hire by Trader?
15   A.  Yes.
16   Q.  And what do you recall in that regard?
17   A.  I don't remember specific instances, but I
18  know it had come up before that if someone needed
19  information on a former Landmark employee, I directed
20  them to Melody Hester to get the contact name at Landmark
21  and directed them to contact Landmark.
22   Q.  And were you, personally, involved in those
23  contacts, or was --
24   A.  Which contacts?
25   Q.  The contacts in the other instances, or was

**30**

1  the extent of your involvement simply to refer them to
2  Ms. Hester to obtain the name of a contact at Landmark?
3   A.  Generally, I forwarded them on to Melody
4  Hester, who either gave me a name that I passed along, or
5  Melody responded to them and gave them a name at
6  Landmark.
7   Q.  All right.  In other words, you didn't have
8  any involvement similar to what you had in this instance?
9   A.  The -- the involvement I had in prior
10  instances was just to pass along the information.
11      MR. SMITH:  All right.  Subject to that, I
12  have no further questions.  Billy, I think there are
13  documents we clearly do not have, and I reserve the right
14  to redepose Ms. Blake upon production of those.
15      MR. FURR:  Well, as I've stated to you in my
16  cover letter, the party in this lawsuit is Landmark
17  Community Newspapers, Inc., and they -- we have produced
18  any documents that are in their possession.  You're
19  asking about documents that are in the possession of
20  Dominion Enterprises, and that would not be subject to
21  the request for production.  In my cover letter to you, I
22  told you that and said that if you wanted to coordinate
23  the production of documents from other Landmark entities,
24  I would be happy to do so, but I'm not sure that's basis
25  to reopen a deposition.

**31**

1      MR. SMITH:  Well --
2      MR. FURR:  So I think the proper way to get
3  documents from Dominion is to either ask me and I can
4  either voluntarily produce it, or issue a subpoena which
5  would be -- make me subject to responding to, but it's
6  not through a request for production of documents to
7  Landmark Community Newspapers, Inc.
8      MR. SMITH:  Well, I think the scope of the
9  inquiry was -- did extend to those entities, but I will
10  clarify that.
11      MR. FURR:  Okay.  I did address that in my
12  cover letter to you when I sent the documents from
13  Landmark.  I wanted to -- the reason I covered that in
14  the letter is because I wanted to be clear what I was
15  producing and that I was happy to work with you on
16  producing documents from other Landmark entities.
17      MR. SMITH:  All right.
18      MR. FURR:  So I do not have any questions
19  for the witness, and she would like to read it before it
20  is finalized.
21      THE REPORTER:  Thank you.
22      MR. SMITH:  And again, you'll coordinate
23  that?
24      MR. FURR:  Yes, you can coordinate that
25  through me.

**32**

1      MR. SMITH:  Thank you.  No further
2  questions.
3      MR. FURR:  Have a nice day.
4      WHEREUPON, the within proceedings were
5  concluded at the approximate hour of 9:51 p.m. this 1st
6  day of May, 2007.
7         *    *    *

(Pages 29 to 32)