IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No.: 07-cv-00170-RPM-CBS

RUSSELL A. PULS, JR.,

    Plaintiff,

v.

LANDMARK COMMUNITY NEWSPAPERS, INC., a Virginia corporation, and
LANDMARK COMMUNITY NEWSPAPERS OF COLORADO, INC., a Colorado corporation,

    Defendants.

## AFFIDAVIT OF KIM HOGAN

STATE OF KENTUCKY,

COUNTY OF Shelby, to-wit:

This day personally appeared before me, a Notary Public, in the aforesaid jurisdiction, Kim Hogan, who after first being duly sworn, stated and deposed as follows:

1.    My name is Kim Hogan and I am currently employed as Director of Circulation at Landmark Community Newspapers, Inc ("LCNI"). From 2000 to 2006, I was employed as Human Resources Director for LCNI. As the former Human Resources Director of LCNI, I am familiar with the employment of Mr. Russell A. Puls.

2.    LCNI employed Mr. Puls as its Advertising Sales Director from July 2, 2001 to August 26, 2005. As Advertising Sales Director, Mr. Puls was responsible for managing the advertising sales staff and improving sales performance.

3.    LCNI discharged Mr. Puls on August 26, 2005 based on two specific incidents. First, Mr. Puls developed a highly inappropriate script for the sales staff to use during sales calls

I-754998.1

EXHIBIT 4

Exhibit A-1

to prospective advertisers in connection with an upcoming event involving the Fire Department. Mr. Puls apparently instructed his staff to request that prospective advertisers sign up for advertising packages. He directed the staff to respond to negative answers from prospective advertisers as follows: "Well, that's really unfortunate that you can't support customers that spend money on you. I'll be passing this along to the fire chiefs at each department."

4. This negative and threatening language is contrary to company policy and Mr. Puls should have known that when he developed the script and passed it along to his sales team. At least one member of his sales team reported that she had objected to using the script because she felt uncomfortable and did not want to offend advertisers. Nonetheless, Mr. Puls directed the entire staff to use the script "word for word" because "it works." I became aware of the script when one staff member forwarded it to management.

5. The second incident that led to Mr. Puls' discharge occurred within roughly the same timeframe. One of LCNI's advertisers, Safeway, withdrew its advertisement from LCNI's publication, 285 Hustler. In response, Mr. Puls directed the publication to place an ad in the spot where the Safeway ad had previously appeared. The ad that ran in lieu of the Safeway ad contained the following language:

> "You won't find Safeway in the 285 Hustler anymore! Safeway has decided NOT to advertise locally for YOUR shopping convenience. You can express your opinion about their decision by calling your local Safeway store. 303-838-9868."

The ad was completely inappropriate and the publication received a number of complaints about it. Mr. Puls should have known that it was unacceptable for him to have run such an ad.

6.  Following his termination, Mr. Puls entered into a settlement agreement with LCNI. The settlement agreement provided that Mr. Puls would be permanently separated from employment with "LCNI" and defined "LCNI" broadly as:

> "Landmark Community Newspapers, Inc., Landmark Community Publications, Inc., their past, present, and future agents, employees, directors, officers, shareholders, affiliates, insurers, reinsurers, affiliated corporations or other entities, successors in interest and newspapers."

7.  The settlement agreement also provided that "LCNI," as defined in the agreement, would provide Mr. Puls with neutral references and that Mr. Puls would release any claim against "LCNI."

8.  In January of 2006, I learned that Mr. Puls had applied for employment with Trader Publishing Company ("Trader"), another Landmark entity.

9.  In my view, Landmark could not re-hire Mr. Puls back into the company. LCNI is affiliated with Trader, as both entities are Landmark companies. We work closely with Trader and view the company as we would any other company within the Landmark family. I have never hesitated to provide information to Trader about a former LCNI employee. I have also never hesitated to request similar information from Trader. I have done so many times in the past in analogous situations. Landmark encourages sharing of such information internally and views the close relationship between the Landmark companies including Trader as one of its greatest assets.

10. Mr. Puls knew or should have known of Trader's affiliation with LCNI. We inform our employees of LCNI's relationship to other Landmark entities from the beginning of their employment. First, Trader is referenced in some of our human resources materials. See copies of human resources materials, attached as Exhibit A. Then, during orientation, all new employees watch a video entitled, "This is Landmark Communications." The video references

3

I-754998.1

Trader and Trader's logo appears at least twice on the screen. Mr. Puls watched this video on his first day of employment. See copy of New Employee Orientation Checklist for Mr. Puls, attached as Exhibit B. In addition, Mr. Puls attended a Landmark leadership seminar with managers from other Landmark entities in March of 2005 during which Trader's relationship to Landmark was the subject of a quiz. See copies of Leadership Class Roster and quiz, attached as Exhibit C. During Mr. Puls' employment, Trader was also in the process of constructing a new building to serve as its headquarters. There were frequent discussions regarding this development. I do not believe that Mr. Puls can truthfully state that he did not know that Trader was affiliated with LCNI.

11. Upon hearing that Mr. Puls had applied for a position with another Landmark entity, I contacted Ms. Sunny Sonner, the Executive Vice President of Human Resources at Trader, and informed her that Landmark had signed a severance agreement with Mr. Puls that stated that he would be permanently separated from Landmark entities.

12. I know Ms. Sonner, as we have worked on various projects together, such as drafting executive training and development plans for Landmark companies. We freely shared this information with each other about former employees and other internal human resources issues.

13. Ms. Sonner informed me that she was not aware of Mr. Puls' settlement agreement with Landmark. She indicated that Mr. Puls had told Trader that he left the company because he disagreed with LCNI management.

14. I told Ms. Sonner that Mr. Puls had been discharged and that he was not eligible for re-hire. I did not tell Ms. Sonner the specific reasons for Mr. Puls' discharge.

4

I-754998.1

15. The company's position has remained the same throughout this process – Mr. Puls was terminated for legitimate, non-discriminatory reasons. Mr. Puls signed a contract with LCNI and its affiliates/affiliated entities in which he agreed that he would be permanently separated from Landmark companies. Trader is an affiliate/affiliated entity of LCNI and it was therefore appropriate for LCNI to disclose the terms of the severance agreement to Trader, a Landmark operation.

_____
Kim Hogan

Subscribed and sworn before me this  18th  day of May, 2007.

_____
Notary Public

My Commission Expires: 3-25-09