Puls v. Landmark Community Newspapers                                    Kim Hogan

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 07-CV-00170-RPM-CBS

TELEPHONE DEPOSITION OF: KIM HOGAN
April 30, 2007

RUSSELL A. PULS, JR.,
Plaintiff,
v.
LANDMARK COMMUNITY NEWSPAPERS, INC., a Virginia corporation,
and LANDMARK COMMUNITY NEWSPAPERS OF COLORADO, INC., a
Colorado corporation,
Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 1515
Arapahoe Street, Tower I, Suite 530, Denver, Colorado 80202
at 11:00 a.m. before Rory L. Joyner, Certified Realtime
Reporter, Registered Professional Reporter and Notary Public
within Colorado.

---

2

APPEARANCES
For the Plaintiff:      BRUCE G. SMITH, ESQ.
                        Darling, Bergstrom, & Milligan, PC
                        1515 Arapahoe Street
                        Tower 1
                        Suite 530
                        Denver, Colorado 80202

For the Defendants:     WILLIAM M. FURR, ESQ.
(By telephone)          Willcox & Savage, P.C.
                        1800 Bank of America Center
                        Norfolk, Virginia 23510
Also Present:           Russell A. Puls, Jr.

---

3

INDEX
EXAMINATION OF KIM HOGAN:                             PAGE
April 30, 2007

By Mr. Smith:                                         7, 75

By Mr. Furr:                                          72

INITIAL
DEPOSITION EXHIBITS:                                  REFERENCE
1    Response to Request for Production of
     Documents                                        --

2    Payroll Authorization, Effective Date
     8/26/05                                          45
3    Performance Review Summary, 3/1/04               --
4    Performance Review Summary, 1/22/02              --
5    Equal Employment Opportunity and Sexual
     Harassment policies, signed 6/26/01              --

6    First Day Orientation Checklist, 7/2/01         --

7    Employment application acknowledgement,
     6/27/01; and Handbook/Supplies Receipt
     Acknowledgment, 6/26/01                          --

8    Memo to Ms. Hogan from Mr. Puls, 6/30/02        --

9    E-mail chain to Pat Richardson from
     Mr. Puls, 6/27/05                                --
10   E-mail chain to Mr. Porterfield from Pat
     Richardson, 7/12/05                              --

11   Document, "Events occurring outside of my
     regular job"                                     --
12   E-mail chain to Ms. Hogan from Mr. Puls,
     8/22/05                                          --

13   Document, "Porterfield retaliation
     complaint," 8/22/05                              --

---

4

14   E-mail chain to Ms. Hogan from Mr. Puls,
     8/22/05                                          62
15   Memo to Mr. Porterfield from Mr. Puls,
     8/23/05                                          --
16   Memo to Mr. Porterfield from Mr. Puls,
     8/23/05                                          --

17A-O Typed notes re conversations of
     Mr. Porterfield and Ms. Hogan with
     employees re Safeway ad and Big Chili
     script                                           28
18   Memo to Ms. Hogan from Mr. Puls, 8/23/05         --
19   E-mail to Mr. Bradberry from Mr. Puls,
     8/24/05                                          --

19A  Memo to Mr. Porterfield from Mr. Puls,
     8/25/05                                          --
19B  Memo to Ms. Hogan from Mr. Puls, 8/25/05         --
20   E-mail to Mr. Porterfield from Mr. Puls,
     8/26/05                                          --

20A  Letter to Russell                                --

20B  Memo to Kiersten from Russell, 4/18/05           --

21   Letter to The Files from Ms. Hogan               50

22   Letter to Mr. Meyer from Mr. Smith,
     2/6/06                                           --
23   Letter to Mr. Smith from Mr. Meyer,
     2/23/06                                          --

24   Letter to Ms. Romero from Ms. Hogan,
     5/1/06                                           --
24A  Notice of Charge of Discrimination,
     4/3/06                                           --

24B-D Letter to Ms. Romero from Ms. Hogan,
     5/1/06                                           71
24E  Document, "Script, Told to follow exactly"      --

---

Coffman Reporting
303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM



EXHIBIT 5

(Pages 1 to 4)

**49**

1   agreement, what did you know about the potential sale of
2   the interest in Trader Publishing?
3       A.   I don't remember the time frame there. I
4   don't recall if I -- I don't believe that I knew that we
5   were contemplating selling Trader at the time, but I
6   don't recall the specific dates.
7       Q.   Did Mr. Porterfield or Mr. Abernathy, to
8   your recollection, mention or discuss that in that
9   context?
10      A.   Mention or discuss what that might have to
11  do with the fact that Landmark was looking at working
12  towards an agreement with Cox?
13      Q.   Or selling its interest in the Trader
14  Publishing Company.
15      A.   No, we never had a conversation about any of
16  that.
17      Q.   What, if any, discussion -- well, what, if
18  any, regular dealings would you have with Trader
19  Publishing as human resources director?
20      A.   Well, there are different times that I've
21  called different people in Trader for help on things.
22  Are you asking about specifically in the HR department,
23  or are you asking about while working with Landmark?
24  Because there are other times that I've called them for a
25  lot of other reasons outside of the HR position.

**50**

1       Q.   Well, I'm thinking specifically as to HR and
2   specifically as to Trader, not Landmark.
3       A.   Okay. If -- since I -- when -- at the time
4   I was in the HR position, I called Sunny Sonner and some
5   folks that worked in training for Trader Publishing, as
6   well, for help on different things that we were working
7   on. For example, we created a general manager
8   development plan here, and I called and asked Sunny for
9   some help on some of the development plans that they had
10  in place and some of the training plans that they had
11  created to have folks go through over an annual period to
12  prepare them for advancement in the company, and she sent
13  me a copy of their plan, that kind of thing. I would
14  make calls to them for that kind of thing, to ask for
15  them to send me copies of the training plan or to help
16  give me advice on a problem that we were working with,
17  that sort of thing.
18      Q.   What is Ms. Sonner's position?
19      A.   I don't know her exact title, but she is in
20  HR. I think she is vice president of human resources or
21  something, but I don't know her exact title.
22      Q.   And is that VP of HR at Landmark?
23      A.   Yes, at Trader.
24      Q.   At Trader? All right. Let me -- let me
25  have you refer to Exhibit 21. Do you have that exhibit

**51**

1   before you?
2       A.   Yes.
3       Q.   This, again, is a typed note that you typed
4   up?
5       A.   Yes.
6       Q.   And is this also from handwritten notes?
7       A.   I -- I don't know. Sometimes I typed them
8   at the time that it happened, and sometimes I took
9   handwritten notes. It would depend on if I was sitting
10  at my desk and someone called and I just started writing
11  or typing. I don't know.
12      Q.   Do you recall the date when you typed this
13  up?
14      A.   No, sir, I don't.
15      Q.   Was it after the filing of the second EEO
16  charge?
17      A.   I don't -- I don't recall. I don't know.
18      Q.   Would you have the original notes from this
19  conversation?
20      A.   If I hand-wrote them before, but again, I
21  don't know if I hand-wrote them or not.
22      Q.   Okay.
23      A.   Typically, in a situation like this, I would
24  not handwrite notes and then type them, because it
25  wouldn't be something that I was talking to somebody over

**52**

1   the phone where I was in a hurry, where I was writing
2   really fast.
3       Q.   All right. So this would not be your
4   typical practice is to type them up in this fashion?
5       A.   I would type a note up to the file, but I
6   wouldn't handwrite it first, because I was not on the
7   phone in a hurry taking notes down while someone was
8   talking to me.
9       Q.   All right. Based on this conversation
10  that's reflected here with Mr. Porterfield and with Mr.
11  Abernathy, you contacted Ms. Sonner; is that correct?
12      A.   I -- no. I contacted -- yeah. I contacted
13  Sunny Sonner, that's correct, at Trader.
14      Q.   All right. Did she ever call you back?
15      A.   She did. I left her a message and she
16  called me back.
17      Q.   And best you recall, what was stated in that
18  conversation by you and by her?
19      A.   To the best of my recall, it was something
20  like, Kim, I got your message; I've been out of town; I'm
21  sorry, but Mr. Puls did apply for a position, and I was
22  not aware that he previously signed an agreement with
23  Landmark, and can you give me more details about what the
24  situation is with him, because my understanding is that
25  he left the company and -- I believe she said because of

**Page 53**

1  a disagreement with management or not agreeing with
2  management. And she left me a message and told me that,
3  and then I called her back.
4      And we went -- she asked me if he had, in
5  fact, worked for LCNI, and I said yes. And she said that
6  he told them in the interview and he had put on his
7  application, I believe, that he had left the company,
8  again, because of not agreeing with management in some
9  way. And she said, Is that correct? And I said no. And
10 then she asked me if he was terminated from the company,
11 and I said, Yes, he was. And she said, Can you tell me
12 why? And I said, I don't want to get into the specifics
13 of it, but he made some decisions that we didn't agree
14 with, that we felt were not in the best interest of the
15 company and were seen as unethical, and he was
16 terminated.
17     Q.   You saw it as unethical?
18     A.   Yes.
19     Q.   All right. Let me back up. Who initiated
20 the first call regarding Mr. Puls? Was it you or Ms.
21 Sonner?
22     A.   Someone from Trader, and I -- I didn't get
23 the call, so I don't -- I can't say who it was, but
24 someone from Trader initially called our Evergreen office
25 and spoke to Brad Bradberry and wanted a reference. And

**Page 54**

1  again, I don't know who that was, because I didn't
2  participate in that conversation. And then Brad told Don
3  about it and wanted to know if he should call them or
4  what, since they were internal, because we -- we do allow
5  and encourage people to give references inside the
6  company, but other than that, we tell people to have them
7  call here to the central office HR department. So
8  because of the situation surrounding Russell, I'm
9  assuming he had -- he asked Don about it. I don't know
10 exactly why, because I don't know what Brad was thinking,
11 but he asked Don how he should handle it.
12     Q.   All right. My question was, did you
13 initiate the conversation or did Ms. Sonner?
14     A.   I -- Don came by here and told Mike and I,
15 and we had a discussion and agreed I would contact Ms.
16 Sonner, and I contacted her.
17     Q.   And apparently, according to this note, you
18 left a message?
19     A.   Yes.
20     Q.   All right. In your prior statement, you
21 said at the time, you were not aware of an agreement that
22 he had with Landmark. What were you referring to?
23     A.   At the time, I wasn't aware that who had an
24 agreement with Landmark?
25     Q.   I may have misunderstood your prior

**Page 55**

1  testimony. I thought you said at the time, I think, of
2  your initial conversation with Ms. Sonner, you weren't
3  aware of a previous -- that he had previously signed an
4  agreement with Landmark?
5      A.   No. You must have misunderstood me, because
6  I don't recall saying that.
7      Q.   All right. Did you -- did you pull up the
8  separation agreement with Mr. Puls at the time you had
9  the conversation with Ms. Sonner?
10     A.   No, sir.
11     Q.   Did you refer to it in any way?
12     A.   I don't recall referring to it, other than
13 to tell her that I -- I'm sure I did tell her that he had
14 signed an agreement and couldn't work for the company,
15 but I would not have gone into specifics about the
16 agreement, no.
17     Q.   Why not?
18     A.   Because I didn't see the need to.
19     Q.   Okay. Did you ever supply a copy of the
20 agreement to Ms. Sonner or anyone else at Trader?
21     A.   No, I don't believe I did. I don't recall
22 doing that.
23     Q.   Were you ever asked to?
24     A.   I don't recall being asked to, no.
25     Q.   Did you discuss with Ms. Sonner that Mr.

**Page 56**

1  Puls did have a separation agreement?
2      A.   Yes.
3      Q.   Did you discuss what the terms of that
4  separation agreement were?
5      A.   No.
6      Q.   What was the context of the discussion about
7  the agreement? Simply that one existed?
8      A.   Just that one existed and that he was
9  permanently separated from the company.
10     Q.   Okay. That's the only term that you
11 discussed with her?
12     A.   I believe so.
13     Q.   All right. Was it Mr. Abernathy or Mr.
14 Porterfield that suggested you call Trader?
15     A.   The suggestion came from Mr. Abernathy.
16     Q.   And did Mr. Abernathy say why he suggested
17 you call Trader?
18     A.   Yes, because Russell could not -- we would
19 be rehiring him within our own company.
20     Q.   Did Mr. Puls -- did Mr. Abernathy or Mr.
21 Porterfield ask you about the separation agreement?
22     A.   No, but at that time, they would have both
23 been aware of it, because they were familiar with the
24 agreement at the time that Mr. Puls signed the agreement.
25     Q.   They would have been aware of it because