IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No.: 07-CV-00170-RPM-CBS

RUSSELL A. PULS, JR.,

Plaintiff,

vs.

LANDMARK COMMUNITY NEWSPAPERS, INC., a Virginia corporation, and LANDMARK COMMUNITY NEWSPAPERS OF COLORADO, INC., a Colorado corporation

Defendants.

---

**PLAINTFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Plaintiff Russell Puls, by his attorneys Darling, Bergstrom & Milligan, PC, and for his response to the Defendants' motion for partial summary judgment submits the following.

**Procedural Posture**

LCNI asserts it is entitled to summary judgment because the reference it gave for Mr. Puls was permissible under the parties' Severance Agreement and therefore not a breach of contract or interference with his contract with his new employer. It contends that it was permitted to tell the new employer, Trader Publishing, that Mr. Puls had been discharged by LCNI. By stipulation of the parties, discovery in this matter was limited to this issue and was not extended to the other issues raised by the claims.

**Summary of Argument**

Mr. Puls negotiated a severance stipulation which revised the reason for the separation. In a related provision the parties agreed that LCNI would give only a neutral reference to

prospective employers of Mr. Puls. Both provisions together were critical to the Plaintiff, who sought a new position after the termination and was concerned about the effect of disclosing a prior discharge. At his request, therefore, the Agreement was specifically revised as to the reason for separation by removing a statement of involuntarily termination and substituting the statement that "Puls separated." In this way the parties had converted to a neutral separation what had previously been recorded as a discharge.

It was Mr. Puls' intention and understanding that the fact of initial involuntary termination not be shared with any company other than LCNI itself and its community newspapers. The Severance Agreement did not permit LCNI to inform any prospective employer of Mr. Puls initial discharge. Trader, as a partnership in which LCNI's holding company parent Landmark Communications owned 50%, is not an affiliate of LCNI by the generally accepted definition of affiliate. Mr. Puls' belief that Trader Publishing was a separate entity not falling within the definition of "LCNI" under the Severance Agreement was indirectly confirmed as the correct one by LCNI's prior counsel. Mr. Puls did not intend to waive his right to apply to other Landmark Communications ventures; LCNI's H.R. manager had no authority to speak on behalf of other LCNI entities to impose such a waiver; and Trader did not consider that Mr. Puls had waived such right. To the extent there is any ambiguity in the Agreement as to what could be said and to whom about Mr. Puls' termination, it presents an issue of fact as to the parties' intent.

In light of the foregoing, and the fact that the Trader interest was being divested by Landmark Communications at the time the reference was given, LCNI's motive in precluding Mr. Puls' employment with Trader was punitive. At a minimum, its motivation is an issue of

fact and further precludes summary judgment on the claim of tortious interference with contract, and if raised in the future, the Title VII retaliation claim.

**Statement of Facts**

1. Defendants Landmark Community Newspapers, Inc. and Landmark Community Newspapers of Colorado, Inc. (together "LCNI") are companies engaged in the publishing of local newspapers.

2. Mr. Puls was employed by Defendants LCNI from July 2, 2001 to August 26, 2005 as advertising director for its Evergreen Newspapers. (Puls Affidavit, ¶ 2)

3. While employed by LCNI, Mr. Puls complained about the treatment of female employees and demeaning statements to and about them by Publisher Mike Coggins. (Puls Affidavit, ¶ 3) He complained to Human Resources Director Kim Hogan and to Regional Director Don Porterfield. (Puls Affidavit, ¶ 4; Kim Hogan deposition, 22:7-12) LCNI has its own internal policy against sexual harassment which includes a non-retaliation clause. (Ex.2)

4. After Mr. Puls detailed the conduct of Mr. Coggins to Don Porterfield, Porterfield stated in a threatening manner to Puls that he was going to bring in a new publisher and "Well see just how you do under the new publisher that I bring in." (Puls Affidavit, ¶ 4)

5. Brad Bradberry then replaced Coggins as publisher of the Evergreen Newspapers. From the outset, Mr. Puls was critical of Mr. Bradberry's management style and treatment of co-employees, especially women. (Puls Affidavit, ¶ 6)

6. Mr. Bradberry did the following: repeatedly remark about women employees' anatomy in either a sexually suggestive manner or highly unflattering way, refer to them as "fucking bitches", embrace certain of them suggestively, and directing the hiring of only, in

Bradberry's words, "young attractive women instead of more old, fat ones." (Puls Affidavit, ¶ 5)

7. As confirmed by Kim Hogan's notes and statements, Mr. Puls complained to Ms. Hogan of Bradberry's conduct and also actions perceived as further retaliation by Mr. Porterfield. (Exs. 3 and 4)

8. After he complained, Publisher Brad Bradberry and LCNI began an investigation into Mr. Puls' conduct related to matters previously subject to no disciplinary action, warning or criticism. Mr. Puls believed he was being subjected to selective treatment and retaliation for his complaints. (Puls Affidavit, ¶¶ 6 and 7)

9. At the point where he stated he had obtained legal counsel, Mr. Puls was terminated. (Puls Affidavit, ¶ 7)

10. Mr. Puls then contacted the EEOC and scheduled an intake appointment to file a charge of retaliation and hostile work environment. (Puls Affidavit, ¶ 8)

11. Prior to his meeting with the EEOC, LCNI entered into settlement negotiation of a severance agreement. After reaching agreement on the monetary amount of severance to be paid, LCNI's attorney forwarded a draft settlement agreement. (Ex. 5)

12. Because of concerns about applying for future employment, Mr. Puls insisted that it be modified to state that he was not involuntarily terminated. He also wanted LCNI to agree it would not give a negative reference about him to any potential employer. Through his counsel he therefore rejected Ex. 5. (Puls Affidavit, ¶ 10)

13. LCNI's attorney sent another draft (Ex. 6), which Mr. Puls also rejected for the same reason of how the separation would be regarded in applying for future employment. (Puls Affidavit, ¶ 10)

14. LCNI's attorney then sent Ex. 1 (the final "Severance Agreement" or "Agreement"), which Mr. Puls accepted and signed with the understanding that it stipulated Mr. Puls had initiated the separation from LCNI. While believing that the Agreement was directed at LCNI and its newspaper properties, Mr. Puls nevertheless wanted to have it specifically included that Evergreen Newspapers could give only a neutral reference. (Puls Affidavit, ¶ 14, 15)

15. It has been the firm policy or at least practice of LCNI to give only a neutral reference for any ex-employee of the company. (Puls Affidavit, ¶ 16; Kim Hogan deposition, 47:5-18) This was confirmed in the initial refusal of Mr. Puls' boss at LCNI, Brad Bradberry, to give any reference about him. (David Saslavsky deposition, 28:21-23)

16. Mr. Puls relied on this policy, and his understanding of the Severance Agreement, in entering into the Agreement. (Puls Affidavit, ¶ 16). Based on both, he believed that LCNI would not divulge the original circumstances of his separation to any person other than LCNI itself, meaning the corporate office and the various newspapers owned and operated by LCNI. These were critical material terms to Mr. Puls, especially given the small amount of the severance payment. In reliance, Mr. Puls withdrew his charge of discrimination with the EEOC. (Puls Affidavit, ¶¶ 15, 16; Ex. 7)

17. Mr. Puls knew that Landmark Communications, Inc. ("Landmark") owned LCNI and had ownership interests in a number of entities, including the Weather Channel. (Puls Affidavit, ¶ 11) Landmark also owned such diverse enterprises as radio stations and career schools. (*See* Exs. 8, 9, Ex. A to Hogan Affidavit) Landmark, in Mr. Puls' experience, is essentially a holding company and had treated its various ventures as entirely separate for management and operations purposes. (Puls Affidavit, ¶ 11) Accordingly, Mr. Puls interpreted

"LCNI" narrowly for purposes of the Severance Agreement, as evidenced by his focus on adding Evergreen Newspapers in the "neutral reference" provision. He believed that the neutral reference policy applied even among the entities in which Landmark had an ownership interest. (Puls Affidavit, ¶ 15) The Plaintiff never considered that the Severance Agreement meant he could not to seek or accept employment with any company in which Landmark owned an interest, other than LCNI and its newspapers. (Puls Affidavit, ¶ 12) He believed that the addition of the language defining LCNI in the Severance Agreement was boilerplate added solely to assure a broad release of LCNI's properties themselves. (Puls Affidavit, ¶¶ 13, 17)

18. Trader Publishing ("Trader") was a company that published a broad array of trade and advertising journals. Prior to its divestiture in September 2006, Trader a partnership owned 50% by Cox Communications, 50% by Landmark Communications. (Defendants' brief) Landmark had announced in September 2005 its intention to divest itself entirely of its interest in Trader, and this was known to upper management at LCNI and Trader at the time of LCNI's reference to Trader about Mr. Puls. (Ex. 10; Hogan deposition, 70:13-23; deposition of Susan Blake, Trader H.R. manager, 26:13-27:9) Trader published classified-advertising type niche market publications which were very different in marketing and operations than the community newspapers of LCNI. There is no document that refers to Trader as an "affiliate" of LCNI or even Landmark. (Ex. 11, Response to Request for Production of Documents, ¶ 10).

19. Mr. Puls was contacted in late 2005 by Ken Rogers, an in-house recruiter at Trader, which published United Parenting Magazines. Mr. Rogers then had David Saslavsky, national sales director of United Parenting, contact Mr. Puls. (Ex. 20) Mr. Saslavsky encouraged Mr. Puls to apply for the position of sales director of Colorado Parent Magazine, one of its publications. Mr. Puls stated that he had left employment at LCNI because of

differences over direction of the company, but avoided revealing the specific circumstances on account of the confidentiality and non-disparagement provisions of the Severance Agreement. (Puls Affidavit, ¶¶ 18 and 19)

20. Mr. Puls was subject to an intensive interview and evaluation process at Trader, including three interviews. (Saslavsky deposition, 25:24-26:1) Saslavsky believed the Plaintiff to be qualified and highly motivated. (Saslavsky deposition, 35:14-19) Colorado Parent Magazine made an employment offer to Mr. Puls (Ex. 12), which he accepted, to start Monday January 23, 2006. (Ex. 13)

21. On Friday, January 20, 2006, Mr. Saslavsky telephoned Mr. Puls to state that the offer of employment was rescinded. The offer, which became a contract of employment upon acceptance, was rescinded because Mr. Saslavsky had been directed to do so by Susan Blake, an H.R. manager at Trader after talking with Kim Hogan at LCNI. (Saslavsky deposition, 42:11-17) Don Porterfield and LCNI President Mike Abernathy, together with Ms. Hogan, decided to call the Trader H.R. director and tell them about Mr. Puls, because "LCNI would not be rehiring him within the company." (Hogan deposition, 54:13-16; 56:13-19; Ex. 14) There is no evidence that Ms. Hogan had been requested or had authority to act on behalf of Landmark or any other Landmark enterprise in negotiating terms of the severance, particularly in demanding that Puls waive his right to work for any other Landmark venture. There is also no evidence that Landmark or any of its ventures rendered any payment or consideration to Puls for signing the Agreement.

22. Kim Hogan testified at deposition that Mr. Puls had made EEO complaints to the company. (Hogan, 22:7-12, Ex. 15, p. 3, Response to Allegation No. 2) In her call to Ms. Sonner and Blake she stated:

> And [Ms. Blake] said that [Mr. Puls] told them in the interview and he had put on his application, I believe, that he had left the company, again, because of not agreeing with management in some way. And she said, Is that correct? And I said no. And then she asked me if he was terminated from the company, and I said, Yes, he was. And she said, Can you tell me why? And I said, I don't want to get into the specifics of it, but he made some decisions that we didn't agree with, that we felt were not in the best interest of the company and were seen as unethical, and he was terminated.
>
> Q: You saw it as unethical?
>
> A: Yes.

(Hogan, 53: 5-18) Ms. Hogan admitted that the Severance Agreement does not state why Mr. Puls separated and whether it was his choice or the company's. (Hogan deposition, 68:16-18; 69:4-6; 73:13-15) She also stated that Landmark does not have a written definition of what constitutes an affiliate. (Hogan deposition, 75:22-24) Ms. Hogan's notes produced in discovery reflect that Mr. Puls had complained of retaliation shortly before his termination and that he had hired legal counsel. (Ex. 4 and 5)

23. Ms. Blake confirmed at deposition that Ms. Hogan initiated the call to Trader. (Blake deposition, 15:25-16:1) Hogan stated to her that the Plaintiff did not resign, but did not share the specific terms of the Severance Agreement. (Blake deposition, 23:15-17) (Ms. Hogan confirmed in her deposition that she did not supply a copy of the Severance Agreement to Trader, Hogan deposition, 55:19-21, and did not even refer back to it before the call. 55:7-16)) Hogan also told Blake and Sonner that Mr. Puls was not eligible for rehire with Landmark. (Blake deposition, 16:15-16) Blake's notes produced in discovery reflect that Hogan also told Blake that Mr. Puls had threatened to sue for harassment. (Ex. 16, underlined. This appears by the notes to be a primary motivation for calling Blake.)

24. Blake then told Saslavsky that it was not true that Mr. Puls had not been discharged and therefore the Plaintiff had made a false statement that necessitated rescission of his offer. (Saslavsky deposition, 43:18-22) Mr. Saslavsky stated it would have been important for him to know that the parties had changed the language regarding termination to show that Mr. Puls had initiated the separation. (Saslavsky deposition, 58:14-17)

25. Following the rescission of employment with Colorado Parent Magazine, Mr. Puls' counsel contacted LCNI counsel regarding the apparent breach of the Severance Agreement. In response, LCNI's counsel countered that the Plaintiff had violated the Agreement by making disparaging remarks about LCNI to a third party. (Exs. 17 and 18) This interpretation of the Agreement, which treated Trader as an entity separate from "LCNI" for purposes of the Agreement, was verified in advance with Trader's H.R. manager Blake. (Ex. 19)

26. The rescission of the Trader employment offer has damaged Mr. Puls directly by losing income, and indirectly by its effect on his obtaining other employment in the newspaper advertising field. It is estimated that Mr. Puls has lost over $350,000 in past and future wages and benefits as a result of the actions of LCNI.

## Legal Argument

### I. THE PARTIES INTENDED TO "GO ON RECORD" AS STIPULATING THAT MR. PULS WAS NOT INVOLUNTARILY TERMINATED.

It is a not uncommon occurrence for an employment separation that is originally a discharge to be modified "on the record" to show a voluntary separation. The obvious benefit to the employee is to avoid the stigma of an involuntary termination in finding new employment. This is sometimes done before the termination in the context of giving him/her the "right to resign." However, it also happens frequently after termination as part of a

settlement or severance agreement. Parties can retroactively modify the reason for a separation, and upon doing so are thereby bound by it. Especially where the employee would have a right to challenge and potentially overturn his discharge, a settlement that removes an adverse reason for termination is enforceable, even if not the original reason for the separation. See *Mattera v. Gambro, Inc.*, 94 Fed.App. 725, 729 (10th Cir. 2004) (where court acknowledged parties' settlement agreement to change fired employee's reason for termination to voluntary resignation was sufficient evidence to establish a prima facie case that employee was not fired); *Brockman v. Sweetwater School District No. 1*, 826 F.Supp. 1328, 1332 (D.Wyo. 1993) (where court upheld terms of settlement agreement that called for employer to expunge fired employee's personnel file of all negative information and make the file reflect that the employee was not terminated, but instead resigned). Thereafter, the employee may legitimately say that the reason for separation was not discharge, and the employer is similarly bound by the stipulated reason for the separation. *Id.*

Here, at a minimum, the parties modified and erased the "official" statement of involuntary termination. Even if entitled to share the reason for separation with another party, which is disputed, LCNI was therefore bound by mutual agreement to state at most that it was a neutral separation. This negotiated statement resolved a substantial dispute between the parties as to whether the termination was lawful. It also represented a bargain by which Mr. Puls agreed to release all claims, not disparage the company and keep the settlement confidential. In exchange he received a minor payment, a stipulation of at least neutral separation, and a commitment to give a neutral reference only. Since the settlement tied his hands in fully explaining his version of the termination to any prospective employer, which would of necessity involve potential disparagement and breach of confidentiality, he insisted that the

parties stipulate that it was not involuntary. He believed the revised statement would be the official record of his separation.

In agreeing to change the reason for termination and give only a neutral reference, LCNI effectively agreed to rescind the previously truthful statement Mr. Puls had been fired. Because LCNI breached the Severance Agreement by then giving an adverse and inaccurate reference about Mr. Puls, his claim for breach of contract and tortious interference with contract claims must stand.

## II. THE INTENDED BEARING OF THE SEVERANCE AGREEMENT ON EMPLOYMENT WITH OTHER LANDMARK INVESTMENTS IS A DISPUTED ISSUE OF FACT.

LCNI in effect argues that it had authority to bar Mr. Puls from employment with Trader because the Plaintiff agreed to relinquish that right. However, the Agreement does not express such a waiver, nor was that plainly its intent. Further, nothing evidences LCNI's authority to impose or seek such a bar on behalf of Landmark Communications ventures, and Trader itself did not conclude that Mr. Puls was barred from employment with that company.

### A. Trader is not an affiliate of LCNI within the intent of the Severance Agreement.

By general usage, an affiliate is an entity controlled by or under common control with the subject entity. *See, e.g.*, Virginia Stock Corporation Act § 13.1-725; C.R.S. § 7-101-401(2); *Black's Law Dictionary* 59 (7th Ed. 1999); Ex. B to Friddell Affidavit, Trader Publishing Joint Venture Agremeent, ¶ 2; *In re Blinds to Go Share Purchase Litigation*, 443 F.3d 1, 5-7 (1st Cir. 2006). A fifty percent owner does not "control" a company, and therefore remote sister companies of such entity are not affiliates. See e.g., *Am.Jur.2d Securities Regulation – Federal §8* ("ownership of a substantial block of a corporation's stock, but less than the majority interest, will not necessarily, in itself, make a shareholder a controlling

person, it being readily apparent that even ownership of 49 percent of the corporation's stock would not constitute control where the remaining 51 percent is in the hands of persons antagonistic to the 49 percent shareholder"); see also, *47B C.J.S. Internal Revenue §639* (provides a more stringent 80% voting power control standard in the context of affiliated companies qualifying to file consolidated versus separate tax returns). Defendant cites only one case in support of its claim of affiliate status—*National Propane Corp. v. Miller*, 18 P.3d 787 (Colo.App. 2000). In that case the corporations at issue were both subsidiaries owned entirely by a common parent. LCNI's argument falls of its own weight—a fifty percent owner does not control an entity; it can only invoke a stalemate. Trader Joint Venture Agreement, ¶ 8.I. And "affiliated corporations and entities," to have any meaning, must refer to insurors and reinsurors. Otherwise it is a meaningless redundancy. Finally, Defendants offer no authority and support for their interpretation of "entities."

At a minimum, the law as to what constitutes an affiliate varies widely, and depends on the jurisdiction and the purpose for which it is being evaluated. *See, e.g.*, Internal Revenue Code, *supra.*, by which an affiliated corporation is one owning 80% of the stock of the subject entity. Given this lack of a universal definition of the term, its meaning in an agreement is dependent ultimately upon the parties' intent. *In re Blinds to Go Share Purchase Litigation*, supra. Absent a clear statement of the parties' intent within the document itself, it remains an issue of fact.

Here, even if fifty percent ownership suffices to establish "affiliate" status for certain regulatory purposes, the parties did not clearly believe that Trader had such status. This is best evidenced by the conflicting interpretations by LCNI's own lawyers who drafted the Severance Agreement. They claimed both that Trader was part of LCNI but on the other hand that Mr.

Puls had disparaged LCNI to Trader. (Exs. 17 and 18) By definition, one cannot disparage a party to the party itself, since the essence of disparagement is a negative statement to a third party. *TMJ Implants, Inc. v. Aetna, Inc.*, 405 F.Supp.2d 1242, 1249 (D.Colo. 2005) ("A claim for disparagement requires demonstration of publication to a third party.") Plainly, LCNI's lawyers believed at least for some purposes that Trader was an entity separate from "LCNI."

Nor did Trader itself ever view Mr. Puls as being barred from applying for employment with it. In fact, it encouraged him to do so, suggesting it saw no bar. Though it was told by LCNI that Mr. Puls had been terminated from all Landmark affiliates, Trader did not cite this rationale in rescinding the offer to him or ever claim subsequently that the Severance Agreement was a bar. If Mr. Puls had indeed breached the Agreement by even applying, one would expect Trader to ask for, and LCNI to provide, a copy of the Severance Agreement that established this breach. There is no evidence Trader or any other Landmark venture paid consideration, or even authorized, such a sweeping bar. All appearances are to the contrary. The scope of Mr. Puls' permanent separation from LCNI is an issue of fact. *See* Puls Affidavit, ¶12. By logic, if there is an issue of fact regarding Trader's status as an affiliate under any part of the Agreement, that issue relates to all parts.

That Mr. Puls legitimately read the definition narrowly is consistent with the surrounding circumstances. The monetary settlement in this case was small, the main consideration being the certainty of a neutral reference to any employer. Landmark Communications is a widespread holding company with dozens of very diverse companies and ventures. It was not a company in which personnel frequently move from one division to another, and which therefore effectively has one employee base. Because employees did not typically move from one entity to another, there would be no standing exchange of information

about an employee of another entity. The definitional language in the introduction was added, almost certainly, to give LCNI a broad release rather than to bar Mr. Puls' employment with other Landmark ventures. If such was the intent of LCNI, it was not clearly expressed.

The Severance Agreement does not define "affiliate." For example, there is no mention of Landmark Communications or even "parent" corporations or companies in the LCNI definition, and the named parties are only Landmark Community Newspapers, Inc., Landmark Community Publications, Inc. (which owned Landmark Community Newspapers), and Evergreen Newspapers. Had the parties intended to cover all Landmark Communications investments, it would have been a simple matter to state this explicitly. It cannot be expected that Mr. Puls knew all of the corporate, partnership and investment relationships of Landmark Publishing. As to Trader Publishing, for example, Landmark's documents refer to its involvement with Trader only as an "interest" that it held, never as an affiliate. (Ex. 10) It was at best a very remote investment only indirectly affiliated with LCNI through the common "interest" of Landmark.

The "LCNI" definition is typical of boilerplate inserted in any release. Puls' request to add "Evergreen Newspapers" to the neutral reference provision demonstrates *his* belief that this provision applied specifically to LCNI entities. Mr. Puls certainly did not consider that he was barred from applying to Trader Publishing, nor did Trader, or that LCNI had the "privilege" under the Severance Agreement to give a negative reference about him to Trader. He, and LCNI's prior counsel, considered Trader to be a separate company for purposes of the Agreement. LCNI cites and has produced no document, other than the Agreement, that suggests it had a privilege to share confidential negative information with another Landmark venture and therefore its right rests solely on the intent of the Agreement. And because LCNI

incorrectly based its right to denigrate Mr. Puls to Trader on an illusory waiver of his right to seek employment with Trader, it had no privilege to do so. Mr. Puls' belief that Trader was not included within the Agreement's definition of "LCNI" at a minimum raises an issue of fact.

**B. An intent to waive the right to apply to a company in a severance agreement must be set forth explicitly and viewed in light of the intent of the agreement as a whole.**

LCNI also argues that Puls cannot enforce the Agreement because he violated it by applying to Trader. It argues that the language of permanent separation means he could not apply to any other Landmark Communications venture. Initially, there is no evidence that Ms. Hogan was requested, or even had authority, to impose or even seek this claimed term in the Severance Agreement or that there was consideration paid for it. There is no evidence apart from the definition that Landmark Communications in any way agreed to the settlement, was paying anything under it, or would be bound by it. Again, there is no evidence that Trader considered Mr. Puls was barred from employment with it. Certainly Mr. Puls did not interpret the Agreement in that manner.

By common practice, a waiver of the right to reapply to a company is almost invariably set forth explicitly. Because an employee is waiving or releasing a valuable right he/she would otherwise freely have, any agreement waiving the right to apply for employment must be stated explicitly and clearly. *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 80 (U.S.S.C. 1998); *Mountain States Tel. & Tel. Co. v. Dep't of Labor and Employment*, 559 P.2d 252 (Colo. App., 1976). Again, there is at least ambiguity as to the parties' intent under the Agreement.

To interpret its intent, a settlement agreement is to be read as a whole in the light of its practical effect. *Bangert Bros. Const. Co. v. Americas Ins. Co.*, 888 F.Supp. 1069 (D.Colo., 1995). There is a disputed issue of fact under the Severance Agreement as to the parties' intent

regarding sharing of information with any other Landmark Communications investment. Logically, if Mr. Puls had the right to apply to Trader, in order not to be effectively barred from work there it was anticipated that LCNI would give Mr. Puls a neutral reference only. Otherwise LCNI could effectively bar him from employment with any venture in which Landmark was invested by saying he was discharged for unethical conduct. This was certainly not Mr. Puls' intent or understanding.

Indeed, the fallacy in Defendants' argument can be seen in the scope of the very language on which it relies. By its reading, Mr. Puls is permanently barred from applying not only to Landmark Communications ventures but also to any of its numerous insurors and their affiliates. This consequence, never intended, demonstrates that the term "LCNI" is used inconsistently within the various provisions of the Severance Agreement, leading to substantial ambiguity as to the parties' intent.

Because there is an issue of fact as to the intent of the parties as to the Agreement's scope and use relative to other Landmark Communications ventures, summary judgment is improper.

## III. LCNI'S MOTIVATION FOR GIVING MR. PULS A NEGATIVE REFERENCE IS A DISPUTED ISSUE OF FACT.

Ms. Hogan's call to Trader effectively blackballed the Plaintiff from employment with any Trader company.[1] Hogan had no apparent authority to effect such a restriction. In its absence Mr. Puls was free to contract with any other company, and it with him. See *Penncro Assoc.*, supra.

---

[1] It also effectively blackballed Mr. Puls from employment with any Cox Communications company, since Cox was also recipient of the information as a 50% owner of Trader at the time. Nothing in the Agreement suggests permission to share negative information with Cox, but rather demonstrates the harm from such a widespread reference.

Several facts tend to show that the motivation for the reference was not a legitimate business purpose. First, Mr. Puls did not waive the right to go to work for any other Landmark enterprise nor Hogan have authority to demand it, yet Hogan misconstrued the Severance Agreement to mean that the Plaintiff was barred from employment with any Landmark venture. Importantly, if she believed that to be the case, she should have sent the Severance Agreement to Trader for enforcement of that bar. Hogan did not even refer back to the Agreement as to what had been agreed upon, an omission either negligent or something more.

Second, Hogan's knowledge at the time was that Trader was being divested by Landmark, thereby removing any interest, already remote, that LCNI would have in whether he worked there. Clearly no testimony or document suggests that Ms. Hogan had an obligation to inform Trader of anything about Mr. Puls. The standard policy of LCNI was to give no reference. By admission, the intent of the LCNI executives was that Mr. Puls simply not work for any company in which Landmark was invested.

Third, as shown by her notes, the reason for Hogan's calling Trader was to warn that Puls was in effect a "troublemaker" who might sue. This evidence gives rise to a claim of retaliatory motive, since he perceived his claims as well-founded. One need not prove he was actually the victim of discrimination in order to maintain a retaliation claim. *Jackson v. Birmingham Bd. of Education*, 544 U.S. 167 (2005).

Fourth, Ms. Hogan volunteered that Mr. Puls had been fired for violating the company's ethics, and thereby went far beyond even stating the fact of involuntary termination. Her reference was given not simply with the intent to answer Trader's question, but with intent to damage Mr. Puls. By giving Mr. Puls no advance notice of the reference and by the

language of the Agreement, Mr. Puls was precluded from countering the reference with his own version of the cause for his termination.

Motivation is a classic issue of fact. *Allen v. Trust Co. of Georgia*, 326 U.S. 630, 636 (1946); *Winkler v. Rocky Mountain Conference of United Methodist Church*, 923 P.2d 152, 162 (Colo.App. 1995); *448 Am. Jur.2d Interference §58*. Because there is an issue of fact as to such motivation, summary judgment is not proper as to Plaintiff's claim of tortious interference with contract. [2] *Id.* Defendants' reliance on *Electrolux Corp. v. Lawson*, 654 P.2d 340 (Colo.App. 1982), is misplaced. The holding there was clearly conditioned upon the existence of a privilege to compete. See, *Restatement (Second) of Torts* § 768 (1977). That element is not present here. Whether LCNI's interference here was improper is therefore dependent upon circumstances involving issues of fact. *Boettcher DTC Bldg Joint Venture v. Falcon Ventures*, 762 P.2d 788 (Colo.App. 1988); *Restatement (Second) of Torts* § 767 (1977).

Mr. Puls also has established a prima facie case of causation and damages. He would have been employed by United Parenting Publishing, at a substantial salary, but for the actions of LCNI.

## Conclusion

The intent of the Severance Agreement at issue, especially in light of its context and related circumstances, is at least ambiguous. The Plaintiff Russell Puls understood, and indeed bargained for, a meaning very different from that claimed by Defendants LCNI in their motion. At a minimum, the Defendants have failed to prove that the parties clearly intended a 50% partnership interest to constitute an "affiliate" under the Agreement. Whether a breach of the

[2] This factual dispute also precludes summary judgment on the issue of retaliatory action under Title VII, though the claim is not the subject of Defendant's motion.

Agreement and a tortious interference with his new employment occurred are therefore issues for a jury.

Submitted this 9th day of July, 2007.

DARLING, BERGSTROM & MILLIGAN, PC

By: /s/ Bruce G. Smith

Bruce G. Smith
Attorney for Plaintiff
1515 Arapahoe Street
Tower 1, Suite 530
Denver, CO 80202
Telephone: (303) 623-9133

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of July, 2007, a true and correct copy of the foregoing **PLAINTIFF'S RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT** was filed and served electronically and by U.S. Mail to the following:

Barbara A. Grandjean, Esq.
Jacobs, Chase, Frick, Kleinkopf & Kelley, LLC
1050 17th Street, Suite 1500
Denver, Colorado 80265

William M. Furr, Esq.
Willcox & Savage, P.C.
1800 Bank of America Center
Norfolk, Virginia 23510

Served via U.S. Mail
Russell Puls
28954 Needles Trail
Evergreen, CO 80439

/s/ Chris Allen