IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case No.: 07-CV-00170-RPM-CBS

RUSSELL A. PULS, JR.,

 Plaintiff,

vs.

LANDMARK COMMUNITY NEWSPAPERS, INC.,
a Virginia corporation, and LANDMARK COMMUNITY
NEWSPAPERS OF COLORADO, INC., a Colorado corporation

 Defendants.

## AFFIDAVIT OF RUSSELL A. PULS, JR.

The affiant, being of lawful age and first duly sworn, states and declares as follows:

1. I am the Plaintiff in this action and have personal knowledge of the facts stated herein.

2. I was employed as the advertising director of Evergreen Newspapers from July, 2001 to August 26, 2005. Evergreen Newspapers is owned by the Defendant Landmark Community Newspapers, Inc. ("LCNI"), which is doing business in Colorado as Landmark Community Newspapers of Colorado, Inc. and owns and operates Evergreen Newspapers.

3. During my tenure, I observed the former publisher of Evergreen Newspapers, Mike Coggins, make overt sexual or demeaning comments to female employees who reported to him.

4. I complained about this conduct to Human Resources Director Kim Hogan, Regional Director Don Porterfield, and President Mike Abernathy. Mr. Coggins was then

terminated from his position. Don Porterfield threatened me angrily at the time of the termination that he was going to bring in a new manager and "We'll just see how you do then." Mr. Coggins was replaced as publisher by Brad Bradberry.

5. Similar to Mr. Coggins, Mr. Bradberry mistreated female workers and also a gay employee. I personally observed the following conduct: Mr. Bradberry repeatedly remarked publicly about women employees' anatomy in either a sexually suggestive manner or highly unflattering way, refer to them as "fucking bitches", embrace certain of them suggestively, and directing the hiring of only "young attractive women instead of more old, fat ones."

6. I complained of Mr. Bradberry's conduct to Kim Hogan and Don Porterfield. In response to my complaints, Mr. Bradberry began to search for something to take issue with about my job performance, which had otherwise been more than satisfactory. He claimed that I had taken actions without his approval, which was untrue.

7. In response, I stated that I intended to complain to the EEOC about retaliation and to hire legal counsel. Shortly after doing so, I was terminated on the false grounds that at a meeting I compelled my staff to use a script for a joint fire department fundraiser. I did not hold a meeting where I instructed my sales reps to use the script and in fact had decided not to use it, and Mr. Bradberry had known of the script months before. The Safeway advertisement at issue was printed with the authorization and approval of Mr. Bradberry. Hogan and Porterfield's attitude toward me escalated once I told them that I had hired an attorney. As confirmed by Ms. Hogan's notes, I believe she called Trader human resources because of my threat to sue and her negative reference to Trader was related to my exercise of rights complain under Title VII.

8. Following my termination, I contacted the EEOC for an intake appointment to file a charge of retaliation and hostile work environment against the company. Prior to that appointment LCNI expressed a desire to settle any claims arising from my termination. Apart from a monetary settlement, because I intended to look for a new position I insisted that the record be changed to reflect that I voluntarily left the company. The difference between "Puls was terminated" and "Puls separated" was huge to me.

9. Because I was concerned about further retaliation by the company's managers, I also insisted that LCNI and Evergreen Newspapers give me only a neutral reference, which was its firm company policy. I wanted the settlement agreement to reflect that I voluntarily left and that both LCNI and Evergreen Newspapers could give only a neutral reference.

10. For those reasons I rejected the first two drafts of the settlement agreement sent LCNI's lawyer, Exs. 5 and 6. After the Agreement was changed to reflect that I initiated the separation, as shown in paragraph A.1 (Ex. 1), I signed it. These were critical terms for me, because I believed they assured that it would not be divulged to any prospective employer that I had left on other than a voluntary basis.

11. I knew that Landmark Communications (Landmark) owned LCNI and owned or had an interest in numerous other companies, including the Weather Channel, but did not know the specifics of those ownerships. To my knowledge at LCNI, Landmark is a holding company and had never been involved in actively managing LCNI's operations or personnel. The companies under Landmark were all considered very separate entities with little, if any, cross-over of personnel from one entity to another.

12. I did not intend to reapply to LCNI, but I did not believe that I was barred from applying for employment to all other companies that Landmark Communications might own an

3

interest in. Such a bar was never stated to me and I did not interpret the Severance Agreement to mean that. To me the language "finally and permanently separated" meant only that I was not temporarily layed off by LCNI. As a veteran manager I have dealt with numerous terminations of employees and if the employee waives his/her right to reapply to that company I have always seen that stated very explicitly.

13. I believed that the only reason for the mention of "affiliates" in the Severance Agreement was to provide LCNI and its properties with a broad release of liability and claim. I did not understand that Kim Hogan was acting on behalf of any entity other than LCNI in signing the Agreement. I do not believe that Ms. Hogan had authority to sign a settlement agreement on behalf of Landmark Communications or any Landmark Communications venture other than LCNI, or to prevent me from applying with another company Landmark had an interest in.

14. I intended that the statement: "LCNI and Evergreen Newspapers will give Puls a neutral reference" prohibited LCNI or Evergreen Newspapers from stating anything about my employment and separation from the company other than to confirm dates of employment and position held, and that the prohibition applied to inquiry by anyone, including any other prospective employer even if owned in part by Landmark Communications. My focus was on LCNI and Evergreen Newspapers since I did not believe anyone else would be informed of my original termination.

15. Specifically, I believed that the "official" reason for my termination had been changed by agreement, from being involuntary to voluntary or at least neutral. I assumed that LCNI and Evergreen Newspapers would be prohibited from stating to <u>anyone</u> that I was fired by the company. If LCNI could state to any company owned in part by Landmark

4

Communications that I had been fired, I would effectively be blackballed from employment by any such company. That was clearly not the intent of the Severance Agreement. Otherwise I would have pursued a challenge to my termination through the EEOC.

16. I am familiar with LCNI's policy on providing references as to former employees. It has been the firm policy of the company, absent an express request of the employee, that it gives out only dates of employment and location and position held. I relied on its adhering to this policy, and the Severance Agreement, in agreeing to withdraw my charge of retaliation with the EEOC.

17. I have read the letters of LCNI's attorneys attached as Exhibits 17 and 18. While I disagree that I disparaged LCNI to anyone, the attorneys' interpretation of the Severance Agreement is the same as mine: Trader was a separate entity apart from LCNI and not covered by the Severance Agreement. I saw the "boilerplate" in the introduction as they did, as just that, and not a blanket agreement between me and all ventures in which Landmark had an interest.

18. Following my separation from LCNI, I was contacted by Ken Rogers, a recruiter for Trader Publishing. I had known of Trader but did not know its specific ownership, prior to the contact. Mr. Rogers put me in touch with James Veltri, a regional manger for Auto Trader, and David Saslavsky, a national manager with United Parenting Publications.

19. After a telephone interview, Mr. Saslavsky encouraged me to apply for an opening as sales director with Colorado Parent. I applied and stated only that the reason for separation from my last job was a difference in direction of the company. I told Mr. Saslavsky that I had a disagreement in management of the company. I considered that my termination had been modified by the settlement to a voluntary separation, so I did not state that I had been

5

discharged. I stated specifically that I had "separated" rather than that I had quit. I did not tell him that I did not have a severance agreement. I believed that LCNI, per the Severance Agreement and its policy, was bound to give only a neutral reference to Trader. I also believed the confidentiality provision of the Severance Agreement restricted me in what I could say about my separation.

20. I interviewed with United Parenting three times, and understood that all of my other references were favorable. I then received an offer and accepted, to start on Monday January 23, 2006. (Exs. 12 and 13)

21. I was given no notice that Kim Hogan was going to make the statements she did to the Trader Publishing H.R. department. I was given no opportunity to question or counter those statements.

22. I have not found regular employment, other than consulting and contracting work, since my separation from LCNI, which I think also affected my employment potential elsewhere. As a result of losing the job with Trader Publishing, I believe that I have lost over $350,000 in estimated past and future income.

Signed this 7th day of July, 2007.

Russell A. Puls, Jr.

STATE OF Colorado )
                    ) ss
County of Jefferson )

SUBSCRIBED AND SWORN to before me this 7th day of July 2007, by Russell A. Puls, Jr., to me personally known.

WITNESS MY HAND AND OFFICIAL SEAL



Notary Public

My commission expires: 4-19-2009