Puls v. Landmark Community Newspapers                                                               Kim Hogan

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 07-CV-00170-RPM-CBS

TELEPHONE DEPOSITION OF: KIM HOGAN
April 30, 2007

RUSSELL A. PULS, JR.,
Plaintiff,
v.
LANDMARK COMMUNITY NEWSPAPERS, INC., a Virginia corporation,
and LANDMARK COMMUNITY NEWSPAPERS OF COLORADO, INC., a
Colorado corporation,
Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 1515
Arapahoe Street, Tower I, Suite 530, Denver, Colorado 80202
at 11:00 a.m. before Rory L. Joyner, Certified Realtime
Reporter, Registered Professional Reporter and Notary Public
within Colorado.

---

**Page 2**

APPEARANCES

For the Plaintiff:   BRUCE G. SMITH, ESQ.
                     Darling, Bergstrom, & Milligan, PC
                     1515 Arapahoe Street
                     Tower 1
                     Suite 530
                     Denver, Colorado 80202

For the Defendants:  WILLIAM M. FURR, ESQ.
(By telephone)       Willcox & Savage, P.C.
                     1800 Bank of America Center
                     Norfolk, Virginia 23510

Also Present:        Russell A. Puls, Jr.

---

**Page 3**

INDEX
EXAMINATION OF KIM HOGAN:                                 PAGE
April 30, 2007

By Mr. Smith:                                             7, 75

By Mr. Furr:                                              72

INITIAL
DEPOSITION EXHIBITS:                                      REFERENCE
1    Response to Request for Production of
     Documents                                            --
2    Payroll Authorization, Effective Date
     8/26/05                                              45
3    Performance Review Summary, 3/1/04                   --
4    Performance Review Summary, 1/22/02                  --
5    Equal Employment Opportunity and Sexual
     Harassment policies, signed 6/26/01                  --
6    First Day Orientation Checklist, 7/2/01              --
7    Employment application acknowledgement,
     6/27/01; and Handbook/Supplies Receipt
     Acknowledgment, 6/26/01                              --
8    Memo to Ms. Hogan from Mr. Puls, 6/30/02             --
9    E-mail chain to Pat Richardson from
     Mr. Puls, 6/27/05                                    --
10   E-mail chain to Mr. Porterfield from Pat
     Richardson, 7/12/05                                  --
11   Document, "Events occurring outside of my
     regular job"                                         --
12   E-mail chain to Ms. Hogan from Mr. Puls,
     8/22/05                                              --
13   Document, "Porterfield retaliation
     complaint," 8/22/05                                  --

---

**Page 4**

14    E-mail chain to Ms. Hogan from Mr. Puls,
      8/22/05                                             62
15    Memo to Mr. Porterfield from Mr. Puls,
      8/23/05                                             --
16    Memo to Mr. Porterfield from Mr. Puls,
      8/23/05                                             --
17A-O Typed notes re conversations of
      Mr. Porterfield and Ms. Hogan with
      employees re Safeway ad and Big Chili
      script                                              28
18    Memo to Ms. Hogan from Mr. Puls, 8/23/05            --
19    E-mail to Mr. Bradberry from Mr. Puls,
      8/24/05                                             --
19A   Memo to Mr. Porterfield from Mr. Puls,
      8/25/05                                             --
19B   Memo to Ms. Hogan from Mr. Puls, 8/25/05            --
20    E-mail to Mr. Porterfield from Mr. Puls,
      8/26/05                                             --
20A   Letter to Russell                                   --
20B   Memo to Kiersten from Russell, 4/18/05              --
21    Letter to The Files from Ms. Hogan                  50
22    Letter to Mr. Meyer from Mr. Smith,
      2/6/06                                              --
23    Letter to Mr. Smith from Mr. Meyer,
      2/23/06                                             --
24    Letter to Ms. Romero from Ms. Hogan,
      5/1/06                                              --
24A   Notice of Charge of Discrimination,
      4/3/06                                              --
24B-D Letter to Ms. Romero from Ms. Hogan,
      5/1/06                                              71
24E   Document, "Script, Told to follow exactly"          --

---

*Coffman Reporting*

303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

(Pages 1 to 4)

21

1  to the attorney, and then talk with her and send her
2  information to back up the response, and she would then
3  do the finish copy to respond back to the EEOC. And I
4  would do any internal questioning here of -- as far as
5  calling the managers and asking questions and getting
6  backup clarification. Occasionally, Ashley would
7  participate in those calls.
8      Q.   Well, let me -- let me clarify or change my
9  question a little bit. Was there a process internal to
10 the company for resolving EEO complaints?
11     A.   Can you be more specific about what you're
12 asking?
13     Q.   Yes. Was there any formal or informal
14 protocol or process that one needed to go through
15 relative to making and getting or raising an EEO
16 complaint?
17     A.   No.
18     Q.   Okay. Were there any written procedures
19 within the company as to whom one was supposed to
20 complain or what process that complaint would go through?
21     A.   Yes. There is -- there are things in our
22 company handbook. For an example, our antiharassment
23 policy, there is information in there that talks about
24 who to contact. And the protocol, of course, was they
25 could contact me as the HR director, and my number is

22

1  listed there, or Mike Abernathy as the president of the
2  company, or someone in corporate HR in Norfolk, Virginia.
3      Q.   When would Mr. Porterfield become involved
4  in any EEO complaint?
5      A.   Any time it would be a property that
6  reported through to Mr. Porterfield.
7      Q.   Did Mr. Puls make EEO complaints to the
8  company?
9      A.   He -- he did. He did make a couple of
10 complaints about harassment by his manager to some other
11 employees that maybe he witnessed or that he had heard
12 about. He did bring those to my attention.
13     Q.   All right. And how were those brought to
14 your attention?
15     A.   I don't recall specifically. Probably by
16 phone. He probably called me to discuss them.
17     Q.   Had you had conversations prior to that with
18 Mr. Puls, as a manager, as to treatment of any of his
19 reports or response to any complaints by any of his
20 reports?
21     A.   Can you be more specific what you're asking,
22 please?
23     Q.   Yes. Mr. Puls was a manager of a department
24 or division of the Evergreen Newspapers?
25     A.   Yes, sir.

23

1      Q.   Okay. And in that capacity, he had certain
2  people reporting to him?
3      A.   Yes, sir.
4      Q.   Did you ever discuss with him, as a manager,
5  dealing with any issues as to his -- or the people that
6  he supervised in that job?
7      A.   I don't recall doing that. I -- well, there
8  was maybe a couple of occasions where an employee would
9  call here when they were upset with how Russell was
10 responding to something, and I would work through that
11 with them and try to work through maybe facilitating a
12 call between them and Russell or that sort of thing.
13     Q.   When would someone bring a complaint to you
14 as opposed to, for example, their supervisor or their
15 manager or Mr. Porterfield?
16     A.   Well, what we -- what we typically recommend
17 that people do is, of course, first try to work it out
18 with your supervisor and talk to your supervisor, but for
19 a lot of reasons, people aren't always comfortable doing
20 that. So again, I referred to our antiharassment policy
21 earlier. If someone is not comfortable going to their
22 supervisor for whatever reason, they can certainly
23 contact me or Mr. Abernathy, or Don Porterfield as the
24 regional manager, if they choose to do that.
25     Q.   Were you involved in a complaint that Mr.

24

1  Puls made in the 2002 time frame regarding a Mike
2  Coggins?
3      A.   Yes, sir.
4      Q.   What was your involvement in that complaint?
5      A.   I believe he originally brought that
6  complaint to me, and again, I -- I don't recall if it was
7  by phone or by letter, but he did bring a couple of
8  complaints to me about some things that Mr. Coggins was
9  saying, that he said he witnessed Mr. Coggins saying to
10 employees or that Mr. Puls said he overheard or another
11 employee told him about those situations. He did bring
12 that to my attention.
13     Q.   And did you investigate that complaint?
14     A.   Yes, sir.
15     Q.   And did you determine that Mr. Puls was
16 accurate in his -- in his statements about what had
17 occurred?
18     A.   I don't recall if everything that he said
19 was accurate, but I do know that some of the information
20 that he brought forth was correct and was substantiated,
21 yes.
22     Q.   How was that complaint resolved?
23     A.   Mr. Porterfield went to Colorado and had a
24 discussion with Mike Coggins to help him understand the
25 culture of our company, and that that behavior was not a

**45**

1  Q.  Okay. Well, I --
2      MR. FURR: I'm going to instruct the witness
3  to take her time and look for that if she has a question
4  about that issue.
5      MR. SMITH: I don't have it immediately
6  handy, Billy, but to save time, I would represent that
7  that is the case. Here it is. Number 2.
8  A.  Yes. Where it asks, is employee recommended
9  for rehire, it does say no.
10 Q.  (BY MR. SMITH) All right. Now, the
11 language that you said relates to rehire related to the
12 language of permanently separated from the company?
13 A.  Yes.
14 Q.  Okay. In other words, that's the language
15 that you say addresses that issue?
16 A.  Yes.
17 Q.  Okay. Landmark, as a holding company, has a
18 great many companies under it, does it not?
19 A.  That's correct.
20 Q.  And those are companies not just in the
21 newspaper business but, for example, The Weather Channel?
22 A.  That's correct.
23 Q.  Okay. What assurance is there that Mr.
24 Puls, for example, would not go to work, back to work,
25 for a Landmark entity?

**46**

1  A.  Well, the application that Landmark business
2  units have employees fill out asks you to tell your
3  previous job history, and the assumption is that if I
4  write on there my previous employment was with another
5  Landmark property that someone would call and ask for a
6  reference.
7  Q.  Okay. So that's the -- that's the only
8  protection that that individual would not rehire with a
9  Landmark entity?
10 A.  I'm speaking for LCNI. There could be
11 something that's done differently at another Landmark
12 property that I can't speak for them.
13 Q.  Why -- well, I have been involved in a fair
14 amount of employment cases, and typically, one will see
15 specific language that an employee, if that is the case,
16 agrees not to reapply for employment with that company.
17 If that's the case, was there a specific reason why LCNI
18 would not use that kind of language?
19     MR. FURR: I'm going to object to that
20 question as lack of foundation, but if you can answer the
21 question, Ms. Hogan, go ahead and answer.
22 A.  I can't answer it. The severance agreement
23 for LCNI was put in place before I came here, so I can't
24 speak to that.
25 Q.  (BY MR. SMITH) Okay. In the severance

**47**

1  agreement, there is the term "neutral reference." What,
2  Ms. Hogan, does that term mean to you?
3  A.  Are you referring to the line, LCNI and
4  Evergreen Newspapers will give Puls a neutral reference?
5  Q.  Yes, and I'm focusing just on the term
6  "neutral reference." What does that mean to you?
7  A.  We consider "neutral reference" to be dates
8  of employment and position and location that the person
9  was in at the time they were employed within Landmark.
10 Q.  All right. And that is the standard policy
11 of LCNI related to new hires or -- excuse me -- to people
12 that have left the company, is simply to provide that
13 information, is it not?
14 A.  That is not a written policy, but it is our
15 practice.
16 Q.  All right. And it's a practice that is
17 consistently followed by the company?
18 A.  Yes.
19 Q.  And that's what you think of in terms of a
20 neutral reference?
21 A.  Yes, sir.
22 Q.  All right. Are you aware that Mr. Puls
23 asked that the initial language of the agreement be
24 changed to state that he separated from the company?
25 A.  Again, I do recall something coming up about

**48**

1  him requesting a change on the wording, but I don't
2  recall the specifics of that, and I don't have that
3  information here in front of me.
4  Q.  Do you have a recollection of discussing any
5  changes in the agreement with Mr. Abernathy or Mr.
6  Porterfield?
7  A.  I know I have had a change surrounding
8  someone where there was a question about the wording and
9  one or two words being changed, but I don't remember if
10 it was Mr. Puls and the specific words that he wanted
11 changed.
12 Q.  In other words, you don't specifically
13 recall?
14 A.  That's correct.
15 Q.  All right. When do you first recall
16 receiving any information that Landmark, as holding
17 company, was contemplating the sale of Trader Publishing?
18 A.  I don't remember an exact date on that.
19 Q.  Okay. Were you kept advised as to the
20 progress in negotiations regarding that sale?
21 A.  No, but that's not typical that Landmark
22 would share that. I mean, even if we're selling or
23 acquiring a property inside LCNI, I'm not kept up to date
24 on the specifics of all of it.
25 Q.  At the time of Mr. Puls' settlement

**53**

1  a disagreement with management or not agreeing with
2  management. And she left me a message and told me that,
3  and then I called her back.
4           And we went -- she asked me if he had, in
5  fact, worked for LCNI, and I said yes. And she said that
6  he told them in the interview and he had put on his
7  application, I believe, that he had left the company,
8  again, because of not agreeing with management in some
9  way. And she said, Is that correct? And I said no. And
10 then she asked me if he was terminated from the company,
11 and I said, Yes, he was. And she said, Can you tell me
12 why? And I said, I don't want to get into the specifics
13 of it, but he made some decisions that we didn't agree
14 with, that we felt were not in the best interest of the
15 company and were seen as unethical, and he was
16 terminated.
17     Q.    You saw it as unethical?
18     A.    Yes.
19     Q.    All right. Let me back up. Who initiated
20 the first call regarding Mr. Puls? Was it you or Ms.
21 Sonner?
22     A.    Someone from Trader, and I -- I didn't get
23 the call, so I don't -- I can't say who it was, but
24 someone from Trader initially called our Evergreen office
25 and spoke to Brad Bradberry and wanted a reference. And

**54**

1  again, I don't know who that was, because I didn't
2  participate in that conversation. And then Brad told Don
3  about it and wanted to know if he should call them or
4  what, since they were internal, because we -- we do allow
5  and encourage people to give references inside the
6  company, but other than that, we tell people to have them
7  call here to the central office HR department. So
8  because of the situation surrounding Russell, I'm
9  assuming he had -- he asked Don about it. I don't know
10 exactly why, because I don't know what Brad was thinking,
11 but he asked Don how he should handle it.
12     Q.    All right. My question was, did you
13 initiate the conversation or did Ms. Sonner?
14     A.    I -- Don came by here and told Mike and I,
15 and we had a discussion and agreed I would contact Ms.
16 Sonner, and I contacted her.
17     Q.    And apparently, according to this note, you
18 left a message?
19     A.    Yes.
20     Q.    All right. In your prior statement, you
21 said at the time, you were not aware of an agreement that
22 he had with Landmark. What were you referring to?
23     A.    At the time, I wasn't aware that who had an
24 agreement with Landmark?
25     Q.    I may have misunderstood your prior

**55**

1  testimony. I thought you said at the time, I think, of
2  your initial conversation with Ms. Sonner, you weren't
3  aware of a previous -- that he had previously signed an
4  agreement with Landmark?
5      A.   No. You must have misunderstood me, because
6  I don't recall saying that.
7      Q.   All right. Did you -- did you pull up the
8  separation agreement with Mr. Puls at the time you had
9  the conversation with Ms. Sonner?
10     A.   No, sir.
11     Q.   Did you refer to it in any way?
12     A.   I don't recall referring to it, other than
13 to tell her that I -- I'm sure I did tell her that he had
14 signed an agreement and couldn't work for the company,
15 but I would not have gone into specifics about the
16 agreement, no.
17     Q.   Why not?
18     A.   Because I didn't see the need to.
19     Q.   Okay. Did you ever supply a copy of the
20 agreement to Ms. Sonner or anyone else at Trader?
21     A.   No, I don't believe I did. I don't recall
22 doing that.
23     Q.   Were you ever asked to?
24     A.   I don't recall being asked to, no.
25     Q.   Did you discuss with Ms. Sonner that Mr.

**56**

1  Puls did have a separation agreement?
2      A.   Yes.
3      Q.   Did you discuss what the terms of that
4  separation agreement were?
5      A.   No.
6      Q.   What was the context of the discussion about
7  the agreement? Simply that one existed?
8      A.   Just that one existed and that he was
9  permanently separated from the company.
10     Q.   Okay. That's the only term that you
11 discussed with her?
12     A.   I believe so.
13     Q.   All right. Was it Mr. Abernathy or Mr.
14 Porterfield that suggested you call Trader?
15     A.   The suggestion came from Mr. Abernathy.
16     Q.   And did Mr. Abernathy say why he suggested
17 you call Trader?
18     A.   Yes, because Russell could not -- we would
19 be rehiring him within our own company.
20     Q.   Did Mr. Puls -- did Mr. Abernathy or Mr.
21 Porterfield ask you about the separation agreement?
22     A.   No, but at that time, they would have both
23 been aware of it, because they were familiar with the
24 agreement at the time that Mr. Puls signed the agreement.
25     Q.   They would have been aware of it because

**65**

1 about after that e-mail?
2    A.   Specifically, the Big Chili script and
3 telling employees that they needed to use the script like
4 that.
5    Q.   Were those things that Mr. Bradberry did not
6 know at the time --
7    A.   I can't say whether he knew about them at
8 the time that he sent is this e-mail or not. I don't
9 know.
10   Q.   Okay.
11   A.   I assume that -- I don't know.
12   Q.   Did you ever interview a Kiersten DePaola
13 about the script on the Big Chili event?
14   A.   Kiersten DePaola? I don't recall
15 specifically who I did interview.
16   Q.   Okay.
17   A.   I talked to several people, but I don't
18 remember the exact names of who they were.
19   Q.   You've heard the -- you know the name
20 Kiersten DePaola?
21   A.   Yes.
22   Q.   And you've talked -- you did talk with her?
23   A.   I don't recall specifically who I talked to.
24 Don Porterfield and I talked to several people together
25 in his office one day, but I don't recall exactly who

**66**

1 those people were.
2    Q.   Did you take notes of all of those
3 conversations?
4    A.   Yes.
5    Q.   Okay. Some of those notes may not be
6 reflected in what you then typed up?
7    A.   I would think they would all be included in
8 what was typed up here.
9    Q.   Did you make a point of typing up all of
10 your notes?
11   A.   No.
12   Q.   All right. Was Mr. Bradberry removed from
13 his position?
14   A.   No.
15   Q.   Was he given a choice of leaving the company
16 voluntarily or -- or being terminated?
17   A.   I believe that Mr. Porterfield went to
18 Evergreen Newspapers to tell Brad that he was going to
19 need to start looking for something else, because things
20 weren't turning around, and if they didn't turn around,
21 he couldn't continue to stay in that job. And he said, I
22 don't want to look for anything else; I just need to
23 leave, and he made the decision to leave. But I -- I --
24 that conversation happened between he and Don
25 Porterfield, so Don Porterfield would be the person to

**67**

1 tell you specifically what was said.
2    Q.   Did you participate in any -- any of those
3 discussions?
4    A.   No. Mr. Porterfield flew out to Colorado
5 and had that conversation, and I was not present.
6    Q.   Okay. Was any of the thinking regarding Mr.
7 Bradberry's status related to actions or inactions as a
8 manager as opposed to financial results?
9    A.   Yes.
10   Q.   And what were those additional issues?
11   A.   That he didn't have a handle on everything
12 that was happening at the property, including some of the
13 information on the things that were going on with
14 Russell, like we felt he should have.
15   Q.   All right. Going back to the separation
16 agreement, it has a provision regarding disparagement.
17 Is that a typical provision in your separation agreement?
18   A.   Yes.
19   Q.   And what to you does "disparagement" mean?
20   A.   To say bad things about someone.
21   Q.   Okay. To make statements to some third
22 party about LCNI?
23   A.   Yes.
24   Q.   All right. And that was the intent, to
25 prohibit Mr. Puls from making such statements?

**68**

1    A.   That's correct.
2    Q.   Would you turn to page 24F, F as in "Frank."
3    A.   Okay.
4    Q.   Under A1, let me represent to you that that
5 sentence originally stated Mr. Puls was separated from
6 his employment, and it was subsequently changed to state,
7 Mr. Puls separated from his employment.
8    A.   Okay.
9        MR. FURR: I'm going to object to lack of
10 foundation on that statement.
11   Q.   (BY MR. SMITH) I'm asking you to assume
12 that to be the case, as I believe it is. Ms. Hogan, if
13 that's the case, would that appear to reflect an intent
14 on Mr. Puls' part that the agreement reflect that he
15 initiated the separation?
16   A.   I don't see it that way at all. I see it as
17 he separated from our company. I don't see it as saying
18 why he separated, if it was his choice or our choice.
19   Q.   Okay. Well, if the original language was
20 that Mr. Puls was separated, and it was changed to state
21 he separated, doesn't that appear to reflect an intent
22 that he initiated the separation?
23       MR. FURR: Wait a second. Let me just --
24 same objection. Go ahead and answer.
25   A.   Okay. In my opinion, no, because we have

**Page 69**

1  people who -- who choose to separate from the company and
2  people that we choose to have separated from the company
3  that sign the same agreement, so I don't see it that way.
4  I just see it as saying that he separated from the
5  company, regardless of whose decision it was that he
6  separate.
7     Q.  (BY MR. SMITH) All right. And in those
8  other instances, those employees have not requested that
9  that language be changed?
10    A.  Not that I recall, no.
11    Q.  And it's fairly unusual to have a separating
12 employee request that that be changed?
13    A.  Yes.
14    Q.  All right. One of the issues you
15 investigated about Mr. Puls was an ad that had run in one
16 of the Evergreen newspapers about Safeway stores?
17    A.  Yes.
18    Q.  Did you ever reach a decision -- and Mr.
19 Puls had a very different recollection of the facts
20 surrounding that than Mr. Bradberry did; is that correct?
21    A.  Well, I -- I don't know what you mean by
22 that, but Mr. Puls felt that Mr. Bradberry okayed the ad,
23 and Mr. Bradberry -- and he says that Mr. Bradberry
24 confirmed and okayed the copy for the ad. Mr. Bradberry
25 says that he did okay us running an ad, but he never

**Page 70**

1  okayed the language that was in the ad or seen the ad
2  before it ran. And I was not able to confirm that Mr.
3  Bradberry did see the ad. I spoke with some people in
4  the graphics department at Evergreen Newspapers who did
5  not recall giving Brad Bradberry a copy of the ad.
6     Q.  So you were never able to resolve that one
7  way or another as to whether Mr. Bradberry had approved
8  the actual copy?
9     A.  That's correct.
10    Q.  All right.
11    A.  Let me say, I was not able to confirm anyone
12 who can verify that he did read the copy.
13    Q.  Let me have you turn to page 25.
14    A.  Okay.
15    Q.  This appears to be a memo from Mr. Frank
16 Batten, Jr., to various individuals. Do you ever recall
17 receiving a copy of this?
18    A.  Yes, I did.
19    Q.  And it would have been about the time frame
20 that this was sent to Mr. Abernathy?
21    A.  Yes. I believe he forwarded it on to
22 stockholders in the company, probably, and so I would
23 have been included in on that.
24    Q.  Just as a stockholder?
25    A.  As a stockholder or -- I know he forwarded

**Page 71**

1  it to some people, and I know I got a copy of it, but I
2  think it was stockholders or the leadership team or
3  something, but I don't recall exactly who he sent it to,
4  but I don't know who else he sent it to. I just know I
5  was on a list of some people that received a copy.
6     Q.  All right. And presumably, Mr. Porterfield
7  received a copy, as well?
8     A.  He is both a stockholder and a member of the
9  leadership team, so he probably was on the same list I
10 was.
11       MR. SMITH:  Let me take a minute, and I
12 think I can wrap up. Let me take a minute and talk with
13 Mr. Puls.
14       (Break from 12:40 p.m. to 12:47 p.m.)
15    Q.  (BY MR. SMITH) Back to the exhibits, Ms.
16 Hogan. Would you turn to 24C.
17    A.  Yes.
18    Q.  The bottom paragraph in the approximate
19 middle of that has a sentence, The human resources
20 representative for LCNI provided information. Do you see
21 that?
22    A.  Yes.
23    Q.  Is that representative yourself?
24    A.  Yes.
25       MR. SMITH:  All right. I have no further

**Page 72**

1  questions, subject to the production of any handwritten
2  notes, Billy, that form the basis of those typewritten
3  notes.
4        MR. FURR:  Okay.
5        MR. SMITH:  We would request those.
6        MR. FURR:  Okay. I will go back -- in fact,
7  Kim, if you can go back and see if you can find any of
8  those notes, just let me know whether they exist or not.
9        THE DEPONENT:  I will.
10       MR. FURR:  And I do have a few follow-up
11 questions. So let me -- there are not many, but let me
12 go ahead and go through my notes here.
13             EXAMINATION
14 BY MR. FURR:
15    Q.  If you look at Exhibit 24F, Ms. Hogan.
16 That's the severance agreement.
17    A.  Yes.
18    Q.  If you look down at paragraph 4, can you
19 just read that first sentence out loud?
20    A.  "Puls agrees, for himself and his heirs,
21 representatives, successors and assigns, that he had been
22 finally and permanently separated from employment with
23 LCNI as of August 26, 2005" --
24    Q.  Okay. That clause is what I was interested
25 in.

**Page 73**

1  A.  Okay.
2  Q.  And that -- is that accurate that he had
3  been finally and permanently separated from employment
4  with LCNI as of August 26?
5  A.  Yes, sir.
6  Q.  Okay. And do you see a distinction between
7  the language in Clause 4 that says he had been separated,
8  and Clause A1, where it says Puls separated from his
9  employment?
10  A.  Yes.
11  Q.  What -- do you see a practical significance
12  in that different language or not?
13  A.  To me, both of them just say that he
14  separated. It doesn't say if he chose to separate or we
15  chose to separate.
16  Q.  Okay. And then if you could look at the top
17  of the agreement, and let me know how LCNI is defined.
18  Read that part of it, where it says Landmark Community
19  Newspapers, Inc.
20  A.  Landmark Community Publications, Inc., their
21  past, present and future agents, employees, directors,
22  officers, shareholders, affiliates, insurers, reinsurers,
23  affiliated corporations or other entities, successors in
24  interest, and newspapers, included --
25  Q.  Okay. Go ahead. I'm sorry.

**Page 74**

1  A.  -- included but not limited to the
2  newspapers referred to as Evergreen Newspapers, referred
3  to herein collectively as LCNI.
4  Q.  And then the word "LCNI" is used as a term
5  throughout the rest of the document; is that right?
6  A.  That's correct, which refers to this entire
7  first paragraph.
8  Q.  And do you consider -- or did you, at the
9  time, consider Trader either an affiliate, an affiliated
10  corporation, or an affiliated other entity of Landmark
11  Community Newspapers, Inc.?
12  A.  Absolutely. In everything we do, we
13  consider them a sister operation.
14  Q.  Had you shared information with Trader
15  previously before you shared information regarding Mr.
16  Puls?
17  A.  Absolutely.
18  Q.  And had Trader shared information with you
19  previously before you had shared information about Mr.
20  Puls with Trader?
21  A.  Absolutely.
22  Q.  Did you treat the sharing of information
23  with Trader any differently than you treated it as -- the
24  sharing of information with any other Landmark entity,
25  such as The Weather Channel, News Channel 5, Landmark

**Page 75**

1  Corporate, The Virginia Pilot, and so forth?
2  A.  No, sir. They're all the same.
3  Q.  Okay. And where it says in Clause 4 that
4  you read that he had been finally and permanently
5  separated from employment with LCNI, did you understand
6  that to mean he was not to be employed by any Landmark
7  entity?
8  A.  Yes, sir.
9       MR. FURR:  Those are all the questions I
10  have. Bruce, do you have any other follow-up questions?
11       MR. SMITH:  One follow-up.
12           EXAMINATION
13  BY MR. SMITH:
14  Q.  Ms. Hogan, do you know of any document that
15  defines what Landmark considers to be an affiliate,
16  specifically, to meet the definition of affiliate?
17  A.  Again, I was not here when this severance
18  agreement was originally written, so that would need to
19  come from corporate. I know we -- the employees here
20  consider affiliates any other Landmark property.
21  Q.  Okay.
22  A.  But I don't know what Landmark considers
23  that. I assume it's the same thing, but I don't have a
24  written definition for that, no.
25       MR. SMITH:  All right. That's all I have.

**Page 76**

1       MR. FURR:  Okay. And she would like to
2  exercise her right to read it before it's finalized.
3       WHEREUPON, the within proceedings were
4  concluded at the approximate hour of 12:53 p.m. this 30th
5  day of April, 2007.
6           *    *    *