## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 07-CV-0170-RPM-CBS

---

DEPOSITION OF: DAVID SASLAVSKY
March 13, 2007

---

RUSSELL A. PULS, JR.,
Plaintiff,
v.
LANDMARK COMMUNITY NEWSPAPERS, INC., a Virginia corporation, and LANDMARK COMMUNITY NEWSPAPERS OF COLORADO, INC., a Colorado corporation,
Defendants.

---

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 1050 17th Street, Suite 1500, Denver, Colorado 80265 at 10:15 a.m. before Sherry A. Wallin, Certified Realtime Reporter, Registered Merit Reporter and Notary Public within Colorado.

## 2

APPEARANCES

For the Plaintiff:   BRUCE G. SMITH, ESQ.
                     Darling, Bergstrom & Milligan, PC
                     1515 Arapahoe Street
                     Tower I, Suite 530
                     Denver, Colorado 80202

For the Defendants:  WILLIAM A. FURR, ESQ.
                     Wilcox & Savage
                     One Commercial Place
                     Suite 1800
                     Norfolk, Virginia 23510

Also Present:        Russell Puls, Jr.

## 3

INDEX

| EXAMINATION OF DAVID SASLAVSKY March 13, 2007 | PAGE |
|---|---|
| By Mr. Smith: | 4 |
| By Mr. Furr: | 74 |

| DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|
| 1    Letter from Saslavsky to Puls, 1/11/06 | 36 |

(Original exhibits attached to original transcript; copies attached to copy transcripts)

| REQUESTED PORTIONS OF TESTIMONY: | PAGE |
|---|---|
| Request for document production or information | -- |
| Certified question | -- |
| Instruction not to answer | -- |
| Other requests or marked testimony | -- |

| EXHIBITS PREVIOUSLY MARKED: | EXHIBIT | PAGE |
|---|---|---|
| (None.) | | |

## 4

```
 1        WHEREUPON, the within proceedings were taken
 2   pursuant to the Federal Rules of Civil Procedure:
 3             DAVID SASLAVSKY,
 4   having been first duly sworn to state the whole truth,
 5   was examined and testified as follows:
 6             EXAMINATION
 7   BY MR. SMITH:
 8        Q.   Sir, would you state your name and for the
 9   record spell your last name?
10        A.   That's a good question. David Saslavsky,
11   and it's S-a-s-l-a-v-s-k-y.
12        Q.   Mr. Saslavsky, where do you reside?
13        A.   I reside in Chicago, Illinois.
14        Q.   Okay. Your address?
15        A.   My address is 3231 North Wilton Street,
16   Apartment 34, Chicago, 60657.
17        Q.   And where are you employed?
18        A.   I'm employed by Dominion Parenting Media,
19   which is --
20        Q.   That's the name of the company?
21        A.   That's the name of our division of --
22   Dominion Enterprise is the parent company, and our
23   division is Dominion Parenting Media. That's what's on
24   my paycheck.
25        Q.   How long have you been employed in that
```

Puls v. Landmark Community Newspapers                                                  David Saslavsky

Page 25

1  A. Yeah, while I was out here.
2  Q. Would anyone else have participated in those
3  interviews?
4  A. Yeah. I had -- well, do you mean with --
5  while I was interviewing him or did I have him interview
6  with other people?
7  Q. Well, good question. While you were
8  interviewing with him first.
9  A. I don't believe anyone -- I don't believe
10 anyone sat in on our interviews.
11 Q. Okay. You did have others interview him at
12 the same time that you did or around the --
13 A. I did.
14 Q. Okay. Do you recall who else would have
15 participated in that interview of Mr. Puls?
16 A. He interviewed with our publisher, Diana
17 Dietvorst, and I also had him do a -- kind of a meet and
18 greet with our sales staff.
19 Q. Would that have been on -- if there were two
20 interviews, would that have been on the first or second
21 or do you recall?
22 A. That's a good question. I don't. It would
23 have been on -- it would have been after -- I believe it
24 was after the second. I believe he came into the office
25 specifically to meet the staff, and that would have been

Page 26

1  a third visit, but I'm not entirely sure if I didn't do
2  it during the second visit.
3  Q. The publisher whose name you mentioned, is
4  she still with Colorado Parent?
5  A. She is still -- she is still the publisher
6  of Colorado Parent, yes.
7  Q. All right. Did you obtain from Mr. Puls a
8  list of references?
9  A. I did, yes.
10 Q. All right. And did you contact those
11 references?
12 A. I did.
13 Q. Do you recall who they were?
14 A. No.
15 Q. All right.
16 A. He gave me a list, and I -- I can't recall.
17 One was -- he had worked at a -- was a partner in a
18 newspaper, I remember that. I don't remember --
19 Q. Do you recall an interview with a Mr. Nolan
20 from Denver Newspaper Agency?
21 A. Now that you mention it, that does seem
22 familiar.
23 Q. Do you recall what Mr. Nolan said about
24 Mr. Puls?
25 A. No, I can't remember now, what Mr. Nolan

Page 27

1  said. I believe he gave him a positive reference, but I
2  don't . . .
3  Q. Okay. Would you consider that a very strong
4  reference that he gave?
5  A. Would I consider it strong? You mean
6  strongly positive?
7  Q. Yes.
8  A. I don't think -- I don't remember thinking
9  that at all.
10 Q. Okay. Do you recall speaking with a Jim
11 Jensen from Carpet Mill?
12     MR. FURR: I'm sorry, from where?
13     MR. SMITH: Carpet Mill.
14 A. That was a client. I can't remember if I
15 made that call or not, if I decided to call the client.
16 I usually like to speak to people that my candidates have
17 either worked closely with -- ideally reported to.
18 Sometimes I don't always call the client reference.
19 Q. (BY MR. SMITH) Okay. And did you talk with
20 a Cindy Beley, B-e-l-e-y?
21 A. I did talk with her.
22 Q. What did she say about Mr. Puls?
23 A. She spoke highly of Mr. Puls. I don't
24 remember --
25 Q. Did you obtain any other reference

Page 28

1  information you can recall?
2  A. Did I obtain?
3  Q. Yes.
4  A. There's -- on our application, it's -- the
5  candidate puts the name of their supervisor at every
6  position, and our application states that we have the
7  right to call them whether or not they -- you know, they
8  check yes or no, but regardless of what the candidate
9  checks, we have the right to call them.
10 Q. Okay. Do you recall calling any other
11 supervisor?
12 A. I did, yes.
13 Q. Okay. Who else did you call?
14 A. I called his supervisor at Landmark
15 Community Newspaper.
16 Q. And who was that?
17 A. I believe his name was Brad, Brad Bradbury.
18 Q. What did Mr. Bradbury say about Mr. Puls?
19 A. Mr. Bradbury would not comment on Mr. Puls.
20 Q. Do you recall his exact words?
21 A. He said that it's their company policy to --
22 not to comment on any past employee, that they -- he
23 can't give any information out. I was -- at that point
24 I, you know, let him know this was a little bit of a
25 different situation because we were all affiliated, and

33

1   A.   That's correct, yes.
2   Q.   All right. Did you -- do you recall any
3   correspondence or exchange with Mr. Craig about Mr. Puls?
4   A.   No.
5   Q.   All right. Did you discuss with Mr. Rogers
6   that Mr. Puls had been contacted or had discussed
7   employment with other Trader entities?
8   A.   Yes.
9   Q.   What do you recall about those
10  conversations?
11  A.   He had applied for Auto Trader. Mr. Puls
12  disclosed that to me as well as Mr. Rogers both disclosed
13  that to me.
14  Q.   And did you discuss as to where would be a
15  best fit or --
16  A.   Where would be a best fit? With?
17  Q.   Yes. Between the Trader entities or --
18  A.   Yes. I discussed that with Mr. Rogers and
19  with Mr. Puls.
20  Q.   What did Mr. Rogers say?
21  A.   Mr. Rogers thought because of his background
22  in editorial publications that he would be a best fit
23  with us.
24  Q.   Okay. Did you discuss Mr. Puls with anyone
25  else at Trader prior to offering him a position?

34

1   A.   Anyone else within or without my division?
2   Q.   Yes. Anyone within Trader Publishing.
3   A.   I'm sure I did.
4   Q.   Who typically would you have --
5   A.   I would talk about that with my immediate
6   supervisor. I would talk about it with the staff here.
7   Q.   Okay. "Staff" meaning after he had done
8   an --
9   A.   Yeah.
10  Q.   -- informal interview process --
11  A.   Yes.
12  Q.   -- with staff, how they felt about him?
13  A.   Um-hum. Sure. I may have just -- I don't
14  know. I mean, I may have discussed -- if I ever have any
15  questions, I feel free to call HR at any time. I don't
16  know if I did or didn't in this case.
17  Q.   Okay. Well, let me get to the crux of
18  things. You determined that Mr. Puls would be a good fit
19  for your publication, Colorado Parent, correct?
20  A.   I hoped so, yes.
21  Q.   In fact, as of the point you made the offer,
22  all of the feedback, references and review you had were
23  very positive.
24  A.   There were -- I would say there was no red
25  flags. There was nothing to stop me from moving forward.

35

1   Q.   All right. Is sales manager an important
2   position?
3   A.   Yes.
4   Q.   That person is in charge of all sales within
5   that publication.
6   A.   Correct.
7   Q.   And their compensation is measured in large
8   part on the volume of sales.
9   A.   Correct.
10  Q.   All right. Your compensation in turn to
11  some extent is based upon the sales success of your
12  publications.
13  A.   That's correct.
14  Q.   You felt Mr. Puls was qualified for the
15  position?
16  A.   I did.
17  Q.   You felt that he appeared highly motivated
18  to succeed in the position?
19  A.   I did.
20  Q.   You offered him a position?
21  A.   I did.
22  Q.   Did you do so -- how did you make the offer
23  to him?
24  A.   I made the offer to him by phone.
25  Q.   And do you recall what time frame that would

36

1   be?
2   A.   I do not.
3        (Deposition Exhibit 1 was marked.)
4   Q.   I've had the reporter hand you Exhibit 1.
5   Is this a letter you issued to Mr. Puls?
6   A.   Yes.
7   Q.   And does this set forth the offer to him?
8   A.   Yes. This is an acceptance letter is what
9   we call it.
10  Q.   All right. Why do you call it an acceptance
11  letter?
12  A.   We don't put offers in writing until they
13  are accepted.
14  Q.   Okay. Meaning you made him an offer by
15  telephone which he accepted?
16  A.   He accepted by phone, and -- at which point
17  I had this letter drafted.
18  Q.   Do you recall any e-mail correspondence from
19  Mr. Puls?
20  A.   I know we did e-mail. I don't recall the
21  correspondence.
22  Q.   One of the elements of the compensation
23  structure set forth in that exhibit is a commission of
24  10 percent of sales above 8,000 a month.
25  A.   Um-hum.

                                                              41

1    A.   I'd need a calculator. I don't remember.
2    Q.   1,808 I think is approximately 47,000 a
3  year.
4    A.   2,500 is --
5    Q.   2,500 obviously is 30,000.
6    A.   30,000. So you have 47 -- 77,000 if he hit
7  target for the office, and anything 10 percent above any
8  sales that he did above $8,000 a month. So --
9    Q.   And did you have any expectation of that
10 amount?
11   A.   I would have liked to have seen him carrying
12 between 10 and 15 thousand a month.
13   Q.   Above the eight or total?
14   A.   No. Total.
15   Q.   Okay. So two to seven additional?
16   A.   Yeah.
17   Q.   Okay. It also refers to the benefit
18 program. What kind of a benefit program did Colorado
19 Parent offer?
20   A.   Same benefits as Trader Publishing.
21   Q.   And briefly what do those include?
22   A.   Health, dental, 401(k), vacation, short-term
23 disability. Standard. It's a very standard benefit
24 package.
25   Q.   Fairly standard in the publishing industry?

                                                              42

1    A.   Yeah.
2    Q.   And was that fairly standard across Trader
3  Publishing?
4    A.   It's the same benefit package that every
5  employee receives.
6    Q.   Okay. You made this, what you called,
7  acceptance letter to him, Exhibit 1. Did he respond to
8  that?
9    A.   I don't remember what -- if he responded to
10 the letter in particular.
11   Q.   You subsequently rescinded the offer that's
12 set forth in this letter.
13   A.   I did.
14   Q.   And why did you do that?
15   A.   I was instructed to.
16   Q.   Who gave you that instruction?
17   A.   I was instructed to by Susan Blake.
18   Q.   Let me try to distinguish -- well, Ms. Blake
19 is an executive within -- or a manager within the HR
20 department as well as a lawyer?
21   A.   Um-hum.
22   Q.   Separating any legal advice she may have
23 given you at any time, did she give you a management
24 reason for withdrawing that offer?
25        MR. FURR: I would -- just so I don't wander

                                                              43

1  into attorney-client privilege problems, if it's okay
2  with you, I would prefer for him to answer the question
3  what was management's view on the continued employment
4  rather than focus on the communication from the lawyer.
5        In other words, I think you can get the same
6  information if you ask what was management's view on the
7  continued employment of Mr. Puls.
8    Q.   (BY MR. SMITH) All right. What was stated
9  or communicated about management's view on that offer?
10   A.   That --
11        MR. FURR: You can answer that question.
12        THE DEPONENT: Okay.
13   A.   That he was not allowed -- going to be
14 allowed to work here due to discrepancies on his
15 application.
16   Q.   (BY MR. SMITH) And what were the
17 discrepancies?
18   A.   He had put on his application that he left
19 Landmark Community Newspapers on his own and also
20 mentioned on the application that he had never been
21 discharged from a position. That's one of the questions.
22 And that turned out not to be true.
23   Q.   Who told you that was not true?
24        THE DEPONENT: Do you want me to answer
25 that?

                                                              44

1        MR. FURR: You can answer.
2    A.   It would be Susan Blake.
3    Q.   (BY MR. SMITH) Do you know what her source
4  of information was?
5    A.   I do not.
6    Q.   Did you ever discuss Mr. Puls with anyone at
7  Landmark Community Newspapers?
8    A.   Did I?
9    Q.   Yes.
10   A.   Brad Bradbury.
11   Q.   I'm sorry. Other than Mr. Bradbury.
12   A.   I did not.
13   Q.   All right. Did you ask for -- well, did you
14 then discuss that information with Mr. Puls?
15   A.   Did I discuss?
16   Q.   That it was claimed that he had falsified
17 his job application.
18   A.   When I called him to tell him that we were
19 rescinding the offer, is that what --
20   Q.   Yes.
21   A.   I don't remember if that's specifically what
22 I said.
23   Q.   Do you remember any comment he made at the
24 time when you told him you were rescinding the offer?
25   A.   One of his only comments was that he was

Puls v. Landmark Community Newspapers                                    David Saslavsky

```
                                                    57
 1  that. I don't -- I would be -- I suppose it would be
 2  helpful, but I am not sure that it would make a
 3  difference.
 4      Q.   (BY MR. SMITH) Let me --
 5      A.   I guess -- here's the thing, is if somebody
 6  put on their application that they weren't terminated and
 7  I found out they were, then I'm done regardless of
 8  whether or not there is a claim.
 9      Q.   Okay. Let me just try to approach it from a
10  practical standpoint. You want to know when you hire
11  somebody whether they were discharged at any other place
12  of employment.
13      A.   Of course.
14      Q.   And if so, why?
15      A.   Right.
16      Q.   If that were, in fact, an unfair discharge,
17  that might be something you'd also want to know.
18      A.   That's true.
19      Q.   Because there could be two sides of that
20  story.
21      A.   Well, yeah. There could be, yes.
22      Q.   All right. And, in fact, it's not unheard
23  of to have a discharge be in some way unfair.
24      A.   That's true.
25      Q.   Correct?
```

```
                                                    58
 1      A.   Okay.
 2      Q.   Whether it's sustained subsequently by a
 3  court or a body, there are, in fact, firings that are
 4  unfair or illegal.
 5      A.   Um-hum.
 6      Q.   You recognize that. Okay. And in the
 7  larger context, you'd want to know what the
 8  circumstances --
 9      A.   Right.
10      Q.   -- of that were. Okay.
11      A.   I guess in this case it wouldn't -- I guess
12  the answer then is in this case, it wouldn't have
13  mattered. It -- at this point.
14      Q.   If the statement of discharge were withdrawn
15  and rescinded, would that have been important
16  information?
17      A.   Yeah.
18      Q.   Okay. And none of that information was ever
19  given to you at any time.
20      A.   No.
21      Q.   All right. Do you know -- again, I
22  understand this is secondhand, but do you know why the
23  information about Mr. Puls went to Ms. Blake rather than
24  to you directly?
25      A.   No, I don't know.
```

```
                                                    59
 1      Q.   Does Ms. Blake have authority to give you
 2  that sort of employment directive?
 3      A.   I've never been -- that's a good question.
 4  I've never been told so, but I would -- I certainly take
 5  what she says very seriously, so I'm --
 6      Q.   Because she was a lawyer.
 7      A.   Yeah. She's representing the company at
 8  that point. So yes, I didn't think that there was a -- I
 9  certainly didn't think there was a way to go around it
10  and look to somebody else.
11      Q.   Well, I mean, let me ask you that. Some HR
12  departments have different standings within companies.
13      A.   Yes.
14      Q.   And sometimes management says, okay, I'm
15  going to take into account what you say, but I'm going to
16  make my own --
17      A.   Very often -- okay. Here's what -- then
18  here's my sort of unwritten law on this is that you're
19  right, when there's a -- you're working with an HR -- one
20  of our HR specialists, that advice is something you can
21  take under advisement. When Susan says something, it's
22  my understanding we do it.
23      Q.   Okay. Sort of an unwritten --
24      A.   Yeah.
25      Q.   -- pecking order?
```

```
                                                    60
 1      A.   There is a certain unwritten pecking order.
 2  Susan's word represents the company's final word.
 3      Q.   Do you know if that information to Ms. Blake
 4  from Landmark Community Newspapers, Inc., LCNI, was ever
 5  conveyed in writing or by e-mail?
 6      A.   I don't know.
 7      Q.   Okay. You've heard the term disparagement
 8  of an employer.
 9      A.   Disparagement?
10      Q.   Yeah.
11      A.   Of an employer from an employee?
12      Q.   Yeah.
13      A.   Yeah.
14      Q.   Okay. It's not uncommon to have a provision
15  of a settlement agreement that one or both parties will
16  not disparage the other party. Is that your
17  understanding?
18      A.   I've never been involved in one, so I could
19  imagine that could be part of it.
20      Q.   And by "disparage," would you agree that
21  generally means to make a statement to some third party
22  about that either employee or that employer?
23      A.   Yeah. Would "disparage" mean a negative
24  comment?
25      Q.   Yeah.
```