Puls v. Landmark Community Newspapers                                                Susan Blake

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 07-CV-00170-RPM-CBS

TELEPHONE DEPOSITION OF: SUSAN R. BLAKE
May 1, 2007

RUSSELL A. PULS, JR.,
Plaintiff,
v.
LANDMARK COMMUNITY NEWSPAPERS, INC., a Virginia corporation,
and LANDMARK COMMUNITY NEWSPAPERS OF COLORADO, INC., a
Colorado corporation,
Defendants.

TAKEN PURSUANT TO NOTICE on behalf of the Plaintiff at 1515 Arapahoe Street, Tower I, Suite 530, Denver, Colorado 80202 at 9:00 a.m. before Rory L. Joyner, Certified Realtime Reporter, Registered Professional Reporter and Notary Public within Colorado.

---

**Page 2**

APPEARANCES

For the Plaintiff:       BRUCE G. SMITH, ESQ.
                         Darling, Bergstrom, & Milligan, PC
                         1515 Arapahoe Street
                         Tower 1
                         Suite 530
                         Denver, Colorado 80202

For the Defendants:      WILLIAM M. FURR, ESQ.
(By telephone)           Willcox & Savage, P.C.
                         1800 Bank of America Center
                         Norfolk, Virginia 23510

Also Present:            Russell A. Puls, Jr.

---

**Page 3**

INDEX
EXAMINATION OF SUSAN R. BLAKE:                               PAGE
May 1, 2007

By Mr. Smith:                                                  4

By Mr. Furr:                                                  --

INITIAL
DEPOSITION EXHIBITS:                                     REFERENCE

(None marked.)

REQUESTED PORTIONS OF TESTIMONY:                            PAGE
Request for document production
or information                                                --

Certified question                                            --

Instruction not to answer                                     --

Other requests or marked testimony                            --

EXHIBITS PREVIOUSLY MARKED              EXHIBIT       PAGE
(None.)

---

**Page 4**

1           WHEREUPON, the within proceedings were taken
2   pursuant to the Federal Rules of Civil Procedure:
3           SUSAN R. BLAKE,
4   present by telephone, having been first duly sworn to state
5   the whole truth, was examined and testified as follows:
6                    EXAMINATION
7   BY MR. SMITH:
8       Q.   Would you state your full name, please.
9       A.   Susan Ray Blake.
10      Q.   And Ms. Blake, where are you located at the
11  time of this conference?
12      A.   Norfolk, Virginia.
13      Q.   Is anyone there present with you?
14      A.   No.
15      Q.   All right. Where specifically are you
16  located?
17      A.   In Norfolk, 150 Granby Street.
18      Q.   You are currently employed?
19      A.   Correct.
20      Q.   And what is your job?
21      A.   Director of employee relations, slash,
22  attorney.
23      Q.   All right. For what company?
24      A.   Dominion Enterprises.
25      Q.   And what is Dominion Enterprises? What is

---

Puls v. Landmark Community Newspapers                                                        Susan Blake

**Page 13**

1  Q.  All right. What, if any, action did you
2  take based upon that e-mail?
3  A.  I forwarded the e-mail to Melody Hester.
4  Q.  Who is Ms. Hester?
5  A.  Administrative assistant.
6  Q.  To whom?
7  A.  Sunny Sonner.
8  Q.  All right. Do you have copies of those
9  e-mails?
10  A.  I do.
11  Q.  All right. And those have been printed?
12  A.  I do not have them in front of me.
13  Q.  Okay. But they're still either retained in
14  the system, or you have hard copies of them?
15  A.  They are retained on our system.
16  Q.  All right. What was Ms. Hester's response?
17  Well, what was the nature of your inquiry to Ms. Hester?
18  A.  Whether -- who to direct Gary's question to.
19  Q.  All right. Did you simply forward Mr.
20  Hibert's question?
21  A.  I forwarded the e-mail to Melody.
22  Q.  All right. And did Mr. Hibert indicate from
23  where the inquiry had come to him?
24  A.  I don't recall.
25  Q.  What was Mr. Hibert's job title?

**Page 14**

1  A.  I know he was the division head of United
2  Parenting Publications. I don't know if his official
3  title is president or not. Or vice president, I presume.
4  Q.  Okay. Division head, meaning head of that
5  division of Trader?
6  A.  Yes.
7  Q.  I take it United Parenting was a
8  wholly-owned division of Trader Publishing Company?
9  A.  It is a division of Trader Publishing
10  Company.
11  Q.  All right. What did Ms. Hester do with your
12  inquiry, if you know?
13  A.  She provided me with a name and contact
14  telephone number at Landmark, which I passed along to
15  Gary Hibert.
16  Q.  And what was the name?
17  A.  I don't recall.
18  Q.  Was it someone in human resources?
19  A.  I believe it was.
20  Q.  Was it a Kim Hogan?
21  A.  I don't recall.
22  Q.  Okay. You simply forwarded that back on to
23  Mr. Hibert?
24  A.  I passed that information along to Gary,
25  yes.

**Page 15**

1  Q.  What did Mr. Hibert do with that
2  information, if anything, do you know?
3  A.  I do not know.
4  Q.  Did you ever receive any subsequent contact
5  from Mr. Hibert about that inquiry?
6  A.  I don't believe so.
7  Q.  Have you talked with him about what, if
8  anything, he did with the information?
9  A.  I don't believe I spoke with Gary, no.
10  Q.  And after that -- what was the time frame of
11  that e-mail? You said right before Christmas of 2005?
12  A.  Which e-mail are you referring to?
13  Q.  The e-mail from Mr. Hibert to you.
14  A.  I believe it was around December 27.
15  Q.  Okay.
16  A.  2005.
17  Q.  Did you then have other conversations or
18  contacts regarding Mr. Puls?
19  A.  I did.
20  Q.  And what was the next, if any, contact you
21  had?
22  A.  I was involved in a conversation around
23  January 19, 2006, from Landmark regarding Mr. Puls.
24  Q.  Was that a call to you from Landmark?
25  A.  I believe the initial call was to Sunny

**Page 16**

1  Sonner.
2  Q.  All right. And did Ms. Sonner involve you
3  in that call?
4  A.  She involved me in a call, yes.
5  Q.  Okay. I guess what I'm asking is, were both
6  of you on the call?
7  A.  There was a call with, I believe, Kim Hogan,
8  Sunny Sonner, and myself.
9.  Q.  Okay. Was anyone else on that call?
10  A.  Not that I'm aware of.
11  Q.  All right. Would you state as best you can
12  recall what was stated by each of the parties.
13  A.  As best I can recall, Kim Hogan stated that
14  she had heard Russell Puls had applied for employment
15  with us and advised us that he was not eligible for
16  rehire with Landmark, and that he had been separated from
17  employment with Landmark.
18  Q.  What did you or Ms. Sonner state during the
19  call?
20  A.  I don't remember.
21  Q.  Do you have any notes of that conversation?
22  A.  I do not.
23  Q.  Did you work up any memorandum or notes
24  after the conversation?
25  A.  I did.

**21**

1  Q.  The call that you and Ms. Sonner had with
2  Ms. Hogan.
3  A.  I don't know.
4  Q.  Okay. Why did Ms. Sonner request that you
5  be in on that call?
6  A.  I believe because I'm over West Coast
7  employee relations, and Colorado fell within my region.
8  Q.  After your memo to Mr. Saslavsky, what, if
9  any, further contacts did you have regarding Mr. Puls?
10  A.  Subsequent to the memo?
11  Q.  Yes.
12  A.  I believe I received two letters from you.
13  Q.  Anything further from Mr. Saslavsky?
14  A.  I believe he communicated to me that he had
15  revoked the offer.
16  Q.  Did Ms. Hogan indicate why Mr. Puls had been
17  terminated from LCNI?
18  A.  I don't recall.
19  Q.  Did you suggest to Mr. Saslavsky that he
20  discuss with Mr. Puls the apparent discrepancy between
21  information he gave to Trader Publishing and that
22  apparent cause of termination from LCNI?
23  A.  Can you repeat the question?
24  Q.  Yes. The information you received from LCNI
25  was inconsistent with, apparently, what Mr. Puls had put

**22**

1  on an application with Trader; is that correct?
2  A.  Is that a question?
3  Q.  Yes.
4  A.  Yes, I believed it was inconsistent.
5  Q.  All right. Did you discuss with Mr.
6  Saslavsky confronting Mr. Puls about that discrepancy or
7  inconsistency?
8  A.  No.
9  Q.  Did the two of you discuss what may have
10  been any reason for that discrepancy?
11  A.  No.
12  Q.  When you had the discussion with Ms. Hogan,
13  did she disclose anything regarding the terms of any
14  settlement with Mr. Puls between LCNI and Mr. Puls?
15  A.  I spoke with Ms. Hogan regarding a severance
16  agreement that Mr. Puls had executed.
17  Q.  And was that in that same conversation with
18  Ms. Sonner or a subsequent conversation?
19  A.  I believe it was a subsequent conversation.
20  Q.  Relative to what we've been talking about,
21  what was the time frame of that conversation?
22  A.  Either the same day or the following day.
23  Q.  And who initiated that call?
24  A.  I did.
25  Q.  Why did you initiate the call?

**23**

1  A.  I believe I wanted to confirm that he was,
2  in fact, separated, that he did not resign, because he
3  had indicated to David Saslavsky that he had resigned and
4  worked out a notice period during the initial interview
5  with David.
6  Q.  And did you recontact Ms. Hogan after again
7  talking with Mr. Saslavsky, or is this just a follow-up
8  conversation you had with her?
9  A.  I had a follow-up conversation with her. I
10  believe it was subsequent to my conversation with Mr.
11  Saslavsky.
12  Q.  All right. And at the time, did Ms. Hogan
13  share the terms of the separation agreement between LCNI
14  and Mr. Puls?
15  A.  I don't recall her sharing the specific
16  terms, no, just that there was an agreement, both parties
17  had executed it, and he was not -- he did not resign.
18  Q.  Did she send you any paperwork regarding Mr.
19  Puls?
20  A.  I don't believe she did.
21  Q.  Have you ever seen the separation agreement
22  between Mr. Puls and LCNI?
23  A.  I've been looking at it in the pack of
24  materials that you forwarded to my attention.
25  Q.  Is that the first time you've been provided

**24**

1  that agreement?
2  A.  I believe it is.
3  Q.  Okay. Had you received any other paperwork
4  of any kind regarding Mr. Puls prior to the packet that I
5  sent to you related to paperwork at LCNI?
6  A.  Can you repeat the question?
7  Q.  Yes. Had you received any kind of paperwork
8  regarding Mr. Puls from LCNI prior to the packet of
9  information that I sent to you?
10  A.  I don't recall ever receiving any other
11  information, written information, from LCNI, no.
12  Q.  Okay. After the contacts from my two
13  letters to you, what, if any, further contact did you
14  have regarding Mr. Puls?
15      MR. FURR: I'm going to instruct the witness
16  not to disclose any attorney-client communications that
17  she had with me or any other party while I was
18  participating in that conversation. Other than that, you
19  can answer the question.
20  A.  I had one telephone conversation with David
21  Saslavsky advising him that our counsel, Billy Furr,
22  would be contacting him regarding a deposition in this
23  matter. All other conversations were with my attorney.
24  Q.  (BY MR. SMITH) With Mr. Furr?
25  A.  Correct.

Puls v. Landmark Community Newspapers                                        Susan Blake

**Page 25**

1  Q.  All right. Any conversations regarding Mr.
2  Puls with Ms. Sonner after that point in time?
3  A.  I believe I -- well, I know I let her know
4  that I was going to be deposed in this matter.
5  Q.  Have you ever attended any kind of executive
6  leadership or managerial training with Landmark
7  Communications?
8  A.  No.
9  Q.  You're familiar with the benefit package
10 that Trader Publishing offered to its employees in
11 January of 2006?
12 A.  Generally, yes.
13 Q.  Do you know whether that was the same
14 package that was offered to employees of Landmark
15 Communications?
16 A.  I do not know.
17 Q.  Does Landmark Communications itself, as a
18 holding company, have a human resources department?
19 A.  I don't know that Landmark Communications is
20 a holding company.
21 Q.  Okay. Whether they are or not, do they have
22 a human resources department?
23 A.  I -- there are human resources -- there is a
24 human resources department, as I understand it, at
25 Landmark, yes.

**Page 26**

1  Q.  And either prior to Dominion or after
2  Dominion took over the operations of Trader Publishing,
3  would you have regular communications with anyone in that
4  department?
5  A.  I don't believe that Dominion took over
6  Trader Publishing Company. I believe Trader Publishing
7  just changed its name to Dominion Enterprises.
8  Q.  All right. Same question.
9  A.  I do not have regular contact with anyone at
10 Landmark. It's on an as-needed basis in response to
11 calls I receive from them, or if I ever needed anything,
12 I would contact them over there.
13 Q.  You learned at some point in time that
14 Landmark Communications would be transferring or selling
15 certain assets that it owned in Trader Publishing?
16 A.  Is that a question?
17 Q.  Yes.
18 A.  Yes.
19 Q.  In what time frame would you have learned of
20 that information?
21 A.  Around September 2005.
22 Q.  Do you know or do you have an understanding
23 yourself of the reason for the sale or divestiture of any
24 assets of Trader Publishing?
25 A.  By Landmark?

**Page 27**

1  Q.  Yes.
2  A.  I was informed generally that Landmark -- I
3  believe it was reported in the newspaper, Landmark stated
4  that they had a high concentration of assets in
5  classified advertising.
6  Q.  And they wanted to divest themselves of
7  those assets?
8  A.  And that played a role in the decision to
9  sell their portion of Trader Publishing Company.
10 Q.  All right. Did you have a discussion with
11 anyone at Auto Trader at any point in time regarding Mr.
12 Puls?
13 A.  I'm unclear what you mean by "Auto Trader."
14 Q.  Okay. Auto Trader was a division or a part
15 of Trader Publishing Company prior to its assumption by
16 Dominion Enterprises?
17 A.  Repeat that. I think -- repeat that,
18 please.
19 Q.  All right. Was Auto Trader a division of
20 Trader Publishing Company?
21 A.  Yes.
22 Q.  All right. And were they under your
23 contacts, as well as the other divisions of Trader, prior
24 to the creation of Dominion Enterprises?
25 A.  The West Coast of the Auto Trader division,

**Page 28**

1  yes.
2  Q.  All right. Did you ever have any contact
3  from anyone at Auto Trader regarding Mr. Puls?
4  A.  No.
5  Q.  Would you have a -- any interaction with a
6  Gary Craig with Auto Trader?
7  A.  Any interaction in general?
8  Q.  Yes.
9  A.  I have worked with Gary Craig, yes.
10 Q.  All right. That portion of the business was
11 divested to Cox Communications?
12 A.  The Auto Trader division, as it pertains to
13 automobiles, yes.
14 Q.  All right. Do you have any continued
15 contact with that division that was previously with
16 Trader Publishing Company?
17 A.  The only interaction I still have with any
18 part of the auto trade division is the portion that
19 Dominion Enterprises has which relates to specialty
20 vehicles, recreational vehicles. So it is not the Auto
21 Trader publications. It is our specialty publications.
22 Q.  Was anyone other than Ms. Sonner, yourself,
23 and Mr. Saslavsky involved from Trader Publishing
24 standpoint -- and Mr. Hibert -- involved from Trader
25 Publishing Company in the decision whether to rescind the