IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

RUSSELL A. PULS, JR.,            )
                                 )
                Plaintiff,       )
                                 )
        vs.                      )  1:07-cv-00170-RPM-CBS
                                 )
LANDMARK COMMUNITY NEWSPAPERS,   )
INC. and LANDMARK COMMUNITY      )
NEWSPAPERS OF COLORADO, INC.,    )
                                 )
                Defendants.      )
_____

MOTION FOR SUMMARY JUDGMENT ON
FIRST AND SECOND CLAIMS
TRANSCRIPT OF PROCEEDINGS
_____

        Proceedings held before the HONORABLE RICHARD P.

MATSCH, U.S. District Judge for the District of Colorado,

beginning at 2:54 p.m. on the 17th day of December, 2007, in

Courtroom A, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiff:         Bruce G. Smith, Esq.
                           Darling, Bergstrom & Milligan,PC
                           1515 Arapahoe Street
                           Tower I, #530
                           Denver, Colorado  80202


For the Defendants:        William M. Furr, Esq.
                           Wilcox & Savage, PC
                           One Commercial Place, #1800
                           Norfolk, Virginia  23510


        Proceedings recorded by electronic sound recording;
        transcript produced by transcription service.

APPEARANCES: (Continued.)

                          Barbara Ann Grandjean, Esq.
                          Jacobs, Chase, Frick, Kleinkopf &
                          Kelley, LLC
                          1050 Seventeenth Street
                          #1500
                          Denver, Colorado  80265

1                         P R O C E E D I N G S

2        (At 2:54 p.m. on December 17, 2007, in the United States

3   District Court at Denver, Colorado, before the HONORABLE

4   RICHARD P. MATSCH, U.S. District Judge, with counsel for the

5   parties present, the following proceedings were had.)

6        THE COURT:  Be seated, please.

7             This is Civil Number 7-CV-170, Russell A. Puls, Jr.

8   against Landmark Community Newspapers, Incorporated, and

9   Landmark Community Newspapers of Colorado, Incorporated.

10  We're here on the defendants' motion for partial summary

11  judgment of dismissal of the first and second claims for

12  relief.

13            So, Mr. Smith is here for Mr. Puls?

14       MR. SMITH:  Yes, Your Honor.  Mr. Puls is also present.

15       THE COURT:  And, Mr. Furr for the--

16       MR. FURR:  Yes, Your Honor.

17       THE COURT:  --defendants.

18            Well, I guess the issue here is the amended

19  complaint asserts two common law claims, breach of contract

20  and intentional interference with contract based on a

21  severance agreement that Mr. Puls had when he left his

22  employment with Evergreen Newspapers, and, then, the third

23  claim is for retaliation in violation of Title VII.  And, the

24  parties, I guess in scheduling this matter with Magistrate

25  Judge Shaffer, emphasized proceeding with the first and

4

1   second claims, and that's where we are with respect to this
2   question of whether, when Kim Hogan notified the people over
3   at I guess it's called Trader Publishing that Mr. Puls had
4   left under a severance agreement with Evergreen Newspapers,
5   she was notifying an affiliate, in that the agreement refers
6   to affiliates, affiliated, corporation or other entities.
7   And, therefore, the communication would not constitute a
8   violation of the agreement that Mr. Puls be given a neutral
9   reference to any prospective employer, he having received a
10  job offer for this Colorado Parent Magazine, which was then
11  rescinded as a result of Ms. Hogan's notification to the, I
12  guess it's to this Ms. Sunny Summer of Colorado Parent.
13         So, we have this almost dizzyingly chain of
14  ownership that's involved.  Although also in looking at this,
15  I don't see why this is all that separate from the Title VII
16  retaliation, because it seems to me that if these entities
17  are sufficiently connected, the failure to hire Mr. Puls
18  would not be a retaliation.  But, we are where we are.  So,
19  Mr. Furr, I'll hear from you on this motion.
20      MR. FURR:  Thank you, Your Honor.
21         Well, Your Honor, just from what you've told the
22  Court--or told us already, it's obvious to me that you're
23  very familiar with the case.  I'm going to skip down about--
24      THE COURT:  Yeah, I understand--
25      MR. FURR:  --a third of the way through my argument.

1     THE COURT:  I understand the papers filed, I think.

2  It's this question of--and, I understand the argument being

3  that you can adopt the Colorado Corporate Code definition of

4  affiliate to assist in this matter.  And, I will say that I

5  don't see anything, though, in the severance agreement that

6  corresponds to an agreement by the plaintiff that he wouldn't

7  seek employment.

8     MR. FURR:  That's correct, Your Honor.  And, we were

9  actually talking about that before the hearing, that a lot of

10  these agreements you see note reemployment clauses, and this

11  one does not have a no reemployment clause.

12     THE COURT:  Okay.

13     MR. FURR:  So, we do have those facts that are

14  different.

15          What this case boils down to, Your Honor, is

16  whether LCNI could give a truthful reference to its

17  affiliate, Trader Publishing Company, when both companies are

18  owned by Landmark Communications.

19          LCNI publishes newspapers and shoppers across the

20  United States.  Trader, similarly, publishes shoppers, not

21  newspapers, but shoppers across the United States.  They both

22  are owned by Landmark.  Although LCNI is 100 percent owned,

23  Trader was 50 percent owned at the time, and is actually 100

24  percent owned today.

25     THE COURT:  What is a shopper?  Is that a free paper?

1      MR. FURR:  It's a free paper that has different types of

2  advertising in it.

3      THE COURT:  Okay.

4      MR. FURR:  For various publications.  And, the most

5  familiar title for Trader Publishing Company is the Auto

6  Trader.  You see the Airplane Trader, or Yacht Trader--I

7  don't know if there are many Yacht Traders in this part of

8  the country, but there are a lot of these Traders that if you

9  want to buy an automobile, you get on Auto Trader, and you

10  can find one that matches your needs.

11          The shoppers that LCNI have are different.  And,

12  the other thing Trader does is they have these parent

13  magazines, Colorado Parent is one of them, and that's the

14  place where Mr. Puls applied after he was discharged by LCNI.

15  He was discharged by LCNI.  It was for inappropriate conduct.

16  He filed an EEOC charge.  They disputed that.  They decided

17  they were going to resolve that charge by having the

18  severance agreement.  In the severance agreement, they agreed

19  to pay this modest amount of money to him in exchange for his

20  release.  And, in that, there's a boiler plate clause.  It's

21  a very short clause that says LCNI and Evergreen Newspapers

22  will supply a neutral reference for Mr. Puls.

23      THE COURT:  Yes.  And, it also says that he was simply

24  separated from his employment, not that he was discharged.

25      MR. FURR:  That's correct.  Now, if you look at the

1    affidavit testimony that's in the record of Kim Hogan, she

2    said where it says someone separated from employment, or

3    someone was separated from employment, it's a distinction

4    without distinction.  I mean, it doesn't say that he

5    resigned.  It says he separated.  And, Mr. Puls is trying to

6    make a big deal about that, but the fact of the matter is he

7    didn't resign, Your Honor.  He was discharged, and he was

8    discharged because he told customers that if they didn't

9    support the Fire Department, he'd just have to let the Fire

10   Chief know about that.

11        THE COURT:  Well, I don't want to go there, because I

12   don't think that's in front of me.

13        MR. FURR:  I understand, Your Honor.

14        THE COURT:  What is in front of me is whether, you know,

15   this is an affiliate.

16        MR. FURR:  That's exactly right.

17        THE COURT:  And, how does Kim Hogan learn about this

18   application?  That's not clear to me.

19        MR. FURR:  One of the LCNI people was in Colorado and

20   was talking to one of the Trader people.  They interact on a

21   weekly basis between Trader and LCNI.  And, she found out

22   about it by virtue of her folks in Colorado talking to the

23   folks for Trader in Colorado, and then she said, "Well, I

24   need to talk to Sonny Saunder at Trader, my colleague,

25   because we exchange information routinely about personnel

1   matters."

2   THE COURT:   So, are there separate Human Resources

3   Departments here?

4   MR. FURR:   There are.   But, they act jointly in a number

5   of respects.   They train jointly, for example.   They train

6   their people jointly.   And, if you look at some of the

7   records in here, there was a list of where even Mr. Puls

8   went, and there were a bunch of people from a lot of

9   different Landmark companies.   They're called the Landmark

10  Family of Businesses.   And, when they train their employees

11  in HR and otherwise, they do it jointly.   And, the HR

12  directors get together periodically to train themselves, and

13  when they have somebody that's applying for a position and

14  they see on their resume, hey, they worked for one of the

15  Landmark Family, as a matter of routine, they will pick up

16  the phone and say hey, Sonny, I've got this person.   What's

17  the deal there?   Or hey, Kim, this person is applying here.

18  And, it's not just done between these two Landmark Companies,

19  it's done between all of the affiliated entities.

20  The decision you have to make today, Your Honor, is

21  you're right, and you've already said it, is whether

22  Landmark, LCNI and Trader are either affiliates or whether

23  they're affiliated entities.   And, if Trader was either an

24  affiliate of LCNI or an affiliated entity of LCNI, then the

25  plaintiff has to lose Count 1 and 2.   And, the reason for

9

1    that is if you look at the definition of LCNI in the

2    agreement, the very agreement that they're suing on, it

3    defines LCNI to be (1), LCNI, (2), affiliates of LCNI, and

4    lists some other things, and then it says affiliated

5    corporations, and other entities of LCNI.

6              If you look at the definition of affiliate--well,

7    I'd like to go through a two step process.  We have to figure

8    out what an affiliate is, and then we have to look to see

9    what an affiliated entity is.  Affiliate is easier to do

10   because it's defined under the Colorado Business Corporations

11   Act.  And, basically, what the Colorado Business Corporations

12   Act says is that any entities under common control, or which

13   control one another, are affiliates.

14             And, so, the question becomes did--is LCNI and

15   Trader under common control of Landmark Communications?

16   Well, for LCNI, it's simple because Landmark Communications

17   is the 100 percent owner of LCNI.  Trader, on the other hand,

18   is the 50 percent owner of LCNI.

19             Our position, Your Honor, is that as the 50 percent

20   owner, Landmark Communications did control Trader because,

21   number one, it was not the minority shareholder.  The other

22   shareholder, the other partner, was Cox Communications, which

23   also owns 50 percent.  So, you're going to hear the

24   plaintiffs.  The plaintiffs have made the argument, well, if

25   you look at AmJur Restatement, it talks about how 49 percent

10

1    shareholders are not controlling the company.  We don't have

2    a 49 percent situation here.  We have a 50 percent situation

3    here.

4         THE COURT:  Where is--is Kim Mattingly (phonetic) Hogan

5    and Kim Hogan, are they the same person?

6         MR. FURR:  They're the same people, Your Honor.

7         THE COURT:  And, where is she?

8         MR. FURR:  She's in Kentucky.

9         THE COURT:  And, why is Colorado--why should we look to

10   Colorado law as the corporation code to define this?

11        MR. FURR:  Well, frankly, we weren't sure that we were

12   supposed to look at the Colorado Code.  And, the reason we

13   did is because the severance agreement was entered into in

14   Colorado.

15        THE COURT:  Well, except that she signs it in Kentucky.

16        MR. FURR:  She signed it in Kentucky, and he signed it

17   in--

18        THE COURT:  In Colorado.

19        MR. FURR:  In Colorado.  And, he worked for them in

20   Colorado.

21        THE COURT:  The Colorado Corporation Code, though, in

22   that respect I think is part of a model corporation code,

23   isn't it?

24        MR. FURR:  It's fairly standard language.  We looked at

25   that, and it looks like most of the states have a similar

1  interpretation of what an affiliate is.

2       The point I want to make about affiliate, Your

3  Honor, is that if Landmark is not in control of Trader, who

4  is?  Because the other owner, Cox, was a 50 percent owner,

5  too.  Now, the fact of the matter is they jointly control,

6  and this is all in the record, Landmark had placed three of

7  the six directors.  Every other year, they got to select the

8  Chairman of the Board.  There was an executive committee,

9  someone from Landmark, someone from Cox.  But, this isn't the

10  situation where you have a minority shareholder of Landmark.

11  Landmark is not a minority shareholder.  They're an equal

12  shareholder to Cox, and they jointly control Trader.

13       So, we think we meet the affiliate test.  The nice

14  thing about our position, Your Honor, is we don't need to

15  meet the affiliate test if Trader was an affiliated entity of

16  LCNI.  Now, the rule of construction is that if someone puts

17  language in an agreement, it has to have some sort of

18  meaning.  And, so, to have affiliated corporation and other

19  entities in there, the scrivener must have thought it was

20  different than affiliate, because they would have just left

21  it as affiliate.

22  THE COURT:  Well, what is the difference?

23  MR. FURR:  Well, the difference, in my opinion, in my

24  argument, Your Honor, is that it's a less rigorous standard

25  than meeting the definition of affiliate.  Unfortunately, the

1   agreement does not define affiliated entity--

2       THE COURT:  Right.

3       MR. FURR:  --and there's no statutory definition that we

4   could find defining it either.  But, at a minimum, we think

5   the Court can look at the language, apply common sense, and

6   say affiliated corporation and other entity must have a less

7   rigorous standard to meet than the word affiliate, which is

8   absolutely defined in the State Business Code.

9           And, when you look at the facts of this case before

10  the Court that they routinely shared information between

11  themselves, that they jointly trained their employees, that

12  they interacted routinely together, I think it's inescapable

13  that the fact is that they were affiliated corporations, or

14  other entities.

15          And, once you can reach that, Your Honor, as you

16  pointed out at the very beginning of the argument, that is

17  the end of the analysis.  That point, the case on Count 1 and

18  Count 2 have to be dismissed because Trader, by definition,

19  was incorporated in the very agreement that they're suing on,

20  and for them to share among themselves, who are identified

21  right there, he had been discharged and that he had a

22  severance agreement is not a violation of that agreement.

23          So, we would ask the Court to dismiss Count 1

24  because, at a minimum, Trader was an affiliated corporation,

25  or other entity, of LCNI.  And, I know there's some mind

1    numbing records in there showing the relationship, but the

2    fact of the matter is even at 50 percent, Landmark was

3    controlling, even if it was joint control, was controlling

4    Trader.

5            Count 2 is even easier to dismiss, Your Honor,

6    because the standard in Colorado is favorable for employers

7    like LCNI being sued for intentional interference.  The

8    court's requirement of establishing intentional interference

9    is action by the defendant which induces a breach of the

10   contract.  There has to be a breach of contract.  I'm not

11   sure what contract was breached here.  It's certainly not

12   alleged.  If it's the contract between Trader and Mr. Puls to

13   hire him, that's an at-will contract.  And, if you look at

14   the Electrolux case that we cite in our brief, that says for

15   at-will contracts, the plaintiff must show wrongful means.

16   In order to survive a motion for summary judgment, he has to

17   show wrongful means.

18           And, the Electrolux case, which was a Colorado

19   Court of Appeals case in 1982, it said wrongful means can be

20   things such as physical violence, fraud, criminal

21   prosecution, civil suits, and there's no allegation here of

22   wrongful means.  So, number one, you don't have a breach of a

23   contract.  But, number two, you certainly don't have a breach

24   of contract of wrongful means.  So, the intentional

25   interference with contract should be dismissed on that basis.

1        So, we respectfully request the Court to dismiss

2   both Count 1 and Count 2.  Thank you, Your Honor.

3        THE COURT:  All right.  Mr. Smith?

4        MR. SMITH:  If it please the Court.

5        THE COURT:  Counsel.

6        MR. SMITH:  Your Honor, if I can put a little different

7   perspective on this matter?  Our argument does not rest

8   solely on the meaning of the term affiliate.  It also rests

9   on the language which Mr. Puls bargained for very

10  specifically to remove the fact of termination, of

11  involuntary termination.  As Mr. Furr so ably says, the

12  language in the--all the language in the agreement needs to

13  have meaning.  The meaning certainly Mr. Puls intention, and

14  that was bargained for and expressed, was that on the record,

15  it was stated that he was not involuntarily terminated.

16       The importance of that, Your Honor, I would contend

17  extends even to an internal reference, such that if someone

18  from another true LCNI company called for the information on

19  Mr. Puls, together with the statement of neutral reference,

20  what they would be obligated to say at that point is there

21  was a separation.  We can't say--

22       THE COURT:  Well, I don't understand that argument.  Are

23  you telling me that if he applied to Landmark Community

24  Newspapers, Incorporated, they would have to hire him?

25       MR. SMITH:  What I'm say--I'm not saying--

1     THE COURT:  They couldn't consider that this separation

2  was made as it was.

3     MR. SMITH:  Your Honor, the separation followed a bitter

4  dispute--

5     THE COURT:  I understand that.  But, are you saying

6  that--and, this goes to why I don't understand why the third

7  claim for relief is really different, the retaliation.   Is

8  that because they didn't hire him?  I mean, if he'd applied

9  to Landmark Community Newspapers, Incorporated, would that be

10  a claim?

11     MR. SMITH:  Your Honor, I think it does extend to

12  another company, in the sense that what happened, and this

13  often happens, is there was put on record a different reason

14  for the separation than originally occurred.  And, the

15  stipulated reason for the separation was neutral, that he was

16  simply separated.  Previous to that, it had contained a

17  statement, "He is terminated."  That was specifically

18  bargained away.

19     THE COURT:  Well, I understand that.  But, what

20  difference does it make?

21     MR. SMITH:  Because that was the--it was agreed that

22  that was a neutral--

23     THE COURT:  Well, what difference does it make if this

24  is an affiliated company?

25     MR. SMITH:  Well, they're the ones claiming they had the

1  privilege to relate this information to that company.

2  THE COURT:  Well, it's your burden.  Your burden is to

3  prove there's a breach of this contract.

4  MR. SMITH:  Understand, Your Honor.

5  THE COURT:  And, your burden is to show they're not

6  affiliated.

7  MR. SMITH:  That's correct, and I would contend by

8  certainly any of the law I've found, control means 51

9  percent.  This entity of Trader was--

10  THE COURT:  Why does it have to be control?

11  MR. SMITH:  Because that's I think by any recognition,

12  the standard for the term affiliate.

13  THE COURT:  Well, by whose recognition?

14  MR. SMITH:  Well, certainly Virginia Corporate Code,

15  which is the, as I understand it, the state of incorporation

16  of Landmark.  It is the standard in Colorado.  It is the

17  standard in the case law that we found.

18  THE COURT:  Well, it isn't the standard in Colorado.

19  MR. SMITH:  Well, I believe the standard in Colorado is

20  control, corporate control.  And, corporate control means 51

21  percent.

22  THE COURT:  Common control is the standard.

23  MR. SMITH:  I'm sorry, Your Honor?

24  THE COURT:  Common control.

25  MR. SMITH:  Common control.

1    THE COURT:  Isn't it?

2    MR. SMITH:  Well, it is a control by veto, if you will.

3  It's a control by standoff.

4    THE COURT:  If you've got fifty-fifty, that's common

5  control, isn't it?

6    MR. SMITH:  Well, I would contend no, that that is not

7  control.  51 percent is control of an entity.

8    THE COURT:  Well, I don't see any support for that.

9    MR. SMITH:  Your Honor, the truth of the matter is the

10  parties did not contemplate application to a very remote

11  entity that was 50 percent owned.

12    THE COURT:  Well, how do we--how do I know that?  Here's

13  the agreement.  It says what it says.

14    MR. SMITH:  Well--

15    THE COURT:  And, it's a very broad provision.

16    MR. SMITH:  Well, certainly I think some of the

17  strongest evidence as to how this is read by the other party

18  is the claim that was made by LCNI's attorneys.  There was a

19  breach of the agreement by Mr. Puls because he disparaged

20  LCNI.

21    THE COURT:  Well, that's out of the case.  There is no

22  such agreement here.  That's why I said to Mr. Furr I don't

23  see any provision in this contract that is something that Mr.

24  Puls breaches by applying.

25    MR. SMITH:  Not by applying.  What they claimed, and I

1  think it's attached to our brief, is that Mr. Puls breached

2  the agreement.

3      THE COURT:  Well, it doesn't make any difference whether

4  he breached the agreement.  You haven't proved that they

5  breached the agreement.

6      MR. SMITH:  By the recognition of their own counsel,

7  Your Honor, LCNI was treated as a different entity from

8  Trader.

9      THE COURT:  Well--

10     MR. SMITH:  They were not considered to be under the

11 same definition of affiliated companies.

12     THE COURT:  What do you mean?

13     MR. SMITH:  Mr. Puls made statements on his application.

14 They then claimed that these were disparaging to LCNI.

15     THE COURT:  Well--

16     MR. SMITH:  If the Court accepts the definition that is

17 contended by the defendants, the definition of LCNI

18 encompasses all of those companies.  One can't disparage a

19 company to one self.

20     THE COURT:  So, that's some kind of an admission, is

21 that what you're arguing?

22     MR. SMITH:  Yes, Your Honor.

23     THE COURT:  Well, forget it.  It's not.

24     MR. SMITH:  That was certainly an expression of their

25 interpretation of the agreement.

1    THE COURT:  The interpretation of the agreement is

2  what's in the briefs now before me.  And, you haven't shown

3  to me that this is not an affiliate, and you have the burden

4  on that.

5    MR. SMITH:  Your Honor, the intent was--

6    THE COURT:  The intent is the language of the agreement.

7  I don't see that this is an ambiguous agreement.

8    MR. SMITH:  It's certainly ambiguous as to the agreed

9  statement for the departure.

10    THE COURT:  That doesn't have anything to do with it,

11  Mr. Smith.

12    MR. SMITH:  Well, Your Honor, I would say on behalf of

13  Mr. Puls it certainly did, because--

14    THE COURT:  Well, that may be his feeling about it, but

15  you lose.  I'm granting the motion for summary judgment on

16  the first and second claims.

17       Now, I don't understand the third claim.

18    MR. SMITH:  Your Honor, obviously, it's closely related.

19    THE COURT:  Yeah, how can there be retaliation if this

20  is essentially the same company?

21    MR. SMITH:  If the company went beyond what they had a

22  privilege to state, if they went beyond and made statements

23  that were untrue about Mr. Puls and the reason for his

24  departure, his termination, I would contend that can be

25  retaliation.

1      THE COURT:  Well, that's not before me, but I don't

2  understand that claim either.  They don't have a duty to hire

3  him, do they?

4      MR. SMITH:  It's not a question of a duty to hire.  It's

5  whether--

6      THE COURT:  Well, do they have to have a reason not to

7  hire him that's non-discriminatory, non-retaliatory?

8      MR. SMITH:  They had already hired him.

9      THE COURT:  No, they rescinded the offer.

10     MR. SMITH:  Trader had hired him.  It was rescinded.

11     THE COURT:  All right.  Well, that's not before me.  I'm

12 granting the first and second claims for relief.

13     MR. SMITH:  All right.

14     THE COURT:  You can do what you want to on the third.

15         Court's in recess.

16     MR. SMITH:  Thank you, Your Honor.

17     (3:20 p.m. - Whereupon, the proceedings were concluded.)

18

19

20

21

22

23

24

25

1                     <u>TRANSCRIBER'S CERTIFICATE</u>

2          I hereby certify that the foregoing has been

3    transcribed by me to the best of my ability, and constitutes

4    a true and accurate transcript of the mechanically recorded

5    proceedings in the above matter.

6          Dated at Aurora, Colorado, this 18th day of May,

7    2008.

8

9

10

11

12                          <u>/s/ Mary Chevalier</u>

13                          Mary Chevalier

14                          Federal Reporting Service, Inc.

15                          17454 East Asbury Place

16                          Aurora, Colorado  80013

17                          (303) 751-2777

18

19

20

21

22

23

24

25