FILED
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

**July 7, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

RUSSELL A. PULS, JR.,

      Plaintiff-Appellant,

v.

LANDMARK COMMUNITY
NEWSPAPERS, INC., a Virginia
corporation; LANDMARK
COMMUNITY NEWSPAPERS OF
COLORADO, INC., a Colorado
corporation,

      Defendants-Appellees.

No. 08-1263
(D.Ct. No. 1:07-CV-00170-RPM-CBS)
(D. Colo.)

_____

### ORDER AND JUDGMENT[*]

━━━━━━━━━━━━━━━━━━━━━━━━━

Before **BRISCOE**, **BRORBY,** and **McCONNELL,** Circuit Judges.

━━━━━━━━━━━━━━━━━━━━━━━━━

      Appellant Russell A. Puls Jr. appeals the district court's grant of summary

judgment in favor of Appellees Landmark Community Newspapers, Inc. and

Landmark Community Newspapers of Colorado, Inc. (collectively referred to as

LCNI) in a dispute over their alleged breach of a severance of employment

_____

      [*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

agreement with Mr. Puls and intentional interference with his at-will employment contract with Trader Publishing Company (Trader).  On appeal, Mr. Puls alleges issues of material fact exist as to whether Trader is an affiliate or affiliated entity of LCNI under the terms of the severance agreement; and, even if it is an affiliate, whether the severance agreement prevented LCNI representatives from providing Trader representatives a negative employment reference about him.  LCNI argues in support of summary judgment, claiming no issue of material fact exists because Trader is an affiliate of LCNI so Trader is a party to the severance agreement at issue and, therefore, LCNI could give a negative employment reference to Trader without breaching the terms of the severance agreement or intentionally interfering with Mr. Puls's at-will employment contract with Trader.  We exercise jurisdiction under 28 U.S.C. § 1291 and affirm the district court's grant of summary judgment in favor of LCNI.[1]

---

[1]  In addition to his breach of contract and intentional interference with contract claims, Mr. Puls alleged LCNI's actions constituted retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq., but later voluntarily dismissed that claim; the district court then entered an order granting dismissal of the retaliation claim without prejudice.  On appeal of the remaining breach of contract and intentional interference with contract claims, this court entered an order stating we lacked jurisdiction because the retaliation claim was dismissed without prejudice, resulting in an order that was not "final" for the purposes of 28 U.S.C. § 1291.  Thereafter, Mr. Puls filed an unopposed motion for entry and certification of final judgment pursuant to Fed. R. Civ. P. 54(b), which the district court granted, entering an order stating, in part, the summary judgment entered in favor of LCNI was a final judgment and thereafter entering a certified judgment in favor of LCNI.  Accordingly, we now have jurisdiction under § 1291 to address the two remaining claims on appeal.

## I.  Factual Background

The following facts are undisputed by the parties.  Mr. Puls is a resident of Jefferson County, Colorado.  Individually, Landmark Community Newspapers, Inc. is a Virginia corporation and Landmark Community Newspapers of Colorado, Inc. is a Colorado corporation; both are wholly-owned subsidiaries of Landmark Communications, Inc. (Landmark) which has its place of business in Virginia and is a privately-held media corporation with multiple ownership interests in newspapers, classified publications, and other communications industries. Landmark owns 100% of LCNI's shares.  LCNI employed Mr. Puls as an advertising sales director for one of its Colorado publications, Evergreen Newspapers, from July 2001 until August 26, 2005, when it fired him.

After LCNI fired Mr. Puls, the parties disputed the reasons for his termination, with Mr. Puls contending it constituted retaliation for his complaints against the publisher, whom he allegedly observed making overt sexual and demeaning comments to female employees, while LCNI asserted it resulted from his alleged unethical advertising tactics in two ad campaigns.[2]  For the purpose of avoiding litigation over the reasons for his termination, the parties agreed to enter into a severance agreement dated October 17, 2005.  The severance agreement

---

[2]  While the parties disputed the reasons for Mr. Puls's termination, this dispute is not relevant to summary judgment resolution, other than to establish the firing of Mr. Puls was contentious, resulting in the separation agreement at issue.

stated it was:

> [M]ade between Russell A. Puls Jr. ("Puls") and "Landmark
> Community Newspapers, Inc., Landmark Community Publications,
> Inc., their past, *present,* and future agents, employees, directors,
> officers, shareholders, *affiliates*, insurers, reinsurers, *affiliated
> corporations or other entities*, successors in interest, and newspapers
> (included but not limited to the newspapers referred to as Evergreen
> Newspapers) (referred to herein collectively as "LCNI").

Apt. App. at 18 (emphasis added).  As to the "reasons for agreement," the

severance agreement stated Mr. Puls "separated from his employment with LCNI,

effective, August 26, 2005," and the parties "wish[ed] to resolve all issues related

to his employment and termination."  *Id*. at 18 (¶¶ A-1, A-2).  Mr. Puls agreed

"he had been finally and permanently separated from employment with LCNI ...."

*Id*. at 18 (¶ A-4).  The parties also agreed LCNI would pay Mr. Puls $8,250

severance pay and Mr. Puls would withdraw any claim or charge with the Equal

Employment Opportunity Commission or any other administrative agency.  With

regard to work references for Mr. Puls, the agreement stated:  "LCNI and

Evergreen Newspapers will give Puls a neutral reference."  *Id*. at 18 (¶ B-3).

LCNI representatives generally limit a "neutral reference" to the dates of

employment, position, and location at the time of employment with Landmark.


In January 2006, following his termination, Mr. Puls accepted a position

with "Colorado Parent," a publication of United Parenting Publications, which at

that time was a division of Trader.[3]  During his interviews with Trader representatives, Mr. Puls did not tell them LCNI terminated or discharged him or that he entered into a severance agreement; instead, he advised them he "separated" from Evergreen Newspapers due to his disagreement with management.

Before Mr. Puls started his new job with Trader, LCNI representatives learned he had applied for a position with Trader.  Kim Hogan, the human resources director for LCNI, contacted Sunny Sonner, the executive vice president of human resources for Trader, and also had a conversation with Susan Blake, an attorney and regional human resources director for Trader.  Ms. Hogan informed them of Mr. Puls's discharge and his ineligibility for rehire under the severance agreement; she also told Ms. Sonner that Mr. Puls made decisions which LCNI disagreed with and considered unethical.  Trader then withdrew its offer of employment to Mr. Puls.[4]

_____

[3]  In September 2006, after the instant dispute arose, "Colorado Parent" became a wholly-owned subsidiary of Landmark.

[4]  During the summary judgment proceedings, the parties disputed the facts supporting the reason for Trader's withdrawal of its offer of employment to Mr. Puls.  Mr. Puls contended it was due generally to LCNI's negative reference from Ms. Hogan stating he had acted unethically.  In turn, LCNI contended the withdrawal of his offer stemmed from:  (1) the severance agreement, which made him ineligible for rehire by an LCNI affiliate such as Trader; and (2) his material misrepresentations to Trader that he had never been discharged from a position
(continued...)

Trader is a jointly-owned Virginia partnership.  The 1991 joint venture agreement forming the partnership lists LTM Company – a Landmark company – and TPI, Inc. – a Cox Communications (Cox) company – as joint venturers, stating each holds a 50% interest in Trader.  The joint venture agreement also refers to both Cox and Landmark as "parent[s]" of the venture.

The joint venture agreement gives the board of directors the power to manage Trader and gives each joint venturer the authority to elect and remove three of the six members of the board of directors; it also states no action can be taken without the vote of at least four of those directors and that a quorum for any board meeting requires four directors.  In addition, each joint venturer has the power, every other year, to select the chairman of Trader's board of directors, who has authority to set the agenda and direct meetings.  At least one board member of each joint venturer is required to serve on each of the board's committees, and one board member of each joint venturer comprises a two-member executive committee, which can act only by unanimous vote.  Under the agreement, either joint venturer can unilaterally remove the chief executive officer (CEO).  The joint venture agreement also provides a paragraph outlining

---

[4](...continued)
and had resigned from LCNI.  The parties make the same allegations on appeal. However, the reasons for Trader's withdrawal of Mr. Puls's employment offer are not dispositive to this appeal.

the limitations on the joint venturers' powers, stating, in part:

> Except for designating and removing Directors ...; removing the CEO
> ...; adopting a plan of liquidation and directing the CEO in winding
> up the affairs of the Venture after the dissolution of the Venture ...;
> and executing certificates and amendments ...; neither Venturer
> acting alone shall, without the consent of the other Venturer, have
> any right or authority, either expressed or implied, to act for or bind
> the Venture.

Apt. App. at 101 (¶ I(1)).

The joint venture agreement defines "affiliate" and "affiliated person," in part, as "any person directly or indirectly Controlling, Controlled by, or under common Control with, the specified Person; [or] any person owning or Controlling ten percent (10%) or more of the outstanding voting securities of the specified Person." *Id.* at 70-71. It also defines "control" as "[t]he possession by any person or related group of persons, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or partnership interests, by contract or otherwise." *Id.* at 73.

## II. Procedural History

On January 23, 2007, Mr. Puls filed his complaint against LCNI, alleging it: (1) breached the terms of the severance agreement by failing to provide a "neutral reference" to Trader; and (2) intentionally interfered with Mr. Puls's at-

will employment contract with Trader by providing a negative reference.
Thereafter, LCNI filed a motion for summary judgment claiming, as it does on
appeal, that no issues of material fact existed because Trader was an affiliate or
affiliated entity of LCNI so that Trader was a party to the severance agreement
and, therefore, LCNI could give a negative employment reference to Trader
without breaching the severance agreement or intentionally interfering with Mr.
Puls's employment contract with Trader.

The district court held a summary judgment hearing on December 17, 2007,
at which time both parties presented argument.  Mr. Puls argued Trader was not
an affiliate of LCNI because Landmark only owned 50% of Trader and therefore
did not have "corporate control" over Trader.  In turn, LCNI argued that under
Colorado statutory law:  (1) Landmark's 50% ownership established it was not a
minority shareholder, but an equal shareholder with Cox; and (2) the joint venture
agreement established Landmark and Cox jointly or commonly controlled Trader
through their representation on the board of directors and rotating selection of the
chairman of the board.

In addressing the parties' arguments at the hearing, the district court
determined:  (1) Mr. Puls had not carried his burden of proving Trader was not an
affiliate of LCNI; (2) the severance agreement was unambiguous with regard to

its reference to affiliates and affiliate entities; and (3) "common control," not "corporate control," was the standard in Colorado for showing the requisite affiliation, which Landmark met in having 50% common control of Trader. Following the hearing, the district court issued an order granting LCNI's motion for summary judgment and stating Mr. Puls had "failed to show sufficient evidentiary support" for his claim LCNI breached the severance agreement because he "failed to show that the communication complained of was not to an affiliate or affiliated entity" of LCNI.  Apt. App. at 263, 289.  For the same reasons, it held Mr. Puls failed to show any support for his tortious intentional interference with a contract claim.

### III.  Appellate Claims and Discussion

Mr. Puls now appeals the district court's grant of summary judgment in favor of LCNI, arguing the district court erred in granting summary judgment. His specific arguments in support of each of his contentions are addressed below. LCNI continues to argue in support of summary judgment.

### A.  Affiliate Issue

Mr. Puls contends Landmark's 50% interest in Trader cannot be construed as a matter of law to establish Trader is an "affiliate" of LCNI under the terms of his severance agreement because "[a] fifty percent owner does not 'control' a

company," a controlling interest requires 51% ownership, and "[b]y general usage, and under Colorado law, an affiliate [must be] controlled by or under common control with the subject entity." Apt. Br. at 12-13. In support of his arguments, Mr. Puls relies on Colo. Rev. Stat. § 7-101-401; *Employment Television Enterprises, LLC v. Barocas,* 100 P.3d 37 (Colo. Ct. App. 2004); and *National Propane Corp. v. Miller*, 18 P.3d 782 (Colo. Ct. App. 2000), as well as other, non-Colorado, cases, Virginia statutory law, and general legal references such as Black's Law Dictionary, American Jurisprudence, and Corpus Juris Secundum.

In response, LCNI makes the same arguments it made before the district court, claiming Landmark's 50% ownership and control, or common control, of Trader establishes Trader's affiliation with LCNI under Colo. Rev. Stat. § 7-101-401. It also relies on the Trader joint venture agreement's definitions to support its contention it is an affiliate of Trader.

In addressing the issue of affiliation, we begin with a discussion of our standard of review, the applicable state law, and the legal principles we apply in interpreting contracts under that state's law. "We review a district court's decision to grant summary judgment de novo, viewing all facts in the light most favorable to the party opposing summary judgment," which in this case is Mr.

Puls. *Grynberg v. Total, S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) (quotation marks and citation omitted), *cert. denied,* 129 S. Ct. 1585 (2009).  We will affirm a grant of summary judgment if no genuine dispute of material fact exists and the prevailing party, which here is LCNI, is entitled to judgment as a matter of law. *Id.* (relying, in part, on Fed. R. Civ. P. 56(c)).  As the nonmoving party, Mr. Puls "may not rest on his pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which he carries the burden of proof." *Travis v. Park City Mun. Corp.*, 565 F.3d 1252, 1258 (10th Cir. 2009) (quotation marks and citation omitted).

"Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption" but also address the other state law and legal principles on which Mr. Puls relies to support his position. *Grynberg*, 538 F.3d at 1346 (relying on *St. Anthony Hosp. v. U.S. Dep't of Health & Human Servs.*, 309 F.3d 680, 703 (10th Cir. 2002)).  "We review de novo a district court's application of state law to interpret a contract." *Deer Crest Assoc. I v. Avalon Deer Valley, LLC*, 566 F.3d 1246, 1248 (10th Cir. 2009).

In setting out the legal principles we apply in interpreting contracts under Colorado law, we rely primarily on our decision in *Level 3 Communications, LLC v. Liebert Corp.*, 535 F.3d 1146 (10th Cir. 2008).  As we stated in that decision,

"[u]nder Colorado law, contracts 'should be interpreted consistently with the well-established principles of contractual interpretation.'" *Id.* at 1154 (quoting *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002)). "Courts 'must examine contractual terms and attempt to determine the intent of the parties.'" *Id.* (quoting *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 973 (Colo. 2005)). "What courts are after is the parties' mutual intent." *Id.* (relying on *Pepcol Mfg. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984)). "Absent an indication the parties chose to deviate from the plain meaning, 'the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used.'" *Id.* (quoting *East Ridge*, 109 P.3d at 974). "In other words, common usage prevails, and 'strained constructions should be avoided.'" *Id.* (quoting *Allstate*, 52 P.3d at 819).

Under Colorado law, "[w]hen a contractual provision unambiguously resolves the parties' dispute, the interpreting court's task is over" because "'in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence.'" *Id.* (quoting *Pepcol*, 687 P.2d at 1314). However, when an ambiguity exists, the meaning of a provision or term is generally an issue of fact which may be determined by extrinsic evidence pertinent to the transaction, including the parties' conduct under the agreement and their conduct before the controversy

-12-

arose. *See id.* at 1154-55 (relying on *East Ridge*, 109 P.3d at 974-75, and *Pepcol*, 687 P.2d at 1314). "'[A] contract is ambiguous only if it is fairly susceptible to more than one interpretation.'" *Id.* at 1155 (quoting *East Ridge*, 109 P.3d at 974). "[W]hether 'a written contract is ambiguous is a question of law,'" and the fact the parties disagree about the meaning of its terms is not enough to establish ambiguity. *Id.* (quoting *East Ridge*, 109 P.3d at 974).

In this case, the severance agreement executed between Mr. Puls and LCNI defines LCNI to include its past or present "affiliates" and "affiliated corporations or other entities." Apt. App. at 18. While the parties disagree on the meanings of these terms, that alone is not enough to establish their ambiguity. *See id.* In determining the plain and generally accepted meanings of the terms "affiliates" and "affiliated corporations or other entities," both parties ask us to consider the definitions of "affiliate" and "control" provided in Title 7 of the Colorado Revised Statutes on Colorado Business Corporations. Specifically, it defines "affiliate" as "any person that directly or indirectly through one or more intermediaries *controls, or is controlled by, or is under common control* with, the person specified." Colo. Rev. Stat. § 7-101-401(2) (emphasis added). The same statute defines "control" as "the possession, *direct or indirect*, of *the power to direct or cause the direction of the management and policies* of an entity, whether through *the ownership of voting shares, by contract,* or otherwise." Colo. Rev.

Stat. § 7-101-401(9) (emphasis added).  However, it does not specify any definitive percentage of ownership required to establish "control."  *See* § 7-101-401(2), (9).

While § 7-101-401 defines "control," it does not define "common control." "Common" generally means "belonging to, shared by, or applying equally: joint," while "control" generally means "to exercise authority or influence over." *Webster's II New Riverside Univ. Dictionary* 287, 306 (1984 ed.).  It follows, then, that the plain and generally accepted meaning of the term "common control" is the equal or joint exercise of authority or influence over another, or, when incorporated with the definition of "control," under § 7-101-401(9), it means equal or joint "power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting shares, by contract, or otherwise."  Colo. Rev. Stat. § 7-101-401(9).  Nothing about the plain and generally accepted meaning of any of these terms leads us to conclude they are ambiguous or susceptible to more than one interpretation.

Applying these general meanings, it is clear Landmark had power, or at least equal or joint power, to direct or cause the direction of the management and policies of Trader through its:  (1) ownership of Trader voting shares; and (2) the joint venture agreement which outlined what powers it possessed.  With regard to

-14-

ownership shares, Landmark owned 50% of those shares, while Cox owned the

other 50%, so that neither was a minority shareholder and, instead, each was an

equal or joint shareholder.  In addition, each retained the same powers outlined in

the joint venture agreement, under which either had the authority to elect and

remove the three members it appointed to the six-member board of directors.

Because no action could be taken without the vote of at least four of the directors,

it is clear at least one of the three Landmark-selected directors had to vote for an

action before it could be taken.  Similarly, Landmark had voting power on the

board of directors to stop any action of which it disapproved.  Similarly, at least

one of the three Landmark-selected directors had to be present to form a quorum

for board meetings.  In addition, every other year Landmark appointed the

chairman of Trader's board of directors, who had the power to set the agenda and

direct meetings, and Landmark also had the unilateral power to remove Trader's

CEO.  Under the joint venture agreement terms, Landmark also had at least one

board member serving on each of the board's committees and always had one

board member on Trader's two-member executive committee, which could only

act by unanimous vote.

Thus, we hold Landmark had power, or joint or equal power, to "direct or

cause the direction of the management and policies" of Trader, thereby

establishing its "control," or "common control," over Trader.  Given Landmark

also controlled LCNI through 100% ownership of its shares, it follows it commonly controlled LCNI and Trader, making them "affiliates," as defined by Colo. Rev. Stat. § 7-101-401(2).

Mr. Puls's contrary arguments are unpersuasive and discussion of them only assists in bolstering our conclusion LCNI and Trader are affiliates as defined under the severance agreement. First, he suggests that as a matter of law "control" under Colorado law must mean more than 50% ownership of a company. However, we note several other Colorado statutes use definitions similar to those in § 7-101-401 and none suggest an entity must own more than 50% of a company to constitute "control." For instance, in defining an "affiliate" or a "related person" of an organization, they all state that it means a person directly or indirectly controlling, controlled by, or under "common control" with the specific person.[5] Of these statutes, only three define "control" in terms of a percentage of ownership or voting interests. Section 10-3-801(3), regarding the regulation of insurance companies and their holding companies, defines "control" similarly to the statute at issue, § 7-101-401(9), but goes further, stating "control"

---

[5] *See* Colo. Rev. Stat. § 4-9-102(63) (regarding secured transactions); § 5-1-301(34)(b) (regarding the Consumer Credit Code); § 10-3-801(1), (3) (regarding regulation of insurance companies and their holding company systems); § 11-101-401(3.5), (23)(c)(i) (regarding financial institutions); § 24-65.5-102(1.5) (regarding notification of surface development); § 38-33.3-103(1) (regarding real property interests and the Colorado Common Interest Ownership Act); § 39-1-102(5.5)(c)(A)-(B) (regarding property tax).

exists if a person owns or holds *"ten percent or more of the voting securities of any other person."* (Emphasis added.) Another statute, § 11-101-401, on financial institutions, defines "control" as owning or controlling *"twenty-five percent or more of the voting securities* of the banking institution." (Emphasis added.) One more statute, § 38-33.3-103(1), on real property interests, defines "control" as one who owns or controls *"more than twenty percent of the voting interests ... or has contributed more than twenty percent of the capital ...."* (Emphasis added.) Thus, only three Colorado statutes explicitly use a definitive percentage of interest or ownership for the purpose of determining what constitutes "control" when determining affiliation, and these percentages are well below the 50% ownership Landmark possessed. As a result, we are not persuaded by Mr. Puls's general implication that "as a matter of law," under Colorado law, "control" must mean more than Landmark's 50% ownership.

Turning from the statutory definitions of "affiliate" and "control," Mr. Puls directs us to the only Colorado case discussing "common control," under § 7-101-401(2). In *National Propane*, the Colorado Court of Appeals applied the term "common control," as referenced in § 7-101-401(2), in determining whether two companies were affiliates for the purpose of enforcing a non-compete contract. 18 P.3d at 784-86. Without detailed discussion, it found that because the two companies at issue, National Propane, L.P. and National Propane SGP, Inc., were

-17-

"under the common control" of National Propane Corp., they were "affiliates under the plain meaning of that term as it is applied to corporations ...." *Id.* at 786. However, because the court does not discuss why those entities were considered under the "common control" of National Propane Corp., as defined by the statute, the case is not useful for our analysis, other than to demonstrate that if two entities are under the "common control" of another corporation, as were LCNI and Trader, they are considered affiliates under the statute. *Id.*

Mr. Puls also directs us to the Colorado case, *Barocas,* to support his claim that corporate control requires 51% ownership. In that case, the purchase agreement in dispute allowed the seller to operate its business only where Media News Group owned a "controlling interest" in a newspaper. *See Barocas*, 100 P.3d at 41. In defining "controlling interest," the court relied on Black's Law Dictionary, which defines it as being "a greater-than-50% ownership in an enterprise." *Id.* at 47; *Black's Law Dictionary* 816 (8th ed. 2004). But, unlike *Barocas*, in this case we are defining the term "affiliate" as used in the separation agreement. As defined by § 7-101-401(2) and (9), an "affiliate" is not determined by "controlling interest," but "control" or "common control," neither of which depends on 51% ownership.

While Mr. Puls states "the law as to what constitutes an affiliate varies

-18-

widely, and depends on the jurisdiction and purpose for which it is being

evaluated," he nevertheless goes to sources beyond Colorado law to define

"control" and "common control."  Apt. Br. at 15.  In so doing, he relies on Am.

Jur.2d *Securities Regulation–Federal* § 8 for the general proposition:

> [O]wnership of a substantial block of a corporation's stock, but less
> than the majority interest, will not necessarily, in itself, make a
> shareholder a controlling person, it being readily apparent that even
> ownership of 49 percent of the corporation's stock would not
> constitute control where the remaining 51 percent is in the hands of
> persons antagonistic to the 49 percent shareholder.

Apt. Br. at 13.  However, this proposition is a general, but not determinative,

statement, and, in any event, Landmark owned 50%, not 49%, interest in Trader,

and had voting power on the board of directors to stop any action of which it

disapproved.  Moreover, the American Jurisprudence section on which Mr. Puls

relies deals with federal securities and secured transactions under federal

statutory law, while Colorado has its own statutory law dealing with secured

transactions.  The Colorado Uniform Commercial Code, dealing with secured

transactions does not base "control" on any explicit majority percentage of

ownership, as compared with the American Jurisprudence reference.  *See* Colo.

Rev. Stat. § 4-9-102(63)(A).


Another unpersuasive legal reference on which Mr. Puls relies is 47B C.J.S.

*Internal Revenue* § 639, which he states requires "a more stringent 80% voting

power control standard in the context of affiliated companies qualifying to file

consolidated versus separate tax returns."  Apt. Br. at 13.  However, this

reference applies to federal taxation under the applicable federal statutory

taxation scheme.  Instead, Colorado has its own statutory tax structure under

which it defines "control" similarly to the statute at issue here, but, unlike Mr.

Puls's reference to Corpus Juris Secundum, it also does not base "control" on any

explicit percentage of voting power.  *See* Colo. Rev. Stat. § 39-1-102(5.5)(c)(A)-

(B).


Mr. Puls's reliance on non-Colorado cases is also not particularly helpful.

Each case to which he cites merely uses the Black's Law Dictionary general

definition of "affiliate" to determine whether two entities are affiliates, without

any in-depth discussion to further assist us.  *See Cold Stone Creamery, Inc. v.*

*Lenora Foods, LLC*, 2007 WL 4336064, at *2 (N.D. Fla. Dec. 8, 2007)

(unpublished op.) (concluding two limited liability companies owned by the same

person were affiliates); *Kanoff v. Better Life Renting Corp.*, 2008 WL 442145, at

*4 (D.N.J. Feb. 14, 2008) (determining two companies owned by the same person

were affiliates by virtue of his ownership) (slip op.); *Churchville v. GACS, Inc.*,

973 So.2d 1212, 1215 (Fla. App. 1 Dist. 2008) (holding where corporation held

100% stock of one company and 80% stock of another company, both companies

were affiliates).  Black's Law Dictionary, to which Mr. Puls also directs us,

-20-

simply defines "affiliate" as one who controls, is controlled by, or is under the common control of another, which is similar to the definition in § 7-101-410(2). *See Black's Law Dictionary* 64 (8th ed. 2004).

Mr. Puls also relies on the Virginia Stock Corporation Act, Va. Code Ann. § 13.1-725, to support his position Landmark did not possess the requisite control of Trader. Presumably, he relies on Virginia law because: Landmark Community Newspapers, Inc., which is explicitly referenced as part of LCNI in the severance agreement, is a Virginia corporation; Landmark is a Virginia corporation; and Trader, at the time in question, was a Virginia partnership. However, the Virginia statute on which he relies, Va. Code Ann. § 13.1-725, defines both "affiliate" and "control" almost identically to its Colorado counterpart. *Compare* Va. Code Ann. § 13.1-725 *with* Colo. Rev. Stat. § 7-101-401(2) and (9). However, the Virginia statute goes further, stating that "the beneficial *ownership of 10 percent or more of a corporation's voting shares* shall be deemed to constitute control." Va. Code Ann. § 13.1-725 (emphasis added). This language almost exactly mirrors the definitions of "affiliate" and "control" in the joint venture agreement, which LCNI asks us to consider in determining whether it is an affiliate of Trader. As a result, even if we relied on Va. Code Ann. § 13.1-725, as urged by Mr. Puls, or the joint venture agreement's definitions, as urged by LCNI, it would only lead us to the same conclusion; i.e., Landmark possessed the requisite control over Trader

for the purpose of making Trader an affiliate of LCNI.

In addition to asserting LCNI is not entitled to summary judgment as a matter of law, Mr. Puls also asks us to rely on extrinsic evidence that shows they "did not intend all enterprises associated with Landmark Communications to be parties to the Agreement." Apt. Br. at 16-17. The conduct Mr. Puls suggests we consider includes: (1) the fact he applied to Trader for a job, which he claims establishes he did not consider it an affiliate; (2) Ms. Hogan's admission she did not consult the severance agreement before making her statements to Trader representatives; which he contends shows she ignored the terms of the agreement; and (3) LCNI's attorneys' claims to his counsel that Mr. Puls disparaged LCNI to Trader during his application process, which he asserts evidences their belief he published a negative statement to Trader as a third party, and not as an affiliate.[6]

Having determined LCNI is entitled to summary judgment as a matter of law, we are not otherwise persuaded by Mr. Puls's argument. Even if we consider

_____

[6] The record establishes that shortly after Trader rescinded its offer of employment, Mr. Puls, through his attorney, contacted LCNI, claiming it had breached the severance agreement by providing a negative reference. In turn, counsel for LCNI responded, contending Trader was an affiliate of LCNI, which allowed LCNI to give a non-neutral reference to Trader, and also contending that Mr. Puls himself violated the severance agreement when he disparaged LCNI to Trader.

this extrinsic evidence for the purpose of showing the parties' intent as to the meaning of the word "affiliate," our determination that Trader and LCNI are affiliates would not change.  First, the attorneys to which Mr. Puls refers were not parties to the severance agreement, and their communication regarding Mr. Puls's disparaging remarks about LCNI to Trader is clearly conduct after a controversy arose so it fails to qualify as permissible extrinsic evidence for the purpose of clarifying any alleged ambiguity in the severance agreement or the intent of the actual parties to the severance contract.  Next, Ms. Hogan's admission she did not consult the severance agreement before making her statements to Trader representatives is not dispositive to this appeal, and, in any event, it is clear from the record she contacted Trader representatives because she and other LCNI and Trader representatives and employees considered Trader an affiliate of LCNI at the time she learned of Mr. Puls's possible employment with Trader, regardless of whether she looked at the agreement before contacting them.

Finally, the record establishes LCNI referenced Trader in its human resources and training materials, including:  (1) its human resources brochure; (2) an orientation video for new employees which Mr. Puls viewed on his first day of employment; and (3) a leadership seminar which Mr. Puls attended.  As a result, Mr. Puls knew, or should have known, some connection existed between LCNI and Trader.  Thus, we conclude his self-serving statement that he applied to

Trader is insufficient, by itself, to establish the parties' "mutual intent" that the term "affiliate" was not meant to include Trader at the time they executed the severance agreement using that term, especially given LCNI and Trader employees already considered Trader an affiliate of LCNI at the time the parties executed the severance contract.

For these reasons, we conclude LCNI is entitled to judgment as a matter of law on the issue of whether LCNI and Trader are affiliates under the severance agreement at issue in this appeal.  Moreover, even if we considered the extrinsic evidence on which Mr. Puls relies, viewing it in the light most favorable to him as the nonmoving party, he has not overcome his burden of showing a genuine issue of material fact exists as to those dispositive matters for which he carries the burden of proof.

### B.  Negative Reference

Mr. Puls argues that even if Trader was an affiliate of LCNI, the severance agreement still prevented LCNI from providing Trader with a negative employment reference about Mr. Puls or was at least ambiguous as to such a reference.  In making this argument, Mr. Puls relies on the provision in the severance agreement stating "LCNI and Evergreen Newspapers will give Puls a neutral reference," which he claims prevented LCNI from giving a negative

reference to any entity, including itself, internally, or Trader, as an affiliate.  In turn, LCNI argues no breach of contract or intentional interference of a contract could occur, even if LCNI gave Trader a negative reference, because Trader is a party to the contract and the "neutral reference" provision was intended to apply only to third parties.

As before, we look to Colorado contract law.  As previously noted, under Colorado law we examine the contract terms and attempt to determine the mutual intent of the parties.  *See Level 3 Commc'ns*, 535 F.3d at 1154.  In the absence of an ambiguity, a written contract cannot be varied by extrinsic evidence, *see id*. at 1154-55, but if an ambiguity exists, the mutual intent of the parties at the time of contracting must be determined by extrinsic evidence, *see Travelers Indem. Co. v. Howard Elec. Co.*, 879 P.2d 431, 434-35 (Colo. Ct. App. 1994).  "In determining the parties' mutual intent, the court should consider the contract's subject matter and the purposes and objects it purports to accomplish," and "[i]n making this evaluation, the circumstances surrounding the creation of the contract may also be considered."  *Bd. of County Comm'rs v. City & County of Denver*, 40 P.3d 25, 29 (Colo. Ct. App. 2001).  As previously discussed, we may also consider the parties' conduct under the agreement and their conduct before the controversy arose.  *See Level 3 Commc'ns*, 535 F.3d at 1154-55.

In this case, the record establishes the parties to the severance agreement were Mr. Puls and "Landmark Community Newspapers, Inc., Landmark Community Publications, Inc., their past, *present,* and future agents, employees, directors, officers, shareholders, *affiliates*, insurers, reinsurers, *affiliated corporations or other entities*, successors in interest, and newspapers (included but not limited to the newspapers referred to as Evergreen Newspapers) (referred to herein collectively as 'LCNI.'"  Apt. App. at 18 (emphasis added).  As a result, it is clear Trader, as an affiliate at the time in question, was a party to the severance agreement and was included in the severance agreement's collective reference to LCNI.  Accordingly, the term "LCNI" in the "neutral reference" provision included Trader.  Thus, it seems rudimentary that any communications by LCNI representatives to Trader representatives regarding an employment reference about Mr. Puls were made to the same party under the agreement and not a third party.  Under such circumstances, no breach of contract could occur, regardless of whether LCNI gave Trader a negative employment reference about Mr. Puls.  In addition, for intentional interference with a contract to occur under Colorado law, "there must be a showing of improper and intentional interference by the defendant that prevents the formation of a contract between the plaintiff *and a third party*."  *MDM Group Assoc. v. CX Reinsurance Co.*, 165 P.3d 882, 886 (Colo. Ct. App. 2007) (emphasis added).  Here, arguably, no third party was involved in the negative reference of which Mr. Puls complains because Trader

was a party to the severance agreement containing the "neutral reference"
provision.

To the extent an ambiguity still exists, we turn to Mr. Puls's argument that
the "neutral reference" provision nevertheless applied internally to LCNI,
including its affiliates, because it does not explicitly indicate to whom the neutral
reference must be given.  In determining to whom this provision applied, it is
undisputed LCNI fired Mr. Puls from its employment and that the firing was
contentious, resulting in their entering into the severance agreement for the
purpose of avoiding future litigation.  LCNI does not contend, nor has Mr. Puls
shown, that after LCNI fired Mr. Puls, and at the time it executed the severance
agreement, it intended to rehire him.  Instead, the severance agreement states Mr.
Puls was finally and permanently separated from "LCNI['s]" employment, which,
by the terms of the agreement, included Trader in its reference to "LCNI."  Given
Mr. Puls was permanently separated from both LCNI and Trader under the
contract terms, it is evident, as LCNI contends, that it did not intend to have the
"neutral reference" provision apply to it or any of its affiliates after it fired Mr.
Puls.

As to Mr. Puls's intent, he admitted in his pleadings before the district
court that when executing the severance agreement, he did not intend to reapply

for employment with LCNI or intend for the "neutral reference" provision to apply to LCNI or "LCNI itself and its community newspapers," making his appellate contention that the "neutral reference" provision was intended to apply to all prospective employers, including LCNI, extremely self-serving.  As a consequence, even if we viewed extrinsic evidence to ascertain the parties' mutual intent as to the "neutral reference" provision (i.e., the circumstances surrounding the contract's creation and the parties' intention Mr. Puls would not work for "LCNI" after his firing), such evidence, together with the agreement's permanent separation provision, indicates a mutual intent for the "neutral reference" provision not to apply to LCNI or Trader, as an affiliate.  In other words, while neither Trader nor LCNI could give a negative reference to a third party under that provision, it did not prevent them from providing a negative reference to each other.

In making this determination, we recognize Mr. Puls made an averment in support of his district court pleadings that he intended the "neutral reference" provision to apply to other companies "even if owned in part by Landmark," although he admitted he did not know what those companies were.[7]  But, as

---

[7]  While Mr. Puls contends on appeal he rejected LCNI's first two drafts of the severance agreement because they did not include a "neutral reference" provision, the record establishes both prior drafts included such a provision. Similarly, Mr. Puls suggests that the fact he insisted the first two drafts of the

<span style="float:right">(continued...)</span>

previously recognized, Mr. Puls knew, or should have known, some connection between Trader and LCNI existed, given LCNI's human resources and training materials repeatedly referenced Trader. We also recognize Mr. Puls's averment that he did not intend the "neutral reference" provision to include Landmark companies illustrates only his intent, not the parties' mutual intent, and is a statement made during litigation, so it does not fully demonstrate the circumstances surrounding the creation of the severance agreement or conduct under the agreement before the controversy began.

For these reasons, we conclude LCNI is entitled to summary judgment as a matter of law on the issue concerning the "negative reference" provision and the breach of contract and intentional interference with contract claims. Moreover, even when viewing the extrinsic evidence in determining the parties' intent with respect to the "neutral reference" provision, Mr. Puls has not overcome his burden of showing a genuine issue of material fact exists.

---

[7](...continued)
agreement be changed, from stating he "was terminated" or "is terminating" from LCNI to stating he "separated" from LCNI, support his contention that the "neutral reference" provision was intended to apply to LCNI and its affiliates. However, our view of this conduct does not materially demonstrate the parties' intent as to that provision, but only implies that when the neutral reference was given to a third party, LCNI could not state they fired or terminated him from employment.

IV.  Conclusion

For the foregoing reasons, we **AFFIRM** the district court's grant of

summary judgment in favor of LCNI.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge

-30-

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker                 July 07, 2009                    Douglas E. Cressler
Clerk of Court                                                        Chief Deputy Clerk


Bruce G. Smith
Darling, Bergstrom & Milligan, Pc
1515 Arapahoe Street
Tower 1, # 530
Denver, Colorado
U.S.A.


**RE:     08-1263, Puls, Jr. v. Landmark Community Newspaper, et al**
          Dist/Ag docket: 1:07-CV-00170-RPM-CBS

Dear Counsel:

Enclosed is a copy of the order and judgment.

Please contact this office if you have questions.

                                        Sincerely,

                                        *Elisabeth A. Shumaker*

                                        Elisabeth A. Shumaker
                                        Clerk of the Court


cc:     William M. Furr
        Barbara Grandjean
        Elizabeth L. Harris


EAS/sds